**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **Vs.** | **:** | **Cr. No. 06-0042ML** |
| **NEIL STIERHOFF** | **:** | |

**MOTION TO SUPPRESS EVIDENCE**

Now comes the defendant in the above-entitled matter and hereby moves this Honorable Court to Suppress all evidence seized pursuant to a purported consent search on or about April 12-13, 2002.

In support of this Motion your defendant avers that said search was conducted without valid consent, was the subject of coercion, was obtained in violation of applicable law and that said search exceeded the scope of the consent purportedly given. Finally, Defendant contends that the search for evidence related to the State misdemeanor stalking charge was a pretext to search for financial documents for a federal tax investigation.

Additionally, the fruits of the alleged consent search were used by the Government as a basis of probable cause in its application for a court authorized search warrant. Defendant submits that as this evidence constitutes "fruit of the poisonous tree", *See, Mapp v. Ohio, 367 U.S. 643 (1961); Wong Sun v. U.S., 371 U.S. 471 (1963)*, the results of the search warrant should likewise be excluded.

In further support of this Motion, your defendant relies upon the reasoning as set forth in the attached Memorandum of Law.

Wherefore, your defendant prays that this Court will grant his Motion to Suppress Evidence.

**Neil Stierhoff,**
**By his attorney,**

**/s/Scott A. Lutes**
Scott A. Lutes, R.I. Bar #3502
127 Dorrance Street, 2nd Floor

Providence, RI 02903
Telephone: (401) 861-1142
Facsimile: (401) 490-3207

**CERTIFICATION**

I hereby certify that I caused to be served, by electronic communication, CM/ECF, a true and accurate copy of the within Motion to Suppress to Stephanie S. Browne, AUSA, stephanie.browne@usdoj.gov, Thomas G. Voracek, thomas.g.voracek@usdoj.gov, and by regular mail, postage prepaid to John N. Kane, AUSA, U.S. Department of Justice,Tax Division, 601D Street, N.W., Washington, D.C. 20530, on this the ___ day of October, 2006.

/s/Scott A. Lutes

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| **vs.** | ) | **Cr. No. 06-0042ML** |
| **NEIL STIERHOFF** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION**
**TO SUPPRESS TANGIBLE EVIDENCE**

**Introduction:**

Neil Stierhoff has moved to suppress the fruits of alleged consent searches of his room, computer, automobile and three self storage units. The fruits of these "consent searches" form the factual basis for the government's Affidavit in Support of Search Warrant of his computer. Additionally, the fruits of these searches form the bulk of the evidence to be offered against Mr. Stierhoff at trial.

The legal basis for the suppression request is premised upon three grounds. First, the "consent" was not given freely, knowingly and voluntarily. Additionally, the "Consent to Search" form is defective on its face. Second, even if the Court were to uphold the consent searches as being valid, the searches exceeded the scope of the consent given. Third, the search was a pretext for an otherwise unlawful search of Defendant's financial records.

**Factual background:**

This case arose out of a misdemeanor stalking investigation by the Rhode Island State Police in April 2002.

In March, 2001, Neil Stierhoff went to the Staples office supply store in South Attleboro, Massachusetts to purchase some items. The cashier, Julie Labossiere, caught

his eye. Approximately one week later, he went back to the store, complimented her on her eyes and gave her a Harp greeting card with a poem in it. Ms. Labossiere accepted the card.

Approximately one week later, defendant returned to the store but Ms. Labossiere left the register, went into the back room and there was no contact between them.

A week after that, in the Staples store, defendant gave her another card and poem.

On the next occasion, defendant went to the store, but was told to leave by the store manager.

Defendant subsequently sent a compact disc with some songs and a couple of poems to Ms. Labossiere's home address in Providence, Rhode Island.

Approximately a week later there Mr. Stierhoff went to Staples, handed Ms. Labossiere a poem and a digital compact disc of a movie.

Ms. Labossiere was temporarily transferred to another store.

The following week when defendant entered the store, he was told by the store manager that he was bothering the woman and to leave her alone. The store manager obtained the license plate and registration of the vehicle defendant was driving when he left.

Defendant then called Ms. Labossiere's home and left a message apologizing for bothering her.

Almost a year later, Ms. Labossiere was attending Rhode Island College. Mr. Stierhoff began leaving poems on her car in the school parking lot.

The Rhode Island State Police were contacted. Ms. Labossiere's uncle is a lieutenant in the Rhode Island State Police.

On or about April 5, 2002, the R.I. State Police began conducting surveillance upon the defendant.[1] The State Police conducted a background check upon Mr. Stierhoff. He was negative for any criminal record in Triple I, BCI, NCIC, and local files. Several federal checks were conducted which were negative for criminal activity or contact. A computer search of his name and social security number were conducted on Faces of the nation and Infotech which revealed no other information other than the New York address. State Police also contacted local, state and federal tax officials for information on Neil Stierhoff with negative results.

During local checks, detectives obtained an East Providence police report which listed Mr. Stierhoff involved in a civil dispute in 1999 at Shelby Self-Storage in East Providence. The owner of the self-storage company identified Mr. Stierhoff as the current renter of three self-storage units.

