**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR. No. 06-0042ML** |
| | : | |
| **NEIL STIERHOFF** | : | |

**OBJECTION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and John N. Kane and Thomas G. Voracek, Trial Attorneys, United States Department of Justice, respectfully submits this Objection to the Defendant's Motion to Suppress Evidence.

The defendant moves to suppress all evidence seized from his residence and three storage units pursuant to two consent searches on or about April 12-13, 2002. The defendant also moves to suppress evidence taken from a computer seized from his residence.

The defendant's motion to suppress should be denied. The Rhode Island State Police (RISP) seized materials pursuant to two properly executed lawful consent searches. The defendant's consent was knowing, voluntary, and without coercion. In addition, special agents of the Internal Revenue Service (IRS)

properly seized directories and files taken from the defendant's computer pursuant to a valid search warrant.

In support of this Objection, the government submits the attached Memorandum of Law.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

/s/John N. Kane
JOHN N. KANE

/s/Thomas G. Voracek
THOMAS G. VORACEK
Trial Attorney
U.S. Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed, with the Clerk of Court using the CM/ECF system, a true and accurate copy of the within Objection to Defendant's Motion To Suppress Evidence, which will in turn send notification to Scott A. Lutes, Attorney at Law, scottluteslaw@yahoo.com, and by regular mail, postage prepaid to Scott A. Lutes, Attorney at Law, 127 Dorrence Street, Providence, Rhode Island 02903, on this the 20th day of November, 2006.

/s/Thomas G. Voracek
Thomas G. Voracek

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR. No. 06-0042ML** |
| | : | |
| **NEIL STIERHOFF** | : | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF GOVERNMENT'S OBJECTION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through its undersigned attorneys, respectfully submits this Memorandum of Law in Support of Government's Objection to Defendant's Motion to Suppress Evidence.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES....................................7

TABLE OF ATTACHMENTS....................................9

I. Introduction.........................................10

II. Factual background..................................10

III. State criminal case history........................14

IV. The search of the defendant's residence on April 12, 2002 was lawful and the resulting seizure of items from his residence should not be suppressed..................................17

A. Search of defendant's residence was lawful......17

B. Valid consent form..............................24

C. Items were seized for a lawful reason...........27

V. The search of the Defendant's storage bins on April 12 - 13, 2002 was lawful and the resulting seizure of items from his storage bins should not be suppressed..................................31

A. Background......................................31

B. Search of the storage bins was lawful...........32

C. Items were seized for a lawful reason...........33

VI. The search of the defendant's computer on May 3, 2002 was lawfully supported by a valid search warrant and affidavit. Evidence resulting from the search of the defendant's computer should not be suppressed..................................34

A. Computer lawfully seized pursuant to the defendant's voluntary consent...................37

B. The search warrant affidavit sets forth ample facts to support a finding of probable

cause that a crime had been committed and that criminal instrumentalities would be located at the place to be searched.............39

C. The materials included in the search warrant affidavit were properly obtained by the IRS.....42

1. The evidence in the affidavit emanated from the RISP's investigation and the IRS's technical assistance to the state police................................42

2. Plain view doctrine........................43

D. Elimination of any possibly offending materials in the search warrant affidavit does not result in an invalid search warrant....44

VII. The search of the defendant's residence and storage bins was not a pretextual search for financial records pursuant to a federal investigation........................................45

VIII. Conclusion........................................50

## TABLE OF AUTHORITIES

**PAGE**


U.S. CONST. amend. IV........................................39

Bumper v. State of North Carolina, 391 U.S. 543 (1968).......23

Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971).......17

Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973)..........18

State v. Stierhoff, 879 A.2d 425 (April 19, 2005)............14
17-19

United States v. Antrium, 389 F.3d 276, 283 (1st Cir. 2004), cert. denied, 544 U.S. 936 (2005)............................30
43

United States v. Baldyga, 233 F.3d 674, 683 (1st Cir. 2000), cert. denied, 534 U.S. 871 (2001)............................39

United States v. Burke, 999 F.2d 596, 599 (1st Cir. 1993)....39

United States v. Caceres, 440 U.S. 741, 754-55 (1979)........47

United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999)...17

United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005)...........................................44

United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999)........18

United States v. Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993).39

United States v. Griffin, 431 F.Supp.2d 164, 170 (D.Mass 2006)...........................................17-20

United States v. MacConnell, 868 F.2d 281, 284 (8th Cir. 1989)...........................................46

United States v. Mares, 428 F.3d 64, 67 (1st Cir. 2005).......18

United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003)..27

United States v. Matlock, 415 U.S. 164, 165-166 (1974).......17

United States v. Tibbs, 49 F.Supp.2d 47 (D.Mass 1999).....22-23

United States v. Watson, 423 U.S. 411, 424 (1976)............21
24

## TABLE OF ATTACHMENTS

**PAGE**

Attachment A
Consent to Search
25 Hollywood Road, Providence..........................11, 24-26

Attachment B
State v. Stierhoff, 879 A.2d 425 (April 19, 2005).......14-16
19

Attachment C
Superior Court Judge's statement, pp. 322 - 325
State v. Stierhoff, P302-1892A, March 26, 2003..........14

Attachment D
Superior Court Judge's statement, pp. 328 - 331
State v. Stierhoff, P302-1892A, March 26, 2003..........17

Attachment E
Detective Sanzi's testimony, pp. 25-31
State v. Stierhoff, P302-1892A, March 24, 2003..........26-27

Attachment F
Consent to Search
Shelby Self Storage.....................................31

Attachment G
D:\MyFiles\Offshore.....................................36, 43

Attachment H
Search Warrant and Affidavit............................37,
40-42



2029293.1

## I. Introduction

The defendant moves to suppress all evidence seized from his residence and three storage units pursuant to two consent searches on or about April 12-13, 2002. The defendant also moves to suppress evidence taken from a computer seized from his residence.

Although the defendant also moved to suppress the fruits from the search of his automobile, the defendant acknowledges that nothing was seized from this location.

The defendant's motion to suppress is premised upon three grounds. First, the defendant contends that his consent to search was not freely and voluntarily given and that the consent form was invalid on its face. Secondly, the defendant argues that the consent search exceeded the scope of any provided consent. Finally, the defendant concludes that the search was a pretext for an otherwise unlawful search of the defendant's financial records.

