C

Supreme Court of Rhode Island.
STATE
v.
Neil STIERHOFF.
**No. 2004-117-C.A.**

April 19, 2005.

**Background:** Defendant was convicted after bench trial in the Superior Court, Providence County, Robert Krause, J., of misdemeanor stalking. He appealed.

**Holdings:** The Supreme Court held that:

2(1) evidence was sufficient to show that defendant's conduct toward victim did not serve legitimate purpose, as required for conviction, and

9(2) defendant had adequate notice that his conduct with respect to victim fell within ambit of stalking statute, as required under Due Process Clause.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ⚿1036.8**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1036 Evidence
110k1036.8 k. Sufficiency of Evidence. Most Cited Cases
Defendant could not assert on appeal his claim that the state was required to introduce competent medical evidence of victim's physical symptomatology in order to prove, in stalking prosecution, that defendant's conduct was of a kind that would cause reasonable person to suffer substantial emotional distress or be in fear of bodily injury, where defendant failed to first raise claim before trial court and, thus, deprived trial court of opportunity to rule on issue. Gen.Laws 1956, §§ 11-59-1(2), 11-59-2(a) (2000).

**[2] Extortion and Threats 165 ⚿32**

165 Extortion and Threats
165II Threats
165k32 k. Evidence. Most Cited Cases
Evidence was sufficient to show that defendant's conduct toward victim did not serve legitimate purpose, as required for conviction for misdemeanor stalking based on harassment, even though conduct included leaving poems and notes; defendant was well aware that his advances toward victim were unwelcome, in that defendant was personally informed by victim's employer that his efforts to contact victim were causing her to feel uncomfortable and fearful, defendant admitted to police that he knew that his communications with victim were unwanted, and certain documents clearly showed that defendant was not only aware but also deeply angered by victim's reaction to his uninvited conduct. Gen.Laws 1956, §§ 11-59-1(2), 11-59-2(a) (2000).

**[3] Criminal Law 110 ⚿257**

110 Criminal Law
110XIII Nonjury or Bench Trial and Conviction
110k257 k. Acquittal or Conviction; Motions for Acquittal, Directed Verdict, Etc. Most Cited Cases
In a jury-waived criminal proceeding, a motion to dismiss, not a motion for judgment of acquittal, is the appropriate motion for a defendant to file when seeking to challenge the legal sufficiency of the evidence.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Attachment B**

**[4] Criminal Law 110 ⟹260.11(3.1)**

110 Criminal Law
110XIII Nonjury or Bench Trial and Conviction
110k260 Appeal and Trial De Novo
110k260.11 Review
110k260.11(3) Questions of Fact
110k260.11(3.1) k. In General. Most Cited Cases

Supreme Court's review of a decision on a motion to dismiss is deferential, and it will not reverse the findings of a trial justice sitting without a jury unless it can be shown that he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong.

**[5] Criminal Law 110 ⟹1035(2)**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in General
110k1035(2) k. Preliminary Proceedings. Most Cited Cases

Defendant waived appellate review of his claim that the state violated discovery rule in stalking prosecution by failing to disclose content of alleged telephone conversation between him and witness, even though defendant raised numerous objections to witness's testimony as to telephone conversation, including the state's alleged failure to disclose content of defendant's statements to witness; after trial court overruled defendant's objection to relevance of witness's testimony, defendant never again raised for trial court's consideration issue of whether the state had violated discovery rule, and thus trial court did not properly pass on issue. Superior Court Rules Crim.Proc., Rule 16(a)(1).

**[6] Criminal Law 110 ⟹1028**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1028 k. Presentation of Questions in General. Most Cited Cases

Supreme Court will not consider a claim that, although briefed and argued at the appellate level, was not effectively raised at trial.

**[7] Criminal Law 110 ⟹1028**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1028 k. Presentation of Questions in General. Most Cited Cases

A litigant must make a timely and appropriate objection during the lower court proceedings before the Supreme Court will indulge the issue on appeal.

**[8] Criminal Law 110 ⟹627.8(6)**

110 Criminal Law
110XX Trial
110XX(A) Preliminary Proceedings
110k627.5 Discovery Prior to and Incident to Trial
110k627.8 Proceedings to Obtain Disclosure
110k627.8(6) k. Failure to Produce Information. Most Cited Cases

When considering an alleged nondisclosure of discovery material in violation the discovery rule, a trial justice and the Supreme Court on review will examine four factors: (1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors. Superior Court Rules Crim.Proc., Rule 16.