On the evening of April 5, 2002, police were watching Shelby Self-Storage when Mr. Stierhoff drove up in a green Dodge Caravan. After a 15 minute stay at the facility, he was followed to the Corliss Street Post Office in Providence. From there the defendant was ultimately followed to the Rhode Island College parking lot. Mr. Stierhoff was seen stopped momentarily in front of Ms. Labossiere's vehicle. From there he drove off and was followed to a home at 25 Hollywood Road, Providence. Surveillance was concluded for the night.

April 6th and 7th the green Caravan was observed parked at 25 Hollywood Road. A check with the Providence Tax Assessor's Office revealed the owner of 25 Hollywood Road to be Jelsy A. Adan. No record of Neil Stierhoff was found in the Tax Assessor's

---

[1] The State Police had ascertained defendant's identity through a registration check of the vehicle which he had rented from Bald Hill Dodge. They also obtained his date of birth,, New York address, license number and social security number from this source.

Office, nor with the Rhode Island Department of Vital Statistics. Detectives checked Mr. Stierhoff's social security number with the Rhode Island Department of Taxation, which proved negative for any information.

On April 8, 2002, surveillance was conducted at 25 Hollywood Road, Shelby Self-Storage and the Rhode Island College Webber Hall dormitory parking lot.[2] Defendant was followed driving from 25 Hollywood Road to the Rhode Island College parking lot where it stopped for 10-15 seconds in front of Ms. Labossiere's vehicle, before returning to 25 Hollywood Road.

On April 12, 2002, the State Police convinced Ms. Labossiere to sit in her vehicle in the Rhode Island College parking lot in an attempt to elicit a response from Mr. Stierhoff. An undercover State Police detective was hidden in the rear seat of Ms. Labossiere's vehicle.

This same evening, Mr. Stierhoff left 25 Hollywood Road and traveled to the Rhode Island College parking lot. Ms. Labossiere was advised to drive out of the parking lot in an attempt to see whether Stierhoff followed. Defendant did follow Ms. Labossiere's vehicle until she ultimately stopped in a Walgreen's parking lot and entered the store.

Mr. Stierhoff was approached by the State Police. According to the police, Mr. Stierhoff was allegedly advised of his Miranda Rights, *then* arrested, as he entered the Walgreen's store. Handcuffed behind his back, he was removed from the store and placed in the rear of a marked police cruiser. At least 10 and perhaps as many as 20

---

[2] Prior to this evening's surveillance, police had been contacted by Bald Hill Dodge to inform them that Stierhoff had returned the green Caravan and had rented a different, white one.

undercover and uniformed police were present in the Walgreen's parking lot at the time of defendant's arrest. A tow truck was on scene to tow his vehicle[3].

Police seized Mr. Stierhoff's wallet which contained his proper identification, a license and several credit cards in his name. Additionally, police found a credit card in the name of Universal Audio Company, and a photo identification card with Stierhoff's picture bearing the name Joseph Adams of Adams Associates, Incorporated.

Police then advised Mr. Stierhoff he had been arrested for bothering Julie Labossiere, but failed to specify a charge. In the back of the cruiser, Stierhoff was told to sign a "Consent to Search" form (See attached Exhibit "A") for 25 Hollywood Road as well as his vehicle. Defendant was taken out of the police car and his handcuffs were switched from behind his back to the front so that he could fill out and sign the "Consent to Search" form.

The "Consent to Search" form is significant due to its lack of date, time, or place information. Additionally, defendant while still handcuffed in the back of the police cruiser, was told what information to place in the respective boxes of the "Consent to Search" form. This is evidenced by the fact that despite the fact that defendant did not know the names of the police officers who were talking to him, the line which purports to authorize members of the R.I. State Police is filled in as "Det. Palmersanzi". In fact, there were two police detectives in the car with defendant, Detective David Palmer and Detective Timothy Sanzi. It should be noted that nowhere on the form, which is written half in English, half in Spanish, is there any indication what crime Mr. Stierhoff is under suspicion of, or what the object of the search was.

---

[3] Defendant allegedly signed a consent to search his vehicle. The search of the van is not discussed here since nothing incriminating was seized.

Finally, the form is incomprehensible because it authorizes "Det Palmersanzi of the R I State Police Department *to conduct a complete* of my premises and/or vehicle described as: 25 Hollywood Rd. Prov. R.I. 2nd fl. Rm. Vec.YX600." The printed form omits the word, "search", but authorizes "Det Palmersanzi of the RI State Police Police Department to *conduct a complete of my premises and/or vehicle*".

At approximately 11:30 p.m., Stierhoff was driven to 25 Hollywood Road, Providence. Numerous members of the Rhode Island State Police entered the house and went to the second floor room. Detectives David Palmer, Detective Timothy Sanzi and Detective John Killian of the Rhode Island State Police Computer Crimes Unit conducted the search subsequent to the defendant's arrest for an as yet, unspecified charge.

Still handcuffed, Stierhoff was placed on a bed while the room was searched.