## II. Factual background

The Rhode Island State Police (RISP) executed a search of the defendant's residence on April 12, 2002, pursuant to his written consent. Only a short time before the search, the

defendant was arrested for stalking, a state criminal offense under RI ST §11-59.

The defendant was taken into custody and placed in the back of a RISP automobile parked in the Walgreen's parking lot. Detective Timothy Sanzi(RISP) read the defendant his Miranda rights from a card. Det. Sanzi and Corporal David Palmer (RISP) advised the defendant of the circumstances of his arrest. In the defendant's possession, the RISP found identification and credit cards in the names of Neil Stierhoff and Joseph Adams. While in the auto, upon the request of Det. Sanzi, the defendant completed and signed a "CONSENT TO SEARCH" form and provided the signed form to the RISP. See Attachment A, Consent to Search. The form permitted the RISP to search his residence at 25 Hollywood Road, Providence, RI, second floor.

On April 12, 2002, at 11:30 p.m., several RISP detectives and officers, including Det. Sanzi, Corp. Palmer, and Detective John Killian, executed a search at 25 Hollywood Road, Second Floor, Providence, Rhode Island. The defendant accompanied the RISP to the residence and used his key to gain access to his locked room on the second floor. The RISP made no attempt to gain access to other parts of the house.

Only the defendant's room on the second floor was searched. The room was approximately 15' by 10' and included a bed,

computer desk, and closet. The defendant sat on the bed during the search.

Upon entry to the room, the RISP observed a computer. The defendant had stated that most of the poems he wrote to the victim were generated on the computer. Due to the high tech capabilities of the computer, Det. Sanzi advised the defendant that the computer would have to be processed by a federal agency for evidence. It is common practice for the IRS to lend its high tech computer analysis capabilities to local law enforcement. The defendant agreed and the RISP seized the computer.

While in the room, the RISP also located the following items:

1) Gray briefcase containing manilla envelopes filled with cash under the bed. This item was not seized by the RISP.

2) Several manilla envelopes of cash located in desk drawer. These items were not seized by the RISP.

3) Fleet Bank statements in name of Joseph Adams. The RISP seized these items without objection by the defendant.

4) Other documents such as bills of sale with the name of Joseph Adams. The RISP seized these items without objection by the defendant.

5) Harp Workshop greeting cards. The RISP seized these items without objection by the defendant.

During the search of his residence, the defendant remained seated on his bed. The defendant stated that the money in the briefcase totaled approximately $100,000. As noted, the RISP did

not count the money and did not seize the briefcase or the cash. The defendant also advised the RISP that a desk drawer contained additional cash of approximately $47,000. The RISP did not seize this cash.

After the RISP found the cash and bank statements, the defendant volunteered the following statements:

1) This is what I get for work.

2) I don't trust banks.

3) I never paid any federal or state taxes.

4) I use the name Joseph Adams for business purposes and that the individual Joseph Adams never existed.

During the execution of the consent search, two individuals (male and female) appeared (one was later identified as John Adan) on the scene. Adan objected to the presence of the RISP in their home. Adan refused to identify himself to the RISP. Adan demanded to know why the police were present. Adan yelled into the defendant's room, "Neil, you can withdraw your consent. Please get them out of the house". The defendant acknowledged that he gave consent to the RISP and did not request that anyone leave the residence. Instead, the defendant stated that he did not want to upset these people but that he wanted the police to get through with this and leave. Det. Sanzi requested the individuals' identity, and the defendant stated that they were roommates that he paid rent to and did favors for in order to stay there, but did not identify them by name.

The two individuals had previously contacted the Providence Police reporting a theft. The police arrived, consulted with the RISP, and departed.

The search at 25 Hollywood Road lasted about 25 to 30 minutes and concluded about midnight.

## III. State criminal case history

The defendant was charged with stalking, a state criminal offense under RI ST §11-59 by complaint on April 13, 2002. The defendant was found guilty of the offense after a trial before the District Court Judge on June 10, 2002. On March 24, 2003, he was found guilty of the same offense after a trial before the Superior Court Judge. The Supreme Court for the State of Rhode Island affirmed the defendant's conviction. See Attachment B, State v. Stierhoff, 879 A.2d 425 (April 19, 2005).

At the conclusion of the defendant's trial before the Superior Court, the Court orally set forth its findings on the facts of the stalking case. See Attachment C, Superior Court Judge's statement, pp. 322 - 325, State v. Stierhoff. The Court found that the defendant's conduct understandably frightened and upset the victim and that the RISP had every right and reason to arrest the defendant. See Attachment C.

In affirming the Superior Court's decision, the Rhode Island Supreme Court set forth the facts as established during the

defendant's trial. See Attachment B, Rhode Island Supreme Court opinion. In February of 2001, the defendant approached the victim in the employee break room of her workplace and handed her an envelope containing a romantic message. The defendant was more than twenty years older than the victim. The victim was shocked by the message. One week later, the defendant again approached the victim in the employee break room and gave her an envelope and a DVD movie. The envelope included a poem which contained references to marriage. The victim became apprehensive and told her mother as well as the store manager of the situation. Two weeks later, the defendant again entered the victim's place of business. The store manager took steps to ensure the victim had no encounter with the defendant. Days later, the defendant again entered the store and was advised by the store manager that he should leave and that he was causing a disturbance. The defendant left the store after staring intently at the victim. The victim was terrified after the incident and cried. A short time later, the defendant mailed a poem and CD to the victim at her mother's house. The victim contacted the RISP.

In mid-April 2001, the defendant again entered the victim's work place. The store manager advised the defendant that his attempted contacts with the victim were causing her to feel uncomfortable and fearful. The manager requested that the defendant cease giving the victim any poems, letters, or other

items. Around the same time, the defendant left a message on the victim's mother's telephone answering machine. The telephone call upset the victim. At this point, the contacts ceased for almost a year.