**[9] Constitutional Law 92 ⟹258(3.1)**

92 Constitutional Law
92XII Due Process of Law
92k256 Criminal Prosecutions
92k258 Creation or Definition of Offense
92k258(3) Particular Statutes and Ordinances
92k258(3.1) k. In General. Most

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cited Cases

**Extortion and Threats 165 ⇐25.1**

165 Extortion and Threats
165II Threats
165k25 Nature and Elements of Offenses
165k25.1 k. In General. Most Cited Cases

Defendant had adequate notice that his conduct with respect to victim fell within ambit of stalking statute, as required under Due Process Clause, even though defendant was never subject to no-contact order, restraining order, or other formal admonition informing him that his communications with victim were uninvited and unwelcome; record was replete with evidence showing that defendant was aware that his unsolicited contacts with victim were unwanted, including that victim's employer told defendant to leave victim alone and that his activity was causing her to be fearful and uncomfortable. U.S.C.A. Const.Amend. 14; Gen.Laws 1956, § 11-59-2(a) (2000).

**[10] Constitutional Law 92 ⇐258(1)**

92 Constitutional Law
92XII Due Process of Law
92k256 Criminal Prosecutions
92k258 Creation or Definition of Offense
92k258(1) k. In General. Most Cited Cases

Under the Due Process Clause, the state has an obligation to frame its criminal statutes so as to inform adequately the persons to whom it is addressed of the type of conduct that is prohibited. U.S.C.A. Const.Amend. 14.

***426** Aaron L. Weisman, Providence, for Plaintiff.
Earl F. Pasbach, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

PER CURIAM.

This case comes before us on the appeal of the defendant, Neil Stierhoff, from his conviction for misdemeanor stalking under G.L.1956 § 11-59-2, following a jury-waived trial before a justice of the Superior Court. Stierhoff raises the following arguments on appeal: (1) the trial justice erred in denying his posttrial motion to dismiss the charges against him because the state failed to prove that his actions ***427** caused "substantial emotional distress" to the complainant, (2) the trial justice erred in denying his motion to dismiss because the state failed to produce evidence that his actions constituted "harassment" as defined under the statute, (3) the trial justice erred in failing to declare a mistrial in light of an alleged discovery violation committed by the state, and (4) the trial justice erred in denying his motion to dismiss because § 11-59-2, as applied to him, is unconstitutionally vague. The matter came before this Court for oral argument on March 9, 2005, pursuant to an order directing the parties to appear and show cause why the issues raised by this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and that the case should be decided at this time. We affirm the judgment of the Superior Court.

FN1. The General Assembly has since declared stalking to be a felony. Also, the disjunctive phrasing of G.L.1956 § 11-59-2 has been reorganized. That section now provides:
"**Stalking prohibited.**-(a) Any person who: (1) harasses another person; or (2) willfully, maliciously, and repeatedly follows another person with the intent to place that person in reasonable fear of bodily injury, is guilty of the crime of stalking.
(b) Stalking shall be deemed a felony punishable by imprisonment for not more than five (5) years, by a fine of not more than ten thousand dollars ($10,000), or both."

**Facts**

The testimony elicited during defendant's trial established the following facts. On the afternoon of February 23, 2001, an unidentified man

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approached the complainant, "Ann," while she was resting in the employee break room of the Staples store in South Attleboro, Massachusetts, where she worked as a cashier. The man, whom Ann had neither met nor seen prior to that day, and who appeared to be more than twenty years her senior, complimented the young woman on her appearance and placed an envelope on the table located between them. Ann opened the envelope, and saw that it contained a greeting card on which was written a romantic poem. She read the poem and thanked the unidentified man, who thereafter left the room. At no time during this encounter did the man introduce himself. Ann was "shocked" by the romantic messages contained in the poem.

FN2. We will refer to the complainant as " Ann" throughout this opinion in an effort to protect her privacy.