Police seized numerous financial records including several Fleet Bank account statements for Account #0413760790 bearing the name Joseph Adams of 25 Hollywood Road, Providence. Police seized several checks made out to Joseph Adams as well as other documents bearing the name and in some cases, the signature of Joseph Adams, Adams Associates, P.O. Box 712, Providence, Rhode Island. Police seized a package of Harp Workshop greeting cards which were blank on the inside. While looking through the room, police located a briefcase, which they opened, containing several manila envelopes containing money. They also found a large sum of cash in a desk drawer. Though Defendant denies making the statements, the police narrative says that Stierhoff, during the execution of the search, said that he doesn't trust banks; that the money in his

room was from his business ventures and that he never pays *State or Federal income taxes*.

The computer in the room was unplugged and removed by the police without inspection. Defendant allegedly told the police the poems he sent to Ms. Labossiere were written on the computer in the room. Defendant allegedly told the police they were in the "My Files, Creative Writing" directory located on "D: Drive". Though Detective Killian the R.I. State Police computer expert was present, the computer was never turned on or examined on scene. It was simply unplugged and taken away by Detective Killian. According to the police narrative, "due to the high tech capability" of the computer it was necessary to take the computer and its hard drives to be "processed by a *Federal agency* for evidence, and Stierhoff agreed".

Two of the other occupants of the home where Stierhoff's room was located were apparently awakened and called the Providence Police to report a breaking and entering. According to the police narrative, the two individuals demanded to know why the police were at the residence. When told of the search in progress the male individual allegedly yelled into the room, "Neil, you can withdraw your consent. Please get them out of the house." According to the police narrative Stierhoff indicated that he did not want to upset these people but that he wanted to "get through with this and leave". Eventually the police concluded their search and took Stierhoff outside.

Once outside the home, Detectives demanded Stierhoff sign a second Consent to Search form to allow a search of his Self-Storage units in East Providence (Exhibit "B"). Sometime after midnight, the police searched three self-storage units. Aside from noting the presence of a large number of electronic equipment, the police seized approximately

eight (8) boxes of financial records, cancelled checks, telephone records, bills and invoices.

After completing the search of the self-storage units, the police took Mr. Stierhoff back to State Police Barracks for processing.

After being processed, Mr. Stierhoff was taken into a room equipped with a tape recorder. Still handcuffed, a witness statement was taken from him beginning at 1:58 in the morning. The Rights Form signed by Mr. Stierhoff indicates a time of 2:00 A.M.. Curiously, the Rights Form is blank in the spot where Mr. Stierhoff's name would normally be inserted and the form is blank in the spot where the signer is apprised of the *crime for which he is a suspect*. The form simply begins, "I, , having been informed that I am a suspect in the crime of ,voluntarily, without threats . . .".(Exhibit "C")

**ARGUMENT**

**There was no valid consent to search**

The Fourth Amendment to the United States Constitution reads:

> The right of the people to be secure in their persons, houses papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A search conducted without a warrant is per se unreasonable. *Coolidge v. New Hampshire*, *403 U.S. 443, 454-5,(1971).* "A warrantless [residential] search violates the Fourth Amendment unless it comes within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. A consensual search is one such

exception. *United States v. Coraine, 198 F.3d 306 (1999), citing, United States v. Forbes, 181 F.3d 1,5 (1st Cir. 1999), quoting, Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).* Because the favored practice is a search pursuant to a warrant, and waivers are disfavored, the government has the burden of proving a valid, voluntary consent by a preponderance of the evidence. *United States v. Griffin, 431 F.Supp. 2d 164,170 (D.Mass 2006), citing, United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006), See also, United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000).*

In the instant case, information obtained by the Rhode Island State Police as a result of an alleged consent search of defendant's room, computer and self-storage units, provides the basis for the government's case. A search warrant for Defendant's computer was issued later by a federal magistrate, but this was only after the federal authorities had already taken possession of computer and had searched its drives and memory at the request of the State Police. If the consent is not valid, it is clear that the results of the search is "fruit of the poisonous tree", *See generally, Wong Sun v. United States, 371 U.S. 407, (1963),* and should be suppressed.

In order to be effective, a person's consent to a search must be freely and voluntarily given. *Coraine at 309, citing United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996).* Whether consent was voluntary or the result of coercion is a question of fact to be determined by the totality of the circumstances. *United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989).* Factors bearing upon this analysis include, but are not limited to age, education, experience, coercion or inherently coercive circumstances, physical and mental condition of the person giving consent, whether the person was under arrest and

whether the person was advised of his right to withhold consent. *Schneckloth, 412 U.S. at 226 and Twomey, 884 F.2d at 51.*

In the case at bar, many factors militate in favor of defendant's argument that his consent was not the product of his knowing and voluntary choice. While Mr. Stierhoff was 47 years old and college educated at the time of his arrest, he had very little life experience that would equip him for this encounter with a dozen armed police officers late at night.