In March of 2002, the defendant placed a paper containing a romantic poem in the victim's car door while it was parked at her college. The victim became fearful and contacted the RISP. Within the next two weeks, the victim found two more notes left in her car. On April 2, 2002, the defendant entered the victim's workplace wearing large sunglasses. After recognizing the defendant, the victim became terrified. The RISP was contacted and initiated extensive surveillance of the defendant. On four successive evenings in April of 2002, the RISP watched the defendant travel to the victim's college and approach her vehicle in the parking lot. Because of his activity, the RISP devised a "sting" operation. On April 12, 2002, the RISP watched the defendant follow the victim in her vehicle. At the RISP's instructions, the victim parked her car and went into a Walgreen's Pharmacy. The defendant parked his vehicle and followed the victim into the pharmacy. The RISP arrested the defendant. See Attachment B, Rhode Island Supreme Court opinion.

**IV. The search of the defendant's residence on April 12, 2002 was lawful and the resulting seizure of items from his residence should not be suppressed.**

**A. Search of defendant's residence was lawful.**

The RISP searched the defendant's residence after obtaining his consent to do so. The defendant argues that any consent he may have given was involuntary or coerced. Upon conclusion of a suppression hearing and trial before the Superior Court in this matter, the Court found that the defendant freely consented to the search. The Superior Court also found that the RISP did not overreach in any way. The Superior Court denied the defendant's motion to suppress evidence. See Attachment D, Superior Court Judge's statement, pp. 328 - 331, State v. Stierhoff.

The RISP neither sought nor obtained a search warrant. Warrantless searches are per se unreasonable under the Fourth Amendment unless the government can show that the search falls within one of the carefully defined sets of exceptions. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999); United States v. Griffin, 431 F.Supp.2d 164, 170 (D.Mass 2006). One of the established exceptions to the warrant requirement is a search that is conducted pursuant to an individual's valid consent. United States v. Matlock, 415 U.S. 164, 165-166 (1974); Coraine, 198 F.3d at 309; Griffin, 431 F.Supp.2d at 170. The government

has the burden of proving a valid, voluntary consent by a preponderance of the evidence. Griffin, 431 F.Supp.2d at 170.

Consent to search must be voluntary under the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973); see also United States v. Mares, 428 F.3d 64, 67 (1st Cir. 2005). Relevant circumstances include age, education, experience, intelligence, and knowledge of the right to withhold consent. United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999); Griffin, 431 F.Supp.2d at 170. Important considerations are whether the consenting party was advised of his constitutional rights and whether permission to search was obtained by coercive means. Griffin, 431 F.Supp.2d at 170.

In the present case, the defendant was 46 years old at the time of the search. The defendant possessed a Bachelor of Science Degree in Engineering from Brown University. At the time of the search, the defendant operated his own business by selling electronic testing equipment nationwide. His business had annual gross receipts of approximately $400,000 - $800,000 during 1998 through 2002. Clearly, due to his age, education, experience, and intelligence, the defendant was capable of understanding all aspects of his given consent to search his residence.

In addition, the defendant's stalking conduct illuminates that he is not a timid fearful person. The Rhode Island Supreme

Court found that the defendant was well aware that his advances towards the victim were unwanted as early as April 2001. Stierhoff, 879 A.2d at 433. He was specifically directed by the victim's boss to leave her alone and stop giving her anything. Undaunted by this rejection, the defendant, one year later, placed notes in the victim's car parked at her college campus on at least three separate occasions. The defendant encountered the victim at her place of work. The defendant traveled to the victim's college on four successive evenings, approaching her parked vehicle each time. Stierhoff, 879 A.2d at 429. The defendant's conduct which constituted the stalking offense reveals that he is independent minded and does not placidly comply with directions or orders.

The RISP exerted no coercion upon the defendant to obtain his consent to search his residence. The defendant was arrested and was read his Miranda rights prior to any consent to search, as well as to the searches themselves. At least one court found it important as to whether the police read a defendant his Miranda[1] rights prior to their request to search. Griffin, 431 F.Supp.2d at 170. The RISP read the defendant his Miranda rights prior to their request to search his residence. After being read his rights, the defendant was aware that he could remain silent. Thereafter, the defendant was presented with an actual choice of

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

whether or not to allow the RISP to search his residence and he made a reasoned decision.

The defendant was presented with a form entitled "CONSENT TO SEARCH". He was asked to complete the form by filling in entries for his name, the officers' names, the officers' specific department, and a description of the place to be searched. The defendant was also asked to sign and date the form. The defendant complied by filling out the form and signing it. By proceeding in this fashion, the RISP ensured that the defendant read the entire form and understood its contents.

The defendant's knowledge of the law and his rights is also revealed in the directory files located in his computer. These files were properly examined pursuant to a valid search warrant. Some of the directory files show that the defendant engaged in exhaustive legal research on tax law, including 26 U.S.C. §7201, and the U.S. Constitution.

The defendant's custodial status is one factor for the court to consider in determining whether he voluntarily consented to the search without coercion. The defendant claims his case is similar to the facts in Griffin, where the court invalidated a consent to search based, in part, upon his custodial status. Griffin, 431 F.Supp.2d at 172. In Griffin, the police arrested a defendant in his house and ordered him to open a safe.

The mere fact that a defendant is in custody at the time of the consent does not invalidate the consent. United States v. Watson, 423 U.S. 411, 424 (1976). While being arrested is undoubtedly a stressful situation, the RISP did not exert pressure on the defendant to sign the consent to search form. Officers did not yell or scream at the defendant or threaten him in any manner. He was handcuffed and placed in the back of a police car. The officers did not draw any guns during the encounter.

Circumstances during the execution of the search can be reflective of the voluntary nature of the consent search. The defendant voluntarily took the RISP to his room in the house and unlocked the door for them. He sat on the bed during the search and provided oral information to the police. The defendant's statements to the RISP during the search further evidences the voluntary nature of his consent and the lack of any coercion exerted by the RISP. The defendant described documents found by the RISP. When bank statements were found in the name of Joseph Adams, the defendant volunteered that he used the name for business purposes. When a large amount of cash was found, the defendant volunteered the amount, that he received the cash as payment for his work, that he doesn't trust banks, and that he didn't pay any federal or state tax. As noted above, all of these statements were made after the defendant was advised of his

right to remain silent. Contrary to the defendant's assertions that the consent was coercively extracted from the defendant, the evidence demonstrates that the defendant understood his rights, read and voluntarily signed the consent form, and then assisted the police during the execution of the search. It can hardly be claimed that his consent was anything but knowledgeable and voluntary.