About a week later, while Ann again was relaxing in the Staples employee break room, the same unidentified man entered the room and approached her. As he had during their first encounter, the man gave Ann an envelope containing a greeting card and a poem. The man then offered Ann a DVD movie, saying that an actress in the film resembled her. She declined the offer, however, and the man exited the room, again without providing his name or any other information about himself to the young woman. After he left, Ann read the poem, which was printed on the inside of the greeting card. At trial, she testified that the contents of that poem, which referred to "marriage," made her nervous. As she had done the week before, Ann showed the card to her coworkers and her mother. Due to the content of the two unsolicited cards, the young woman began to develop apprehensions about encountering the man again. She communicated her concerns to her managers at Staples, who consequently agreed to take her off register duty if the man returned to the store while she was working.

FN3. A DVD is a high-density compact disk storing large amounts of data, especially high-resolution audio-visual material.

The man again entered the Staples store a few weeks later, on March 24, 2001. The store manager on that day, Norman J. Letendre, was notified of the man's arrival and promptly removed Ann from register duty. The man left without incident. Undeterred by the manager's efforts to protect the young woman, however, the man returned to the store just days later, again while Ann was working at one of the store's checkout counters. Ann noticed ***428** the man as he walked into the store, and she communicated his presence to her coworkers. They, in turn, informed the store's manager. Although the manager did not remove Ann from her register, he approached the man and informed him that his presence was causing the manager to fear that he might cause a scene. In response, the man assured Letendre that he would complete his purchase and leave the store. He then gathered some merchandise and approached Ann's register aisle, where she rung him out as her manager stood directly next to her. According to Ann, the man intently stared at her while he stood in line. As she waited on him, his gaze terrified the young woman. After the man left the store, Ann cried and was consoled by a coworker.

Much to the complainant's dismay, however, the man's undesired attempts to strike up a relationship with her soon expanded beyond the confines of the Staples store in Attleboro, when an envelope addressed to Ann arrived in the mail at her mother's house in Providence. Although she was living in a student dormitory at Rhode Island College at the time, Ann was home to receive the mail on that particular day. When she opened the envelope, the young woman discovered an Easter card, a CD, and yet another poem printed on the inside of the card. She immediately recognized that the writing style of the poem was the same as that contained in the two cards that she had received from the man whose approaches had frightened her while working at Staples. Ann's initial fears were significantly exacerbated because she realized that the man involved in those encounters had somehow obtained her mother's home address. Distressed by this knowledge, Ann decided to contact the Rhode Island State Police. Because she had no concrete personal information about the man, however, the police were unable to launch a comprehensive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

investigation at that time.

FN4. When she listened to the CD, Ann discovered that it contained numerous " love songs," as she described while testifying.

A short time later, in mid-April 2001, the same man again entered the Staples store during Ann's shift. On that particular day, the store's general manager, Brian P. Leg, approached the man and informed him that his apparent efforts to cultivate a personal relationship with Ann were causing her to feel uncomfortable and fearful. The manager also asked the man to refrain from coming into the store while she was working, and also to stop giving her any poems, letters, or other items in the future. The manager informed the man that if he was unwilling to stop his attempts to interact with the complainant, he would not be permitted to shop at any Staples store in the future. At trial, the manager testified that, during their conversation, the man said that if his actions were upsetting the young woman, he would stop. Nevertheless, this incident motivated Staples management to modify Ann's work schedule in an effort to avoid such future confrontations.

Around the same time, Ann was frightened by another unnerving incident, when a man identifying himself as the person that previously had given the complainant the poems left a voice message on Ann's mother's home telephone answering machine. In the message, the man said that he felt his actions were being misinterpreted and that he had not intended any harm to Ann. Despite the caller's apologetic sentiment, the message upset and worried the young woman even more. For some reason, the contacts ceased for almost a year after the voice message.

*429 On March 19, 2002, however, Ann observed a piece of paper folded and stuck inside the driver's side door of her vehicle, which was parked on the Rhode Island College campus. Thinking that the piece of paper was an everyday campus flier or bulletin, she removed it from the door and began reading it. Upon doing so, Ann discovered, to her dismay, that the folded paper contained not an advertisement, but a romantic poem. Much worse, Ann immediately observed that the note was typewritten in the same font and in the same style as the distressing cards and poems that she had received during the preceding year. Ann immediately broke down in tears and fearfully scanned the lot to see if the man was watching her. She then brought the letter to the Rhode Island State Police.