The Defendant had never been arrested before. Thrown into handcuffs, he was either read his read his rights as he was walked to the police car, or when placed in the rear of the cruiser.[4] Meanwhile, there were at least 10 or more armed police officers surrounding him. There were bystanders watching him being arrested. His vehicle was towed from the parking lot almost immediately. It was late at night, almost midnight. He was not asked whether he wanted to speak to police, and he was never asked to sign a Rights Form at this time, the Police immediately began asking him questions once he was put in the police car. Within moments he is taken out of the police car again, handcuffed in front, put back into the car. He was told, "we're going to need a consent" (Sup. Ct. tr. p.31 line 13), or as Sanzi testified in Superior Court in response to questioning:

Q: When did you take him out of the vehicle?

A: Took him out of the vehicle in order to check him if he had anything on him.

Q: You didn't do that after you put handcuffs on and brought him out; you didn't pat him down?

A: I wanted to have a search; I did that in the store;

[4] Detective Sanzi testified in the District Court trial, "I advised him of his Miranda rights and placed him into a State Police vehicle." Tr. p. 16, line 7-8. In Superior Court Sanzi testified that he advised Mr. Stierhoff of his rights "In the car". Tr. p. 90, line 2.

Q: You didn't find anything on him there?

A: His identification.

Q: You found that, but you wanted to do a thorough search saying at this point so you took him back out of the car?

A: Yes sir. ***I also knew we're going to introduce a consent. He was going to have to sign it.***

Q: Going to have to sign right? That is the whole point of this. You wanted him to sign that particular evening, right?

A: ***We wanted to get consent to search, yes.*** (Sup. Ct. tr. pg. 90, line 13 – pg. 91, line 4)

Stierhoff was given a blank Consent to Search form. Sanzi testified he *believes* Detective Palmer filled out the top part of the form[5], Defendant avers that he was directed and told what to put in the blank spaces. Defendant sat in the back seat of the police cruiser, the two officers sat in the front. The dome light in the cruiser was on. The form is half in Spanish, half in English. The hour, date and place lines are blank. The person authorized to conduct the search is identified as one word, "Det Palmersanzi", even though, by all accounts, this signified two officers, Detective David Palmer, and Detective Timothy Sanzi.[6] The document was not read to Defendant, he did not read it himself, he was not asked if he had read it and he was not asked if he had any questions about it. Stierhoff simply filled in the blanks as told to him by the police officers. The

---

[5] Sanzi testified in response to questioning:

Question: You believe it was Det. Palmer that prepared this, is that right?

Answer: To the best of my recollection; if not, it was the defendant. Sup. Ct. tr p. 95, lines 5-8.

[6] Defendant submits the run-on name of "Palmersanzi" instead of two distinct names as well as the fact that Sanzi is not capitalized is additional proof that he filled out the form at State Police direction because he wasn't familiar with the names and asked for the spelling thinking that it was one person's name.

document was "self-explanatory" according to Detective Sanzi. (Sup. Ct. tr. pg. 34, line 7.)

Defendant was told that if he didn't sign the Consent form, the police would obtain a warrant and search the home anyway. Not wanting to disturb the people with whom he lived and from whom he rented a room, and figuring that the police were going to search the home regardless, Stierhoff signed the form. But only after obtaining a concession that the police would not disturb the other people in the house, that they would enter quietly and not wear uniforms. Stierhoff also told the police the specific hard drive and directory the poems were contained on in his computer.

Evidence of the fear Stierhoff was experiencing is demonstrated by a simple comparison of his signature obtained in the back of the cruiser, with his signature three hours later at the station. There is a marked change. The signature in the cruiser is obviously written with a shaky hand, the letters of the name are bunched together (or are missing, as the "i" in Neil appears to be) and is barely legible. Stierhoff's signature at the State Police barracks is written smoothly and all of the letters are identifiable. Defendant was not told what he was being arrested for except that it was for "bothering" that girl. Even three hours later, when Defendant is finally asked to sign a "Rights" form, at the barracks, the space on the form where it indicates the crime of which he is a suspect, is blank.

If the requirement of consent is to be a meaningful one, it cannot be coerced by explicit or implicit means. *United States v. Tibbs, 49 F.Supp.2d 47, citing, Camara v. Municipal Court of the City and County of San Francisco, 387 U.S. 523,528 (1967).* Otherwise, no matter how subtle the coercion was, the resulting "consent" would be "no

more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. *Schneckloth, 412 U.S. at 228.*

As previously stated, voluntariness is measured by the totality of the circumstances. *Schneckloth, 412 U.S. at 249.*

Consent searches have been struck down in similar situations. In *United States v. Tibbs, 49 F.Supp.2d 47*, a "consent" search was struck down because the Court felt that the consent was not voluntary. *Tibbs* involved a situation where the defendant was arrested in a car, some distance away from the apartment he occasionally stayed at with his girlfriend. Nevertheless, the police went back to the apartment without a warrant to ask the girlfriend, Ms. Goode, for consent to search. There were approximately 12 police officers who descended upon the apartment at 10:00 at night. The police made a "protective sweep" of the apartment before asking for consent to search. Ms. Goode had never been in trouble with the law before and felt particularly vulnerable because her son was asleep in the bedroom. The police told her to sign a consent to search form because if she didn't they would obtain a warrant in a short time anyway. Ms. Goode signed the form.