Moreover, during the execution of the search, another individual in the house advised the defendant that he could withdraw his consent. The defendant heard this advice and stated that he just wanted to get the search over with. Consequently, the defendant expressed his understanding of the voluntary nature of his consent and that he could terminate the search at anytime. Instead, the defendant clearly articulated that he desired for the RISP to proceed with the search. It may have been the defendant's motivation to allow a consent search so as to minimize the intrusion upon the other occupants of the house. There is no evidence that his decision to allow a consent search was based on coercion.

The defense argues that the circumstances in the present case may be implicitly coercive. The defense notes that the Court in Tibbs, struck down a consent search because the consent was not voluntary. United States v. Tibbs, 49 F.Supp.2d 47 (D.Mass 1999). Some circumstances in Tibbs appear similar to the

present case such as a signed consent form, a number of police officers and the lateness of the hour. However, the Court in Tibbs found that the police threatened the consenting individual by stating that if she did not sign the consent the police would then contact the Department of Social Services and take her child. Id. at 49. In addition, the consent form was signed in Tibbs after the search had already begun. Id. at 50. In the present case, the RISP did not threaten the defendant with any punitive action if he did not sign the consent form. Moreover, the consent form was signed prior to the search beginning.

The defendant also argues that his consent was not voluntarily provided because the RISP advised the defendant that they would get a search warrant if he refused to sign. The defendant's reliance upon the U.S. Supreme Court's decision in Bumper for this proposition is misplaced. Bumper v. State of North Carolina, 391 U.S. 543 (1968). In Bumper, the police arrived at the front door of a 66 year old grandmother and stated that they had a warrant to search the house. The grandmother allowed the police to search the house even though a warrant had never actually been obtained. The court found this situation to be "instinct with coercion" and "where there is coercion there can not be consent." Bumper, 391 U.S. at 550.

To the contrary, in the present case, the defendant knew that the RISP did not have a search warrant for his residence. In

fact, the RISP stated the obvious, that if the defendant did not sign the consent form, they would have to seek a search warrant. Agreeing to a search solely because he did not want the RISP to obtain a warrant does not, in and of itself, render the consent search involuntary.

The RISP completed the search of the defendant's room in less than an hour minimizing the intrusion.

Under the totality of the circumstances, the defendant's consent to search was voluntary. There is no evidence of any threats, acts of force, promises, or any other forces of coercion which would render the defendant's consent involuntary. Watson, 423 U.S. at 425.

**B. Valid consent form.**

The defendant also contends that the form signed by him was defective on its face. Specifically, the defendant claims that the form is incomprehensible because it authorizes the police "to conduct a complete of my premises..." The defense notes that the printed form omits the word "search".

Although the form omitted the word "search" in one context, the form as a whole is not incomprehensible and informed the defendant that he was consenting to a search. Clearly, the form states in capital letters at the top, "CONSENT TO SEARCH". See Attachment A. A review of the form details that the defendant knows he has a right not to have his premises searched and that,

nonetheless, he freely consents to the search. The form also includes a line-by-line translation in Spanish.

The English portion of the printed form provided to the defendant reads as follows:

**CONSENT TO SEARCH**

**Hour:**
**Date:**
**Place:**

**I,____________ , having been informed of my right not to have a search made of the premises and/or vehicle described below without a search warrant and my right to refuse to consent to such a search, do authorize _______________ of the ___________ Police Department to conduct a complete of my premises and/or vehicle described as __________________ __________________ .**

**I give my consent to this search knowing that if any incriminating evidence is found it can be used against me in Court.**

**The police officer(s) named above has my permission [t] take any letter, papers, or other property from my premises and/or vehicle.**

**I give this written permission to the police officer(s) named voluntarily and without threats or promises of any kind.**

______________________
**Signature**

**Witnesses:** ______________________

See Attachment A.

The defendant filled out the appropriate blank areas with his name, the police officers, the name of the police department, and his residential address and vehicle license. The defendant signed and dated the form.

A review of the form clearly indicates that the defendant acknowledges that he was informed of his right not to have a search made without a warrant. In addition, the defendant was aware of his right to refuse to give consent to such a search. Moreover, the defendant acknowledged that he is giving his consent to search knowing that if any incriminating evidence is found it can be used against him. Finally, the defendant attests that he is giving his written permission to the police voluntarily and without threats or promises of any kind.

The defendant contends that the form did not advise him of the crime for which he was under suspicion. However, the defendant actually knew why he was arrested. The RISP advised the defendant prior to seeking his consent to search that he was arrested in connection with stalking a young woman. After the RISP read the defendant his Miranda rights, the police questioned him as to why he had followed the girl. See Attachment E, Det. Sanzi's testimony at pp. 25-31. The RISP and the defendant

engaged in a colloquy concerning his following a girl knowing that his advances were unwanted. See Attachment E.

After discussing the alleged offense, the RISP secured the defendant's identification pieces including his driver's license and credit cards in a different name. Thereafter, the RISP advised the defendant that they sought his consent to search his residence.

Therefore, the defendant's claim that the consent form was so defective as to render his consent invalid should be rejected.

**C. Items were seized for a lawful reason.**

Defendant contends that the search exceeded the scope of the consent purportedly given. Warrantless searches may not exceed the scope of the consent given. United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003).

In the present case, the CONSENT TO SEARCH form completed and signed by the defendant clearly stated the types of evidence which the police had permission to seized. The form states, "The police officer(s) named above has my permission t[sic] take any letters, papers, or other property from my premises and/or vehicle."

The RISP seized the following from the defendant's residence:

1) Fleet Bank statements in the name of Joseph Adams;

2) Other documents such as bills of sale with the name of Joseph Adams;

3) Harp Workshop greeting cards;

4) Computer.

The RISP seized these above items without objection from the defendant. All of the above seized materials fall within the ambit of the Consent to Search form completed and signed by the defendant.