On March 29, 2002, Ann discovered another note attached to the outside of her car door in the same manner as the previous note. Ann once again became alarmed when she saw the note, and, without reading it, she took it directly to the state police. On April 2, 2002, Ann discovered a third note placed in the door of her car, in the same fashion as on the previous two occasions. She again took the letter directly to the state police without reading it.

Later on that same day, Ann was working at Staples when a suspicious-looking man wearing large sunglasses entered the store. She noticed the man because he did not remove his sunglasses as he shopped, but Ann did not immediately recognize the customer as anyone she had ever met or seen prior to that day. The man collected some items and went to Ann's register, where she rang him out. After he had made his purchase and exited the store, however, Ann came to the chilling realization that the man in the glasses was the same man who had approached her in the employee break room in February 2001. As the reality sank in, Ann became "scared" and "ready to cry." Notwithstanding her fear, she immediately told her manager, Riccardo Oriani, of the man's whereabouts. The manager then ran out of the store in an effort to ascertain the man's license plate number. Fortunately, Oriani was able to observe the suspicious man as he entered a van in the Staples parking lot. He wrote down the vehicle's license plate number as it exited the lot, and he communicated that information to law enforcement later that same afternoon.

That license plate number enabled the state police to identify the owner of the van as Neil Stierhoff of Providence. In light of Ann's complaints from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

previous year, the state police decided to initiate extensive surveillance of the suspect. On four successive evenings in early April 2002, the state police watched as Stierhoff left his home and traveled to Rhode Island College. On each night, they observed Stierhoff approach Ann's vehicle, which was parked in the student lot outside the Webber Hall dormitories.

Because of Stierhoff's rather furtive behavior on those consecutive evenings, and fearful of his motives, the state police devised a "sting" operation. Ann agreed to participate, which would require her to drive her vehicle in the Rhode Island College vicinity so that the suspect might notice and begin to follow her. On the evening of April 12, 2002, the state police observed the suspect leave his home and begin driving toward Rhode Island College. They instructed Ann to sit in her car in the student parking lot to await Stierhoff's arrival on campus. Ann was accompanied by one of the state police detectives, Joseph Dubeau, who hid in the back seat of her vehicle while she waited. When they saw Stierhoff's van arrive on campus, the state police directed Ann to ***430** begin driving her vehicle on a predetermined route. Ann complied, exiting the Rhode Island College campus. The plan seemed a success, as the state police observed Stierhoff's van follow Ann's vehicle down a road leading out of the campus.

When she reached the end of the way connecting Rhode Island College to Metcalf Road, Ann took a left turn. However, the van did not follow her. As a result, the state police instructed Ann to park her vehicle in a local convenience store parking lot. Twenty to thirty minutes later, the state police observed Stierhoff's van, parked with its lights off, on a side street adjacent to the convenience store where Ann had parked. The state police then directed Ann to drive down Woonasquatucket Avenue toward a Walgreen's store located a short distance from the convenience store. She complied, and the state police watched as Stierhoff again followed Ann's vehicle into the Walgreen's parking lot. When she arrived there, the State Police advised Ann to exit her vehicle and enter the store. She followed their directions, and the police watched as Stierhoff got out of his van and followed her into the building. Several members of the state police immediately entered the store behind Stierhoff and placed him under arrest. As the suspect entered the store, Ann later testified, she was "scared to death."

After being arrested and advised of his *Miranda* rights, Stierhoff admitted to following Ann because of his romantic interest in her, although he knew his advances were unwanted. In an interview later that night, Stierhoff admitted to giving Ann the poems and cards while she worked at Staples and further acknowledged sending the Easter card, music CD, and poems to her mother's residence in Providence. The suspect also admitted to leaving a message on the answering machine at that home. Stierhoff subsequently signed a consent form allowing the state police to search his apartment and his personal computer. The computer search revealed several notes and other documents expressing Stierhoff's amorous sentiments for Ann. The suspect subsequently was charged with stalking.