In suppressing the fruits of the search, the Court laid emphasis upon the fact that Ms. Goode was a "newcomer" to the law, since she had never been in trouble before, and that she was particularly vulnerable because she didn't want to traumatize her sleeping child. The court found the circumstances "implicitly coercive – the lateness of the hour, the number of police officers, the vulnerability of the witness. Perhaps, recognizing that the situation was suspect, the police took the time to get a formal written consent, rather

that rely on the eleven or twelve police officers' testimony. By the time they secured her signature on the form, however, it was too little, too late." *Tibbs at 52.*

The *Tibbs* Court was also troubled by the police officer's statement that if Goode didn't sign the consent form he would obtain a warrant, since it was unclear whether probable cause to search even existed. *Id. at 54.* The Court cited *Bumper v. North Carolina*, 391 U.S. 543 (1968) with approval.

In *Bumper*, the United States Supreme Court held that the consent given by the defendant's grandmother to the search of the house was not voluntary, where the grandmother only gave consent because she was falsely told that the sheriff had a search warrant. The *Bumper* Court said, "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. If that is false, whether or not the officers could have obtained a warrant, consent procured as a result is vitiated. *Id. at* .

Likewise in this case, there were 10 police officers on scene when Stierhoff was arrested. It was almost midnight. He had never been in trouble with the law. He was told that if he didn't sign the Consent, a warrant would be obtained and the home searched anyway. Not wanting to disturb the people from whom he rented a room and figuring that it was futile to resist, he signed the Consent form without reading it. Had Stierhoff attempted to read it, he may not have even understood it, since the form was non-sensical in that it read "to conduct a complete of my premises and/or vehicle". What distinguishes Stierhoff's situation and makes the argument for involuntariness even more compelling than the situation in *Tibbs*, is the fact that Stierhoff was sitting in the back seat of a police vehicle when he signed the Consent, whereas the girlfriend in *Tibbs*

was not in custody or under arrest. "When considering whether consent was given for a warrantless search, sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody because consent must be a product of the individual's free and unconstrained choice, rather that a mere acquiescence to a show of authority. *United States v. Griffin, 431 F.Supp.2d 164, 170, citing United States v. Trueber, 238 F.3d 79,95 (1st Cir. 2001), See also, United States v. Weidul, 325 F.3d 50, 54 (1st Cir. 2003)* (consent to search not voluntary though resident said "okay", because police officer's statement that he was going to search laundry room was a claim of lawful authority).

*Griffin* involved a purported consent search of defendant's safe after he had been arrested in his home upon a valid warrant. The consent was found to be invalid partly because the defendant had never been arrested before and he was placed in handcuffs in front of his wife and young son. The police also couched their "request/demand[7] in the same hortatory language that officers use to issue orders that clearly require no consent (the pat down frisk, the handcuffing) the police communicated that Griffin had no reasonable alternative but to acquiesce." *Id. at 172.* The *Griffin* Court held, "While a defendant's custody always warrants a sensitivity to the heightened possibility of coercion, this possibility is magnified in the current situation because of the defendant's unfamiliarity with the criminal justice system, stressful family situation, the presence of three armed officers in his home, and the statements of the officers which amounted to orders, not requests. Given these facts, defendant's actions cannot possibly be viewed as voluntary." *Id.*

---

[7] The language employed was, "You're going to take me to the safe". Then, when defendant, who was handcuffed, went to the safe as directed, he was told, "Give me the combination to the safe".

Similarly, in the case at bar, Stierhoff was handcuffed late at night in the presence of 10 police officers. Detective Sanzi's language to the defendant made it clear that it was necessary that he sign the consent form. The handcuffs were shifted from behind defendant's back to his front *before he was even asked* whether he would give consent because Sanzi knew "I also knew we're going to introduce a consent. He was going to have to sign it." Sup.Ct. tr. pg. 90, lines 24-5.

Defendant's purported consent was not a product of his free will done in a knowing and voluntary manner. It was acquiescence to authority, by a scared individual who had no prior experience with criminal law, late at night, while surrounded by numerous armed police officers who told him that if he didn't sign a Consent, a warrant would be obtained anyway. The facts of this case militate more strongly in favor of suppression than the cases cited above.

With regard to the alleged Consent to Search the storage units the same argument came be made, except the hour is now past midnight. The Defendant is still handcuffed. He was already coerced into signing a Consent to search his room. The people with whom he lives were upset to the point of calling the Providence Police, he is still surrounded by at least 4 State Troopers. Again, he is told that a Search Warrant can be obtained[8]. He gave in to the officers' demand as opposed to freely and voluntarily chose to consent. Clearly, by review of the relevant case law, no voluntary consent was given.

**The Search Exceeded the Scope of Consent**

Even if a consent is found to be voluntary, the government must still prove that its search did not exceed the scope of consent given. *United States v. Marshall, 348 F.2d*

[8] There appears to be no rational argument to be made that would justify the existence of probable cause to believe that any evidence of a misdemeanor stalking charge would be found in the self-storage units, and consequently, little chance that a warrant would issue.