The seizure of the Harp greeting cards and computer were directly related to the stalking offense. The defendant advised the RISP that the computer contained letters and poems that he had written to the stalking victim.

With respect to the other documents taken from the residence, these seized items were also properly obtained by the RISP pursuant to the consent search as these items assisted the police in ascertaining the defendant's identity. Prior to his arrest, the RISP had difficulty determining the identity of the perpetrator of the stalking violation. In addition, the RISP was interested in determining whether the offender had a prior criminal history of similar behavior. The RISP was able to trace a rental car used by the perpetrator of the stalking offense to Neil Stierhoff with an address in White Plains, New York. However, after further investigation, the RISP determined that the White Plains address on the defendant's driver's license was not a residence, but a Mailbox Etc. business location.

Furthermore, the RISP became more concerned about the defendant's true identity at the time of the arrest. The RISP secured identification pieces from the defendant's wallet as he was arrested. These documents included a drivers license in the name of Neil Stierhoff with the above noted address in White Plains, New York; credit cards in the names of Neil Stierhoff and Joseph Adams; and a phone card in the name of Universal Audio. When questioned by the RISP, the defendant told them that he resided at 25 Hollywood Road in Providence which directly conflicted with the address on his license. During the execution of the search, the defendant advised the RISP that he used an alias, Joseph Adams, for business purposes.

Accordingly, at the time of the search, the RISP appropriately seized documentation at the defendant's residence relating to his identity. The police knew that the perpetrator of the stalking crime had used various names and various addresses. His true identification was a very important aspect of the stalking investigation.

In addition, the RISP could reasonably seize the documents as possible evidence of tax fraud under the plain view doctrine. As noted above, during the execution of the search, the defendant advised the RISP that he operated a business, maintained cash from his business of approximately $147,000, and that he did not pay any state or federal taxes. The RISP also found a bank

statement on his desk indicating that the defendant's business had more than $1 million in its bank account. Based on these circumstances, the RISP could reasonably believed that these financial documents may have been evidence of a possible state or federal tax crime and properly seized them pursuant to the plain view doctrine. The plain view doctrine validates a seizure where (1) the seizing police officer lawfully reached the position from which he could see the item in plain view; (2) the seizure satisfied the probable cause standard; and (3) the seizing officer had a lawful right of access to the object itself. United States v. Antrium, 389 F.3d 276, 283 (1st Cir. 2004), cert. denied, 544 U.S. 936 (2005).

Therefore, the RISP properly seized evidence at his residence. The defendant voluntarily consented to a search of his residence. The signed Consent to Search form allowed the seizure of all evidence taken and the defendant did not object to any of the seizures. The RISP had a legitimate purpose in securing documents relating to names that the defendant had used in order to ascertain his correct identity and address. Finally, the defendant made statements during the execution of the search that, when coupled with documents taken by the RISP, could have given rise to a possible commission of state or federal tax violations.

## V. The search of the Defendant's storage bins on April 12 - 13, 2002 was lawful and the resulting seizure of items from his storage bins should not be suppressed.

### A. Background

Upon conclusion of the search at 25 Hollywood Road, the RISP asked the defendant if they could also search his storage facilities at Shelby Storage. Previously, the RISP had placed the defendant under surveillance and witnessed him at that location.

The defendant completed and signed another "CONSENT TO SEARCH" form and provided the signed form to the RISP. See Attachment F, Consent to Search. The form permitted the RISP to search his storage facilities, nos. 13, 14, 15, and 18 at Shelby Storage.

Shortly after midnight on April 13, 2002, several RISP detectives and officers executed a search at the Shelby Storage facility, bin nos. 13, 14, 15, and 18. The defendant accompanied the RISP to the storage facility and used his access code to gain entry to his storage bins. The RISP proceeded to search the location.

During the search, the RISP found documents bearing the names of Joseph Mulvaney and Universal Audio as well as Neil Stierhoff. The defendant stated that he had assumed responsibility for the Mulvaney bills and made payments. The

defendant also stated that he never met nor knew Mulvaney, but Mulvaney used to live at 25 Hollywood Road. He further stated that Universal Audio Company was another company he had assumed under an alias.

The RISP seized one box of records which contained documents bearing the names of Joseph Mulvaney, Universal Audio, and Neil Stierhoff as well as business journals. This box was seized without objection by the defendant.

After the search at the Shelby Storage facility, the defendant was transported to the Lincoln Woods Police Barracks and processed.

**B. Search of the storage bins was lawful.**

The RISP searched the storage bins after obtaining his consent to do so. A search warrant was neither sought nor obtained. The RISP exerted no coercion upon the defendant to obtain his consent to search the storage bins.

The defendant's arguments concerning his lack of voluntary consent to search with respect to the storage units is similar to his argument regarding his consent to search his residence. The defendant further argues in a footnote that there appears to be no rational argument to believe that evidence of the stalking violation would be located in the storage bins.

As in the above discussion concerning the residence, the defendant both completed and signed the Consent to Search form.

The printed form was the same as the form previously discussed in the residential search section. The defendant was aware of his rights and signed the form voluntarily without coercion. Moreover, the defendant's actions during the execution of the search of the storage bins is indicative of voluntary consent. Since the defendant signed the consent to search form approximately three hours after his arrest, any arguable shock resulting from his arrest had diminished. The defendant opened his storage bins for inspection by supplying needed access codes. The defendant witnessed the search and commented during the search with respect to found items.

**C. Items were seized for a lawful reason.**

As noted above, one box of documents was taken from the storage facility. The box contained some documents relating to Joseph Mulvaney, Universal Audio, and Neil Stierhoff as well as business journals. The defendant did not object to this seizure.

The RISP properly seized these items as evidence of the defendant's true identity. As discussed above, the defendant's identity and address represented important issues for the RISP to investigate. The RISP found documents in the storage facility relating to other names and entities apparently used by the defendant.

Moreover, the documents were properly seized as evidence of possible tax fraud. The defendant previously told the RISP that

he never paid state or federal taxes and admitted that he operated a business in another name. Therefore, at the time the defendant signed the Consent to Search form for the storage facility, he was well aware that he was permitting the RISP to look at evidence of tax fraud. The journals of the defendant's business activities are directly related to a possible state or federal tax violation.