At trial, the state presented the testimony of Ann, Ann's mother, the three Staples managers who had dealt with Stierhoff: Norman Letendre, Brian Leg, and Riccardo Oriani, Rhode Island State Police Detective Timothy Sanzi, and IRS special agent James Donahue, who testified briefly about his efforts to extract information from the hard drive of defendant's personal computer. The state also introduced into evidence each of the letters, cards, poems, notes, and the CD that defendant had given to the complainant. In addition, the state introduced several other undelivered documents and letters that were intended for Ann. Those undelivered letters were extracted from Stierhoff's home computer. At the conclusion of the evidence, defendant moved to dismiss the criminal charges on the grounds that the state had failed to sustain its burden of proof under § 11-59-1 and § 11-59-2. The trial justice granted the motion in part, finding that the state had failed to present any evidence that defendant had willfully, maliciously, and repeatedly followed the complainant with the intent to place her in fear of bodily injury. However, the trial justice found that the state had presented evidence sufficient to support a conviction for stalking based on Stierhoff's harassment of the complainant. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant was declared guilty of stalking in violation of § 11-59-2 and sentenced to twelve months, nine to serve, with forty-five days in the Adult Correctional Institutions and the remainder on home confinement. The remaining three months were suspended. ***431** Judgment was entered on August 18, 2003, and defendant filed a timely appeal.

**Analysis**

**I**

**Motion to Dismiss**

At the time of defendant's arrest in April 2002, G.L.1956 (2000 Reenactment) § 11-59-1 provided as follows:
"**Definitions.**-As used in this chapter:
(1) 'Course of conduct' means a pattern of conduct composed of a series of acts over a period of time, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'
(2) 'Harasses' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or bothers the person, and which serves no legitimate purpose. The course of conduct must be of a kind that would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury."

FN5. In June 2002, the General Assembly amended § 11-59-1(2) to include an element of specific intent. That section now provides:
"(2) 'Harasses' means a knowing and willful course of conduct directed at a specific person *with the intent to* seriously alarm, annoy, or bother the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury." P.L. 2002, ch. 183, § 1. (Emphasis added.)

At the time of defendant's arrest, G.L.1956 (2000 Reenactment) § 11-59-2(a) provided as follows:
"**Stalking prohibited**-(a) Any person who: harasses another person; or willfully, maliciously, and repeatedly follows another person with the intent to place that person in reasonable fear of bodily injury, is guilty of the crime of stalking, punishable by imprisonment for not more than one year or by a fine of not more than one thousand dollars ($1,000), or both."

[1] The defendant's first argument on appeal is that the trial justice should have granted his motion to dismiss because the state failed to present any evidence that defendant's conduct was "of a kind that would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury" pursuant to § 11-59-1(2). Specifically, he maintains that the state failed to prove that the complainant sustained substantial emotional distress because it failed to introduce competent medical evidence of Ann's physical symptomatology. We discern no such prerequisite for the application of § 11-59-1(2) in either the language of the statute or in any decision of this Court. Moreover, our review of the record in this case reveals that defendant failed to raise this argument at any time before the trial justice, including during the hearing on his posttrial motion to dismiss. "It is axiomatic that [this Court] will not entertain on appeal an issue that the aggrieved party did not specifically raise before the trial court." *Town of Richmond v. Wawaloam Reservation, Inc.*, 850 A.2d 924, 930 (R.I.2004). "When an issue is not explicitly raised in the trial court with sufficient clarity so that the trial justice may appropriately respond to the claims of a party, we shall not consider the alleged error on appeal." *Id.* (quoting *Scully v. Matarese*, 422 A.2d 740, 741 (R.I.1980)). Because defendant failed to first raise this issue before the trial justice, he deprived the court of the opportunity to rule on the issue. As a result, defendant may not assert this argument on appeal.

***432** [2][3][4] The defendant's second contention

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on appeal is that the trial justice should have granted his posttrial motion to dismiss because the state failed to show that his conduct toward Ann did not serve a "legitimate purpose," as required to prove "harassment" under § 11-59-1. On this point, defendant also maintains that his actions were constitutionally protected, and thus outside of the scope of § 11-59-2. At the outset, we note that defendant waived his right to a jury trial in this matter. "In a jury-waived criminal proceeding such as this one, a motion to dismiss-not a motion for judgment of acquittal-is the appropriate motion for a defendant to file when seeking to challenge the legal sufficiency of the evidence." *State v. Silvia,* 798 A.2d 419, 424 (R.I.2002). As a result, our standard of review in this case is different from what it would have been if a jury had returned a guilty verdict against defendant. We have held that in ruling on a motion to dismiss presented after the close of all the evidence, a trial justice sitting without a jury should:

"weigh and evaluate the trial evidence, pass upon the credibility of the trial witnesses, and engage in the inferential process, impartially, not being required to view the inferences in favor of the nonmoving party, and against the moving party.