*281, 286 (1st Cir. 2003).* The scope of consent is measured by a test of objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the subject?" *Florida v. Jimeno, 500 U.S. 248, 251 (1991).* Courts therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous statements and actions. *Marshall, 348 F.2d at 286-7, citing United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002).* "We therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999).*

The expressed intent of the police officer's search was to have a look at the computer that had generated the cards and poems to Ms. Labossiere. Mr. Stierhoff allegedly consented to this request, but limited the scope of the search for the poems and cards to the "My Files, Creative Writing Directory" contained on the "D: drive" of the computer. Even though State Police Detective John Killian, a computer expert, was on scene, and even though defendant had allegedly identified the drive and directory that the poems were on, the computer was not examined on scene. Instead, the computer was unplugged, multiple disk drives were seized, and the equipment was sent to the Internal Revenue Service for "forensic audit" in Boston. D.Ct tr. pg.20, lines 12-14 and Sup.Ct. tr. pg 54, lines 18-20. Special Agent James Donahue did not limit his examination of the computer to the "My Files, Creative Writing" directory in "D: drive", he examined the entire computer and associated hard drives. Additionally, police seized invoices, checks, bills, and other documentary evidence unrelated to the misdemeanor stalking charge.

Based upon what seen during the illegal "forensic audit" of the computer, Agent Ferraro of the Internal Revenue Service two weeks later drafted an Affidavit to search the computer and seize evidence in an attempt to cure this deficiency. Based upon what counsel has seen of the evidence to date, none of the required policies of the Internal Revenue Service's Manual regarding the procedure for the issuance of Search Warrants appear to have been followed.

The First Circuit had occasion to rule on the illegality of a computer search after the police had secured a valid consent to search in *United States v. Turner*, *169 F.3d 84 (1st Cir. 1999)*. In *Turner*, the police were called to the apartment of a woman who had been the victim of a nighttime assault. Upon arrival at the scene, police were told by Turner, who lived next door to the woman, that he had called the police when he observed the intruder fleeing the victim's apartment through the window. The next day police noticed the window screen to Turner's apartment ajar and asked for permission to search for evidence of the intruder in the belief that he may have entered Turner's apartment as well. Upon looking in the apartment, police uncovered blood stains and a knife consistent with the one used in the assault, for which Turner could offer no explanation.

The defendant, now a suspect in the assault, signed a Consent to Search form which apparently gave police blanket authority to search the apartment. While searching the apartment, an officer bumped a table containing the defendant's computer. The bump activated the screen of the computer which illuminated a picture of a nude blonde woman in bondage bearing a resemblance to the neighbor who was the victim of the assault. The officer sat at the computer and accessed several files with the suffix .jpg, denoting a file

containing a photograph. The officer opened the files and found similar photos. After the district attorney's office was consulted, the officer copied the files on to a floppy disk and then searched the computer hard drive for other incriminating files. One of the files opened depicted child pornography. The officer shut down the computer and seized it.

The defendant moved to suppress the search as beyond the scope of the consent given. The Government countered that the Consent was so broad, authorizing search of all of the defendant's personal property, that it necessarily encompassed a comprehensive search of his computer files.

The First Circuit did not agree and suppressed the fruits of the alleged consent search because "the consent did not authorize the search of the computer" because "an objectively reasonable person assessing in context the exchange between the defendant and these detectives would have understood that the police intended to search only in places where an intruder hastily might have disposed of any physical evidence of the assault. *United States v. Turner, 169 F.3d at 87.* The *Turner* Court cited to *Jimeno* for the proposition that "the scope of a [consensual] search is generally defined by its *expressed object*". *Id. citing, Jimeno 500 U.S. at 251.* "Government agents may not obtain consent to search on the representation that they intend to look for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." *Id., citing, United States v. Dichiarinte, 445 F.2d 126 (7th Cir. 1971).* "When a purpose is included in the [officer's] request, then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose." *Id. at 88, citing 3 Wayne R.LaFave, Search and Seizure, § 8.1(c) at 620 (3d ed. 1996).*

Moreover, the *Turner* Court rejected the Government's argument that the sexually suggestive image which suddenly came into "plain view" on the computer screen rendered Turner's computer files 'fair game" under a consensual search simply because the neighbor's assault had a sexual component to it. The critical consideration for the Court was the fact that "the detectives never announced, *before Turner gave his consent*, that they were investigating a sexual assault or attempted rape. *Id. at 88.* The Court felt it was not objectively reasonable, even assuming that such computer images could be considered circumstantial evidence of a planned sexual assault, that Turner would have understood that such images were within the "expressed object" of the intended search for evidence of an aggravated assault. *Id.*

Finally, the Government argued that even if the original search was circumscribed, Turner's failure to object to the search of his computer resulted in an expansion of the scope of the authorized search. This too was rejected by the Court since Turner was not present in the room when the computer was being searched therefore he had no meaningful opportunity to object to the search. *Id. at 89.*

Similarly, in the case at bar, Stierhoff may have consented to a search of a particular file identified on a particular hard drive, but an objectively reasonable person viewing the exchange between Stierhoff and the police, and in consideration of the nature of the charge, would not have assumed that a general license to search the entire computer and multiple hard drives had been given. Additionally, in light of the fact that the computer was unplugged and removed from Defendant's presence to be searched elsewhere, effectively gave him no "meaningful opportunity" to object to any expansion of the original consent.