Accordingly, the RISP properly seized evidence at his storage facility. The Consent to Search form allowed the seizure of all evidence taken and the defendant did not object to any of the seizures. The RISP also had a legitimate purpose in securing documents relating to the defendant's identity as well as possible state and federal tax violations.

**VI. The search of the defendant's computer on May 3, 2002 was lawfully supported by a valid search warrant and affidavit. Evidence resulting from the search of the defendant's computer should not be suppressed.**

As previously discussed, the defendant's computer was seized on April 12, 2002 at his residence pursuant to his written consent. The defendant advised that information relating to the stalking charge (poems written to the victim) was contained in the computer. Detective John Killian of the RISP was involved in the execution of the search of the residence and inspected the computer at the scene. According to Det. Killian, the defendant

advised him that the poems were located on the "D" drive; in the "My file", "creative writing" directories. Det. Killian determined that due to the complexity of the computer hardware and the amount of time it might take to access the appropriate files that it would be more efficient to seize the computer hardware. The defendant did not pose an objection to the RISP taking the computer.

After seizing the computer, the RISP determined that they did not possess the equipment or knowledge to access the required information. Contrary to the defendant's assertions, Detective Killian was new to the computer assignment in April of 2002 and did not possess the expertise to access the defendant's computer. Moreover, the entire RISP computer program had just recently been developed.

On April 16, 2002, at the request of the RISP, IRS Special Agents Robert Ferraro and James Donahue arrived at the RISP barracks in Scituate, Rhode Island, in an attempt to assist the RISP in their inspection of the computer's hard drives. The RISP specifically requested assistance from the IRS agents in order to secure evidence concerning a possible stalking charge. After inspecting the computer, Agent Donahue determined that he would not be able to image the computer without additional equipment and forensic tools given the sophistication of the computer. On

April 16, 2002, the RISP turned custody of the computer over to Agent Ferraro and Agent Donahue.

In addition, the RISP advised the IRS agents that documents including various credit cards, bank statements, and cancelled checks were taken from the defendant and the defendant's residence. Some of these documents were in the name of Joseph Adams. The RISP provided copies of these documents to Agent Ferraro. Furthermore, the RISP permitted the IRS agents to copy business records taken from the Shelby Storage facility.

On April 29, 2002, after obtaining the necessary additional equipment, IRS Agent Donahue completed copying the computer's hard drives. At this time, Agent Donahue viewed the directory structure which had been copied to the IRS owned hard drive in the ADS box. Within the "My Files" folder, Agent Donahue found the "creative writings" folder where defendant indicated evidence would be found of his correspondence with the stalking victim. Within the same "My Files" directory folder, Agent Donahue saw a folder "offshore" which contained additional folders such as "money laundering". See Attachment G, computer directory structure. At this juncture, he terminated any further inspection of the computer prior to the viewing of any files. Agent Donahue discussed his findings with Agent Ferraro.

After his conversation with Agent Donahue, Agent Ferraro prepared a search warrant and accompanying affidavit for a search

upon the Dell Precision workstation, Model 530 MT, serial number J98DQ01, with Intel Xeon 1.70 Gigahertz processor. On April 30, 2002, Agent Ferraro and Assistant U.S. Attorney (AUSA) Ira Belkin presented a search warrant and affidavit to U.S. Magistrate Robert W. Lovegreen. The magistrate signed the warrant.

On May 1, 2002, Agent Ferraro realized that the warrant contained an incorrect computer serial number. AUSA Belkin and Agent Ferraro corrected the warrant to reflect the correct serial number. On May 2, 2002, a search warrant and affidavit with the correct serial number was signed by the magistrate. See Attachment H, Search warrant and affidavit. On May 3, 2002, the IRS executed the search warrant on the computer. The resulting search of the computer found many files which the government plans to use in its case-in-chief at trial. These files include evidence bearing upon the defendant's wilfulness to commit tax fraud, his use of the Joseph Adams identity, and his payment of personal items with funds from the Joseph Adams bank account.

**A. Computer lawfully seized pursuant to the Defendant's voluntary consent.**

The RISP lawfully seized the defendant's computer pursuant to his voluntary consent from his residence. As discussed above, the RISP exerted no coercion upon the defendant and the defendant's consent to search his residence was freely given to the RISP. The Consent to Search form signed by the defendant stated that the police have his permission to take property from

my premises. During the execution of the search, the RISP observed a computer in the residence. The defendant advised the RISP that the computer contained poems he wrote to the stalking victim. The RISP seized his computer without the defendant's objection. Therefore, the RISP lawfully seized the defendant's computer pursuant to this voluntary consent.

The defendant contends that any consent to search his computer was limited to a single directory, "creative writing". During the execution of the search, the defendant advised the RISP that the poems were located on his "D" drive; in the "My file", "creative writing" directories. The defendant's statement as to where the RISP may find the poems in his computer does not constitute a limitation of his consent to search his computer. Instead, the defendant was simply assisting the RISP as to where they could expeditiously find the poems.

The defendant's consent to the search of his computer was unlimited. Since the RISP legitimately requested the technical assistance of a federal agency, the IRS, to assist them in their search for evidence, the IRS's subsequent search of the computer should also be limitless. The Consent to Search form signed by the defendant allowed the RISP to seize any property without limitations. The defendant did not expressly object to the RISP seizing the computer or accessing any files unrelated to the stalking incident. The RISP was interested in accessing all

files on the computer to determine the defendant's true identity as well as providing additional information on the stalking offense. Finally, the defendant knew that the RISP was aware that the defendant had probably committed a tax offense at the time of the computer seizure.

Even if the court should find that the defendant sufficiently limited his consent to search the computer, the defendant's motion to suppress any evidence taken from the computer is without merit as the government obtained a valid warrant authorizing the resulting search.