After so doing, if the trial justice in a criminal case setting concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she denies the defendant's motion to dismiss and, if both sides have rested, enters decision and judgment of conviction thereon. If the evidence is not sufficient, he or she grants the motion and dismisses the case." *State v. McKone,* 673 A.2d 1068, 1072-73 (R.I.1996).

Accordingly, "[o]ur review of the decision on a motion to dismiss is deferential, and we will not reverse the findings of a 'trial justice sitting without a jury unless it can be shown that he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong.' " *Silvia,* 798 A.2d at 424 (quoting *State v. Traficante,* 636 A.2d 692, 694 (R.I.1994)).

In *State v. Breen,* 767 A.2d 50, 56 (R.I.2001), we recognized that mere communications sent from one person to another, without more, may not, as a matter of law, amount to "harassment" under § 11-59-2. Notwithstanding the absence of a precise statutory definition of the term "legitimate purpose," however, we held that in circumstances in which a defendant *is aware* that his or her contacts with the complainant are unwelcome; such communications depart from the realm of legitimacy or protected speech and become prohibited behavior under the " stalking" statute. *Breen,* 767 A.2d at 56. In *Breen,* the defendant was convicted of stalking the complainant, his ex-girlfriend, in December 1992.

As a result, he was sentenced to one year of probation and ordered to have no contact with the complainant. Commencing the day after the expiration of his probationary term, however, the defendant began leaving letters of poetry on the complainant's vehicle and mailing unsigned cards to her residence. In light of their tumultuous past, the complainant was deeply disturbed by the defendant's resumed contacts and contacted the police. The defendant thereafter was charged and convicted a second time for violating § 11-59-2.

On appeal, defendant argued that his letters and poems served a "legitimate purpose," which disqualified the conduct from the meaning of " harassment" under the statute. We disagreed, holding that there was substantial evidence that the defendant was aware that his continued communications with the complainant were unwelcome. That awareness was based on ***433** the defendant's previous conviction for stalking the same woman and the prior imposition of a no-contact order. We determined that to be a sufficient basis to remove his conduct from the ambit of the statute's "legitimate purpose" exemption.

Here, the state provided conclusive evidence at trial that defendant was well aware that his advances toward Ann were unwelcome. The record establishes that, as early as April 2001, defendant was personally informed by Staples management that his efforts to contact Ann were causing her to feel uncomfortable and fearful. When he was arrested by the state police a year later, defendant admitted his knowledge that his communications with the complainant were unwanted. The state introduced numerous documents obtained from the hard drive of defendant's computer that clearly indicate that defendant was not only aware, but also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deeply disturbed and angered by the complainant's reaction to his uninvited letters, poems, cards, CD, and personal visits to the Staples store. In one such document, defendant acknowledged and admitted to upsetting and disturbing the complainant:

"I wanted to share my thoughts and compliments with you in private. What was so wrong? * * * I put my thoughts on paper, so as not to appear to be too aggressive. *But you viewed me as a threat and as some kind of predator.* It was a shocking and disturbing revelation to find out that you would have practically had me incarcerated for merely handing you a couple of heartfelt poems[.]" (Emphasis added.)

We are satisfied that in denying defendant's posttrial motion to dismiss, the trial justice conducted a comprehensive review of the evidence presented to the court. He concluded that there was no basis upon which to suggest that defendant's continued activity toward Ann may either have served a legitimate purpose or fallen within the purview of " constitutionally protected" speech. The trial justice declared, "[c]ontinually leaving love poetry or love notes * * * for [Ann], stuffing them in her car door without ever introducing himself to her does not reflect shyness. Rather, in this [c]ourt's view, it reflects sneaky, surreptitious activity and, indeed, activity that this defendant knew full well was upsetting to her." We have reviewed the record and the evidence presented in this case and discern no indication whatsoever that the trial justice in any way misconceived relevant and material evidence or was otherwise clearly wrong in his assessment of the pertinent issues in this case. We completely agree with the decision of the trial justice to deny the motion to dismiss.