A similar case bears mentioning from the Seventh Circuit Court of Appeals. *United States v. Carey, 172 F.3d 1268 (1999),* involved a defendant arrested for narcotics offenses, who gave a general consent to search his residence after discovery of drug paraphernalia in plain view. During the course of the search, which revealed numerous other items of drug dealing, two computers were seized. The computers were seized and brought to the police station. A warrant to search the computers for "names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances" was obtained.

During the course of the court authorized computer search, JPG files were discovered. The investigating detective testified he was unfamiliar with this type of file and consequently opened it up to see what it contained. The file contained images of child pornography. The detective then contacted his superior officer, who in turn contacted the county attorney's office, who authorized the continuation of the search. The detective temporarily abandoned his search for drug records and downloaded numerous JPG files all containing child pornography. The detective then resumed his search for drug activity.

Carey moved to suppress the images of child pornography as exceeding the scope of the warrant and his original consent to search. He argued that the search "constituted general rummaging around in flagrant disregard for the terms of the warrant and in violation of the Fourth Amendment". *United States v. Carey, 172 F.3d at 1272.*

The Government countered that the "plain view doctrine" authorized the search. *See, Coolidge v.New Hampshire, 403 U.S. 443, 465 (1971),* because the officer was lawfully in a position to view the object seized in plain view; the object's incriminating

nature was immediately apparent, i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and the officer had a lawful right of access to the object itself. *Id.* Moreover, the Government argued that drug traffickers often conceal their activities by deceptive labeling of records, therefore, a search of all of the computer files was authorized.

The Seventh Circuit court disagreed and suppressed the fruits of the search beyond the first file which they determined was discovered inadvertently. *Id. at 1273.* The Court determined that the officer had exceeded his original, court authorized search and that the original consent to search given by Carey did not extend to a search of the computer files.

Similarly, Mr. Stierhoff may have consented to a limited search of a certain directory on a particular disk drive, but he did not give the police carte blanche to do a "forensic audit" of his computer and all associated hard drives. The financial records were in a different format and had nothing to do with anything associated with a misdemeanor stalking charge. There were four hard drives attached to Stierhoff's computer which were all duplicated.

"Since electronic storage is likely to contain a greater quantity and variety of information than any previous storage method, computers make tempting targets in searches for incriminating information." *Id., citing, Raphael Winick, Searches and Seizures of Computers and Computer Data, 8 harv. J.L. & Tech. 75, 104 (1994).* Relying on analogies to closed containers or file cabinets may lead courts to 'oversimplify a complex area of Fourth Amendment doctrines and ignore the realities of massive modern computer storage'. *Id.*

Finally, the seizure of documentary evidence from the defendant's room and self storage units in the form of checks, invoices, bills, etc., had absolutely nothing to do with the misdemeanor charge he was facing, was beyond the scope of the consent given to the police and as such, should be suppressed.

**The Search of Defendant's Room and Storage Units was a Pretexual Search for Financial Records Pursuant to a Federal Investigation**

In order for the Internal Revenue Service to get approval to obtain a warrant in a tax related investigation, there are many requirements that need to be followed. The Internal Revenue Manual spells out the procedure to be followed. Consistent with Internal Revenue Policy, search warrants are only allowed "with restraint and only in significant cases." *Internal Revenue Manual, 38.1.1.3, para. 5, Search Warrant Procedures.* "Special agents are constrained by the requirements of the IRM (Internal Revenue Manual) regarding the tactical choice to use a search warrant, which requires them 'to execute their law enforcement responsibilities by continually assessing . . . the probable impact of their law enforcement activities on the image of the Service." *Id.*

Pursuant to the Internal Revenue Service Manual there is a multiple stage policy of reporting, review and approval before a search warrant can issue in a tax related investigation. This policy requires prior approval of a search warrant by a Criminal Tax attorney. The Criminal Tax Attorney provides written advice outlining how the warrant is consistent with Internal Revenue policy and the recommendations of the Webster Commission. The request is sent to the Special Agent in Charge for consideration. Only if the Special Agent in Charge approves of the search warrant application can the matter

proceed. Only after the Internal Revenue procedures have been complied with is the matter supposed to be forwarded to the U.S. Attorney's Office. This is the procedure for non-sensitive targets. When the target is sensitive, an accountant, an attorney, a physician, a local, state, federal or foreign public official or political candidate, a member of the clergy, a representative of the electronic or printed new media, an official of a labor union, or an official of an organization deemed to be exempt under section 501(c)(3), additional steps and levels of approval must be obtained.

According to the police narratives obtained by counsel to date, it is clear that Detective Sanzi consulted with State and Federal officials prior to the defendant's arrest in an attempt to ascertain his identity. Sanzi states he obtained defendant's social security number and contacted federal, state and local officials. Specifically listed are the Department of Health, Registrar of Vital Statistics, the Rhode Island Division of Taxation, Providence City Tax Assessor's Office, the Rhode Island and Delaware Secretary of State's Offices. He also ran NCIC, Triple I, and BCI, checks, put his name and information through Faces of the Nation and Infotech, issued subpoenas to telephone companies and spoke with Bald Hill Dodge.