**B. The search warrant affidavit sets forth ample facts to support a finding of probable cause that a crime had been committed and that criminal instrumentalities would be located at the place to be searched.**

A basic principle of the Fourth Amendment is that there must be probable cause for a search warrant to issue. U.S. CONST. amend. IV. Probable cause for a search warrant "exists where information in the affidavit reveals 'a fair probability that contraband or evidence of a crime will be found in a particular place.' United States v. Baldyga, 233 F.3d 674, 683 (1st Cir. 2000), cert. denied, 534 U.S. 871 (2001). "The standard of probable cause requires a probability, not a prima facie showing, of criminal activity." United States v. Burke, 999 F.2d 596, 599 (1st Cir. 1993). The standard for determining the sufficiency of an affidavit is the totality of the circumstances. United States v. Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993).

In the present case, the defendant does not contend that the affidavit attached to the warrant lacked evidence supporting a probable cause determination that a criminal violation occurred.

The warrant states that the computer contained possible evidence of the violations of Title 26, United States Code, Sections 7201 and 7203. In order to establish tax evasion, pursuant to 26 U.S.C. §7201, the government must establish:

A. An attempt to evade or defeat a tax or the payment thereof;
B. An additional tax due and owing; and
C. Willfulness.

In order to establish that a defendant failed to file a return pursuant to 26 U.S.C. §7203, the government must establish:

A. Defendant was a person required to file a return;
B. Defendant failed to file a return at the time required by law, and;
C. The failure to file was wilful.

Agent Ferraro's affidavit was based upon:

1) Information provided by the Rhode Island State Police;

2) Documents/Records seized from the defendant's residence and storage facility;

3) Statements made by the defendant to the RISP;

4) Limited information from IRS Special Agent James Donahue who performed a cursory examination of the computer at issue.

<u>See</u> Attachment H.

IRS Special Agent James Donahue has been a special agent with the IRS Criminal Investigations since 1988. He has received

extensive training in the area of Seized Computer and Evidence Recovery (SCER) at the Federal Law Enforcement Training Center (FLETC) located in Glynco, Georgia. He has received advanced computer forensic training at the University of North Texas and at the United States Service Center Cyber Smuggling Center. See Attachment H, Affidavit at p. 5, no. 27.

The affidavit lists the following as proof of probable cause:

1. The defendant's own statements to the police that he is operating a business under the alias name of Joe Adams, and that he never paid state or federal income taxes (Affidavit at no. 7);

2. Police found a large sum of United States currency ($147,000) in the defendant's room and that the defendant stated that this money was his savings from his business ventures (Affidavit at no. 8);

3. The defendant told the police that he had various customers and used the Internet web site "Ebay" for sales under the name JA and that he used the computer in his business (Affidavit at no. 9);

4. That the defendant had a bank account in the name of Joseph Adams and that a bank statement dated July 16, 2001, relating to this account, was found in the defendant's room and listed a beginning and ending balance of $1 million (Affidavit at no. 18)

5. That business sales records listed total sales of over $550,000 for 1999 and exceeding $360,000 for 2000 (Affidavit at no. 21);

6. The defendant's computer included a directory name (1) "Offshore" and included in that directory were sub-directories with the names of various countries and places including Cuba, Europe, Crenada[sic], Belize, Switzerland, Citze[sic] and others. In addition, there existed a directory "moneylaundering"[sic] (Affidavit at no. 22);



2029293.1

7. That the defendant has not filed a federal individual income tax return from 1996 through the present (Affidavit at no. 23).

In summary, the affidavit included evidence that the defendant had not filed a federal tax return from 1996 through 2001 while conducting a profitable business. Under the totality of the circumstances, the affidavit to search the defendant's computer provided probable cause of violations of 26 U.S.C. §§ 7201 and 7203.

**C. The materials included in the search warrant affidavit were properly obtained by the IRS.**

**1. The evidence in the affidavit emanated from the RISP's investigation and the IRS's technical assistance to the state police.**

All of the evidence included in the affidavit was legitimately obtained by the IRS. As noted above, the items located in the defendant's room were properly seized pursuant to a consent to search. In addition, the defendant's statements were properly obtained as he had previously been read his Miranda warnings.

The defendant contends that the affidavit to the warrant improperly included references to folders viewed on the computer by the IRS. The defendant may claim that he limited the government's inspection of his computer only to evidence of stalking violations and, therefore, references to other computer

information was improperly included in the search warrant affidavit.

The government's inclusion of the directories "Offshore" and "moneylaundering" in the affidavit was proper. In providing assistance to the RISP, Agent Donahue opened the directory structure on the defendant's computer and viewed the directories "Off Shore" and "moneylaundering". Agent Donahue checked some subfolders of the "Off Shore" directory and found subfolders entitled with various countries. Agent Donahue did not delve further into the defendant's computer without a warrant. The affidavit stated, "...Special Agent Donahue came across a directory name (1) "Offshore" and included in that directory were sub-directories with the names of various countries and places including Cuba, Europe, Crenada[sic], Belize, Switzerland, Citze[sic] and others. In addition, there existed a directory "moneylaundering"[sic]. Affidavit at no. 22. See also, Attachment G.

**2. Plain view doctrine.**

In the alternative, and assuming for the sake of argument that the defendant limited his consent to search the "My Files/creative writing" directory, the government contends that Agent Donahue legitimately viewed the "Offshore" and "moneylaundering" directories under the "plain view" doctrine as described above by the Court in Antrim. Antrim, 389 F.3d at 283.

Agent Donahue was lawfully in a position where he could see the item (directories entitled offshore and moneylaundering) in plain view. He was legitimately assisting the RISP in conducting an inspection of the defendant's computer. Nevertheless, knowing that the defendant had previously admitted that he did not pay taxes, Agent Donahue believed the prudent and cautious course would be to stop further analysis of the computer and to seek a search warrant.

**D. Elimination of any possibly offending materials in the search warrant affidavit does not result in an invalid search warrant.**

If the Court should find that Agent Donahue impermissibly viewed directories in the defendant's computer as beyond the scope of his consent search, the search warrant remains valid. Even without the references in the affidavit to "offshore" and "moneylaundering" directories, the affidavit continues to support probable cause to believe that the defendant committed a tax crime and that evidence of a tax crime would be located in the computer. A court may excise offending information from an affidavit and evaluate whether the remaining information is sufficient to establish probable cause. United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005).