FN6. We specifically note that the communications which constituted such a large portion of the conduct by defendant that violated the statute were not communications about matters of public concern, nor did they otherwise serve a legitimate purpose pursuant to § 11-59-2. *Cf. Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (differentiating between speech on matters of public concern and speech on private matters).

## II

## Discovery Violation

The defendant next contends that the trial justice erred in permitting the state to introduce at trial the testimony of Brian Leg, one of the Staples store managers, about statements defendant made to him during a telephone conversation following their in-store confrontation in April 2001. The defendant maintains that the state's failure to disclose the contents of his statements to the witness violated its duty under Rule 16(a)(1) of the Superior Court Rules of Criminal Procedure, which requires the state in a criminal prosecution, upon written request by a defendant, to ***434** fully disclose to the defendant "all relevant written or recorded statements or confessions, signed or unsigned, or written summaries of oral statements or confessions made by the defendant[.]" The state, on the other hand, asserts that it never possessed any knowledge prior to his testimony at trial that Leg ever had engaged in any additional conversation with defendant outside of the Staples store. In the alternative, the state maintains that the evidence elicited from Leg, even if improperly admitted, would not have affected the outcome of the case, and therefore was harmless to the determination of defendant's guilt under § 11-59-2.

FN7. Rule 16(a)(1) of the Superior Court Rules of Criminal procedure provides, in pertinent part:

"*Discovery by Defendant.* Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:

(1) all relevant written or recorded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> statements or confessions, signed or unsigned, or written summaries of oral statements or confessions made by the defendant, or copies thereof[.]"

The record indicates that when Leg began to testify about his telephone conversation with the defendant, defense counsel immediately objected. At that time, defendant alleged several grounds for his objection. Specifically, defendant challenged the relevance of the testimony, questioned the grounds upon which the witness could identify defendant over the telephone, and asserted that the state had failed to disclose the content of the alleged conversation in any discovery. Because there was no jury sitting in this matter, however, the trial justice permitted the state to further inquire of the witness as to the purported telephone conversation to determine the propriety of defendant's objection. After Leg testified about the brief conversation with defendant, the trial justice asked defendant's counsel whether he still intended to pursue his earlier objection. At that point, defendant objected only to the relevance of the witness's testimony, arguing that the witness's lack of any personal knowledge of the identity of the voice on the telephone rendered his testimony unfairly prejudicial to defendant. The court overruled the objection, and defendant asserted no further challenges to the witness's testimony.

[5][6][7] The defendant's acquiescence in the decision of the trial justice, and his failure to press his argument that the state failed to disclose the content of the alleged telephone conversation, results in a waiver of the issue on appeal to this Court. It is well established that this Court will not consider a claim that, "although briefed and argued at the appellate level, * * * [was] not effectively raised at trial." *Foley v. Osborne Court Condominium,* 724 A.2d 436, 440 (R.I.1999) (quoting *State v. Rupert,* 649 A.2d 1013, 1015 (R.I.1994)). Thus, a "litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal." *State v. Grant,* 840 A.2d 541, 546 (R.I.2004). We have held, however, that a general objection will not preserve an issue for appellate review; rather, "assignments of error must be alleged with sufficient particularity so it will call the trial justice's attention to the basis of the objection." *Id.* at 546-47. In this case, counsel raised numerous objections to Leg's testimony, including the state's alleged failure to disclose the content of defendant's statements to the witness. After the trial justice overruled counsel's objection to the relevance of the ***435** testimony, however, counsel never again raised for the trial justice's consideration the issue of whether the state had violated Rule 16. Moreover, upon being asked by the trial justice if he had any further objections, defendant replied in the negative. Thus, the record indicates that defendant never adequately expressed its Rule 16-based objection in a manner sufficient to afford the trial justice an opportunity to elicit further information and properly pass on the issue. This omission, whether intentional or not, bars defendant from now raising the argument on appeal to this Court.