Defendant believes that one of the federal officials Detective Sanzi spoke with was an agent of the Internal Revenue Service. Apparently the Internal Revenue Service had no record of Mr. Stierhoff's social security number in its data base. Certainly if this happened, the Internal Revenue agent's curiosity would have been piqued.

Curiously, when Defendant is arrested for a state misdemeanor stalking charge, a Consent to Search is demanded of the Defendant for his home, computer and three self-storage units.

Curiously, all of the evidence seized from the room and storage spaces consisted of financial records, receipts and cancelled checks which bear no rational nexus to a misdemeanor stalking charge. Additionally defendant's computer was of keen interest to the State Police.

Curiously, Detective John Killian, the state police computer expert was on scene around midnight of April 12, 2002, when defendant's room was searched. Purportedly Detective Killian was there for the purpose of lending assistance in retrieving the information that defendant had allegedly admitted was contained on "Drive D: Creative Writing Directory."

Curiously however, Detective Killian never turned the computer on, never downloaded the information, he simply unplugged the machine, seized four hard drives and sent them to the IRS for a "forensic audit". Defendant is aware that the State Police maintain a crime lab at the University of Rhode Island and that there is a forensic computer lab there. Affiliated with the crime lab and the computer science department is a state of the art Digital Forensic Center designed specifically for the forensic analysis of seized computers. In fact, Detective Killian has been a guest lecturer there along with Special Agent Daniel Dickerman of the Internal Revenue Service.

Curiously, Mr. Stierhoff's computer is not sent to Kingston, Rhode Island for analysis at the State Police's facility, it is sent to the Internal Revenue Service in Boston, Massachusetts for "forensic audit".

Defendant's argument is necessarily speculative at this time since the defense does not have access to the agents' rough notes and writings and no responses to the Motion for Exculpatory Evidence have been received. However, on the face of the

objective facts and based upon the perception of the Defendant who was there, the state police detective's motivation for their search appeared to be driven to uncover financial information as opposed to evidence of the misdemeanor stalking charge for which they were purportedly there. This belief underlies the defense argument that the state police impermissibly expanded the scope of the limited search of defendant's computer that he allegedly condoned.

Analogizing the Defendant's alleged consent to search "D: Drive, Creative Writing Directory", to the same authority to search that a search warrant would convey necessarily limits the search to the terms of the search warrant. Items seized beyond the scope of the warrant are suppressible.

Several cases are instructive. In *United States v. Young*, *877 F.2d 1099(1st Cir. 1989)*, a state police detective and a Drug Enforcement Administration Agent investigated Mr. Young. They ultimately obtained a search warrant to search Young's home for "marijuana, cocaine, records and ledgers of drug sales transactions, weight scales, drug paraphernalia, U.S. currency, safety deposit keys". *Id. at 1101*. When an Internal Revenue Service agent heard about the search of Young's home, the agent and several other federal tax agents entered the home and conducted their own search, purportedly upon the basis of the state court authorized search warrant. In attempting to justify their search, the IRS agent explained that he was attempting to assist state authorities in understanding financial materials that might be relevant to their investigation in addition to conducting his own tax investigation. The district court judge suppressed all of the items seized by the IRS agent because it was unlawfully seized and was outside the scope of the warrant.

The First Circuit upheld the lower court on this issue. They ruled, "Here, the activities of Agent Blair seem reasonably segregable from those of the other officers. The search was designed as a drug search, not as an excuse for a tax record search." *Id. at 1106, See also, United States v. Rettig, 589 F.2d 418 (9th Cir. 1978)* ( agents substantially exceeded scope of search warrant and conducted general search; not possible for court after the fact to identify discrete items of evidence which would have been discovered had the agents kept their search within the bounds of the warrant, all evidence seized during search suppressed)

Likewise, in this case, the Internal Revenue Service relied upon the fruits of either and illegal search, or at minimum, a search which exceed the scope of the consent, and conducted a pretextual search to gather financial information on Mr. Stierhoff. In an effort to legitimize their search the agent drafted a search warrant. However, because the information contained in the affidavit was gleaned from the prior illegal search, the warrant is invalidated because it is "fruit of the poisonous tree". As such, the illegal search should be suppressed.

**Respectfully submitted,**
**Neil Stierhoff,**
**By his attorney,**

**/s/Scott A. Lutes**

Scott A. Lutes, Esquire R.I. Bar #3502
127 Dorrance Street, 2nd Floor
Providence, RI 02903
Telephone: (401) 861-1142
Facsimile: (401) 490-3207

**CERTIFICATION**

I hereby certify that I caused to be transmitted via CM/ECF, a true and accurate copy of the above Memorandum in Support of Motion to Suppress, to Stephanie Browne, AUSA at stephanie.browne@usdoj.gov, and to Thomas G. Voracek, Esquire, at thomas.g.voracek@usdoj.gov, and by regular mail, postage prepaid to John N. Kane, Esquire, U.S. Department of Justice, Tax Division, 601 D Street, N.W., Room 7334, Washington, D.C. 20530, on this the ___ day of October, 2006.

/s/Scott A. Lutes