In the present affidavit, Agent Ferraro sets forth sufficient evidence that the defendant probably committed a tax crime under Title 26. In addition, the defendant advised the

RISP that evidence of his business activities would be located in the computer. Consequently, even without the possibly offending language of the directory names, the affidavit sufficiently supports probable cause that evidence of tax crimes would be located within the computer.

Taking all these factors together, it appears there was a "fair probability that contraband or evidence" of the crimes of tax evasion and failure to file tax returns would be found in the defendant's computer.

**VII. The search of the defendant's residence and storage bins was not a pretextual search for financial records pursuant to a federal investigation.**

The defendant contends that the search of the defendant's residence and storage units was a pretextual search of financial records pursuant to a federal investigation. The defendant argues that it is believed that the state investigators had communications concerning the defendant with the IRS prior to the searches and that financial records were seized from the defendant to assist a federal tax investigation.

Prior to defendant's arrest on April 12, 2002, the RISP took various steps to investigate the defendant's identity.
The RISP checked a national database for any prior criminal history. They also checked with federal agencies, including the Postal Inspector, INS, and possibly the IRS in order to determine the defendant's identity.

The defendant argues that the circumstances of the search and seizures demonstrates that the search was nothing more than a pretext for a federal investigation. It is accurate that the RISP turned the defendant's computer over to the IRS a few days after the search. However, the mere fact that the federal agents took possession of some of the seized items following the search does not result in the search begin deemed "of federal character". One court rejected this contention holding that the focus must be on the **prior involvement** of the federal officials. United States v. MacConnell, 868 F.2d 281, 284 (8th Cir. 1989).

In this case, any prior involvement of the IRS or any other federal agency was solely to provide identifying information about the defendant to the RISP. The IRS is one federal agency that maintains records concerning a taxpayer's name and address. If a state investigative agency is having difficulty ascertaining a target's identity, it is prudent and common practice for the state agency to request such information from any federal agency. In any event, the RISP and the IRS did not collude prior to the defendant's arrest in order to gain information about the defendant's finances.

Concerning the IRS's involvement in the stalking offense after the arrest, IRS Agent Donahue will explain that it is common practice for local law enforcement to seek the assistance of the IRS with respect to computer evidence because of their

reputation for having the expertise to handle highly sophisticated computer equipment. He will also testify that the defendant's computer was indeed highly sophisticated as even he had difficulty accessing the hard drive, necessitating that the IRS take the defendant's computer to IRS headquarters so that they could access their analytical equipment.

The defendant also argues that the IRS failed to comply with their own internal procedures in obtaining a search warrant. However, Agent Ferraro will testify that all internal procedures were complied with. In addition, it should be noted that any violation of an agency's own regulations is not a basis for suppression unless constitutional rights have been violated. United States v. Caceres, 440 U.S. 741, 754-55 (1979).

The defendant concludes by raising several points of speculation clearly implying that the state search and seizure of materials was nothing more than an attempt to assist the federal investigators. For example, the defendant speculates:

> Curiously, all of the evidence seized from the room and storage spaces consisted of financial records, receipts and cancelled checks which bear no rational nexus to a misdemeanor stalking charge. Additionally, defendant's computer was of keen interest to the State Police.

Defendant's Motion at p. 27.

In response, the RISP's actions the evening of the searches can only be explained by examining the full nature of the state investigation at that juncture. The defendant's conduct in the

state offense was taken seriously by the RISP. The defendant made at least four contacts with the victim in March and April of 2001. The defendant admitted that he well understood that his advances were not welcome and that he was frightening the victim. Thereafter, the defendant made no known attempt to contact the victim for one year.

In March of 2002, the defendant began to initiate more contacts with the victim. Waiting one year before making more contacts demonstrates the defendant's consuming preoccupation with the victim.

An examination of the defendant's contacts with the victim in March and April of 2002 reveal an escalation in the nature of the contacts. The defendant placed telephone calls to the victim's home. Later, the defendant, apparently based on some sort of surveillance, was able to identify her vehicle. The defendant placed notes on her vehicle at her college. These actions demonstrate that the defendant was watching and tracking the victim's movements. Then, on April 12, the defendant attempted to make a personal encounter with the victim at the pharmacy where he was arrested. Clearly, his preoccupation with the victim and the escalation of his contacts with her would alarm any prudent law enforcement agency. Contrary to the defendant's attempts to minimize the state criminal action as a

misdemeanor, the government contends that the quick reaction by the RISP may have prevented the case from becoming a felony.

With that backdrop, the RISP's actions during the execution of the consent searches on April 12, 2002 are more readily explainable. At the time of his arrest that same date, the RISP only knew that the defendant had used a Mailbox Etc. business address as his residence on his New York state driver's license. Through surveillance, the RISP knew that the defendant had some connection to 25 Hollywood Road in Providence and a storage facility but could not connect his name with these locations. At the time he was arrested, the RISP found identification and credit cards in his wallet in the names of Neil Stierhoff and Joseph Adams. The defendant later admitted that he used the name Joseph Adams to conduct business. The RISP attempted to secure as much information as they could about the defendant's identity during the searches. Of course, they were interested in ascertaining his true identity to determine if the individual may have a criminal history for similar violations. If such was the case, this would be an important consideration by a state court in determining whether to release such an individual pending trial.

Accordingly, the RISP's interest in obtaining documents from the defendant's residence during the search was not a pretext for

a federal investigation but, instead, was the result of prudent law enforcement.

## VIII. Conclusion

Wherefore, for the above stated reasons, the defendant's motion to suppress evidence should be denied.

Respectfully submitted,
UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

/s/John N. Kane
JOHN N. KANE

/s/Thomas G. Voracek
THOMAS G. VORACEK
Trial Attorney
U.S. Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed, with the Clerk of Court using the CM/ECF system, a true and accurate copy of the within Memorandum of Law in Support of Government's Objection to the Defendant's Motion to Suppress Evidence, which will in turn send notification to Scott A. Lutes, Attorney at Law, scottluteslaw@yahoo.com, and by regular mail, postage prepaid to Scott A. Lutes, Attorney at Law, 127 Dorrence Street, Providence, Rhode Island 02903, on this the 20th day of November, 2006.

/s/Thomas G. Voracek
Thomas G. Voracek