[8] Even assuming, *arguendo,* that defendant had properly raised its objection under Rule 16 before the trial justice; we would be reluctant to second-guess the trial justice's assessment of the effect of Leg's testimony on the overall outcome of this case. When considering an alleged nondisclosure of discovery material in violation of Rule 16, a trial justice and this Court on review will examine four factors: "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *State v. Padula,* 551 A.2d 687, 690 (R.I.1988) (quoting *State v. Boucher,* 542 A.2d 236, 241 (R.I.1988)). Here, it is readily apparent to this Court that the evidence of defendant's telephone conversation as communicated by Leg works little, if any, prejudice to defendant. Our review of the record amply demonstrates that the content of the telephone conversation, as recounted by Leg, was the same as the conversation in which Leg and defendant previously had engaged at Staples during their April 2002 encounter-a conversation about which Leg already had fully testified. Also, considering that the state produced substantial additional evidence establishing defendant's guilt in this matter, it is unlikely that the state's failure to disclose defendant's statements to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Leg during the telephone conversation would be sufficient to warrant the imposition of a sanction under Rule 16, much less the declaration of a mistrial, or reversal on appeal to this Court. *See generally State v. Hazard,* 797 A.2d 448, 470 (R.I.2002) (where trial justice prevented defense counsel from arguing about the significance of a witness's failure to testify, such error was not so prejudicial to warrant a new trial given the substantial evidence establishing the defendant's guilt).

**III**

**Constitutionality of § 11-59-2**

[9][10] Finally, we turn to Stierhoff's argument that the trial justice erred in denying his motion to dismiss the criminal charges because § 11-59-2, as applied to defendant, is unconstitutionally vague. This Court has recognized that "[t]he due-process clause of the Fourteenth Amendment requires that a criminal statute be declared void when it is 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *.' " *State v. Alegria,* 449 A.2d 131, 133 (R.I.1982) (quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). As a result, "the state has an obligation to frame its criminal statutes so as to inform adequately the persons to whom it is addressed of the type of conduct that is prohibited." *Id.*

"Vagueness challenges under the due process clause rest principally on lack of notice." *State v. Sahady,* 694 A.2d 707, 708 (R.I.1997). Thus, we have held that "[a]bsent some other constitutional concern, if the facts show that a defendant is given sufficient notice that his conduct is at risk we see no reason to speculate whether the statute notifies a hypothetical ***436** defendant." *Id.* "This method of generally examining vagueness challenges only as they apply to a particular defendant's factual circumstances furthers our long settled practice of construing ' legislative enactment[s] of the General Assembly to be constitutional and valid * * * whenever such a construction is reasonably possible.' " *Id.* (quoting *State v. Fonseca,* 670 A.2d 1237, 1240 (R.I.1996)).

Mindful of these principles, we see no merit in defendant's challenge to the constitutionality of § 11-59-2. The crux of defendant's argument is that the statute is unconstitutionally vague because defendant was at no time placed on notice that his communications with Ann might expose him to criminal liability. This contention plainly contradicts the weight of the evidence introduced at trial. While the defendant's own admissions to the state police clearly establish that he had knowledge that his unsolicited contacts with Ann were unwelcome as early as April 2001, the record is replete with additional evidence supporting this conclusion. Namely, the defendant was told by Staples management to leave the complainant alone, and that his activity was causing her to be fearful and uncomfortable. Following that initial warning, defendant left a voice message on the complainant's mother's answering machine in which he quite clearly apologized for his behavior toward Ann. Several other writings uncovered from defendant's home computer unequivocally confirm that he was aware that his efforts to begin a romantic relationship with Ann were unwanted. Clearly, the evidence presented by the state in this case, including defendant's own admissions, establish that Stierhoff knew that the complainant was bothered by his conduct, yet he persisted in his attempts to engage her romantic interest in him until the day of his arrest in April 2002.

In the face of these facts, the defendant, citing our decision in *Breen,* argues that he was not sufficiently and adequately on notice of the criminality of his actions for the purposes of § 11-59-2 because he was never the subject of a no-contact order, restraining order, or other formal admonition informing him that his communications with Ann were uninvited and unwelcome. The defendant misconstrues and stretches our holding in *Breen;* there is nothing in the language of § 11-59-2 to suggest that a criminal defendant must first be served with any such type of official warning before his alarming, annoying, or bothersome conduct falls within the ambit of the statute.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Conclusion**

For the foregoing reasons, we affirm the Superior Court judgment and remand the record in this case thereto.

R.I.,2005.
State v. Stierhoff
879 A.2d 425

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.