IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Cr. No. 1:06-CR-00042-ML |
| v. | ) | |
| Neil Stierhoff, Defendant. | ) | **Defendant's Supplemental Memorandum of Law to Support Motion to Suppress Evidence** |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW**

Now comes Neil Stierhoff ("Stierhoff" or Defendant), by and through undersigned counsel, and respectfully submits this Supplemental Memorandum of Law to support his Motion to Suppress Evidence (Docket 44) and to respond to Plaintiff's "Supplemental Memorandum of Law In Support Of Government's Objection to Defendant's Motion to Suppress Evidence" (Docket 62) as requested by the Court in its oral order at the conclusion of the Motion to Suppress hearing on December 12 and 13, 2006. Hearing Tr. 12/13/2006 p.192, line 15. Defendant submits that the testimony and evidence presented during the hearing provide a more accurate and consistent understanding of the facts related to the obtaining of evidence by Rhode Island State Police ("RISP"), which was subsequently given to the Internal Revenue Service (IRS), than the understanding derived from only from the government's testimony and documents, available prior to the hearing, which had been incorporated into both the Motion to Suppress and the government's objections to the Motion. Based on this more complete view of the facts and for the reasons set forth below Defendant asserts the following:

1. All of the evidence obtained after Defendant's immediate arrest was obtained as a result of Defendant's involuntary consent resulting from the illegal and unlawful actions of RISP;
2. The seizure, search and viewing of Defendant's computer data was improper; and
3. All evidence obtained by the IRS after opening the files requested by RISP was beyond the scope of the RISP investigation.

Support for Defendant's assertions is set forth below.

**A. Undisputed Material Facts.**

On the evening of April 12, 2002, RISP set up a "sting operation" to entrap Defendant into an alleged misdemeanor stalking offense. From evidence and testimony submitted at the Suppression Hearing it is clear that RISP knew the identity of Defendant from the extensive research they conducted prior to the surveillance of April 12th. This included his driver's license information gleaned from Bald Hill Dodge, the car dealer which rented a vehicle to Stierhoff. RISP also had also obtained from previous surveillance a photograph of Defendant at the Corliss Street Post Office on April 5, 2002. This is verified by Detective Sanzi's narrative report[1] at page 6 which states:

> A photograph was obtained of the occupant as he entered the Corliss Street Post Office on the evening of April 5, 2002. This photograph was consistent with the physical description provided by both the rental clerk at Bald Hill Dodge in Warwick, as well as the complainant.

This is also confirmed in the Hearing Transcript of December 12, 2006, at p. 53 lines 20-23.

In any event, the undisputed facts reveal that the surveillance on April 12th was initiated at approximately 8:00 p.m. in a Rhode Island College parking lot. See, Exhibit "A" at page 10 and Hearing Tr. 12/12/2006 p.113 at lines 18-19. Defendant was later confronted by RISP officers and handcuffed with his hands behind his back in a Walgreen's store at approximately 9:30 p.m. See Hearing Tr. 12/12/2006 p.113 at line 25; Hearing Tr. 12/13/2006 p.121 at lines 18-19. Defendant was immediately placed in a police car. From 9:30 p.m. until shortly before 11:30 p.m. Defendant was confined in the back seat of a State Police vehicle. At some point during this time Defendant was removed from the car and the handcuffs were removed and

---

[1] Detective Sanzi referred to his narrative report at lease four times during his direct and cross examinations. See Hearing Transcript of 12/12/2006 p.53 at line 11 and p.105 at lines 7, 12, and 15. Defendant's attorney requested to Sanzi to view his narrative, labeled as government's Exhibit C-14, p.106 at line 18. Exhibit C-14 was inadvertently not offered or admitted as evidence at the hearing. Accordingly, Detective Sanzi's narrative report is hereby annexed and attached hereto as Exhibit "A".

replaced so that his hands were handcuffed in front so he could sign the "Consent" form.[2] Hearing Tr. 12/12/2006 p.68 at lines 2-8. The search of Defendant's residence didn't occur until approximately 11:30 p.m. See Exhibit "A" at page 7 and Hearing Tr. 12/12/2006 p.135 at lines 2-5. The search concluded sometime after midnight and a second consent form to search storage bins located at Shelby Self Storage was obtained. See testimony of Detective Killian, Hearing Tr. 12/13/2006 p.26 at lines 3-15 and Exhibit "A" at page 8. After the search of the storage bins Defendant was taken to Lincoln Woods barracks where he was given a Miranda rights form and asked to sign the form before an interview at 2:00 a.m. See Hearing Tr. 12/12/2006 p.89 at line 18-19; p.90, at lines 9-11 and pp.90-91 at lines 24-3.

**B. Defendant's Consent was Not Voluntary.**

Defendant addressed in his Motion to Suppress that the Fourth Amendment to the United States Constitution reads:

> The right of the people to be secure in their persons, houses papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Defendant also noted that a search conducted without a warrant is per se unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-5 (1971). "A warrantless [residential] search violates the Fourth Amendment unless it comes within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. A consensual search is one such exception, *United States v. Coraine*, 198 F.3d 306 (1st Cir. 1999), citing, *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999), quoting, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[2] Defendant was originally handcuffed behind his back, see testimony of Sanzi, Hearing Tr. 12/12/2006 p.60 at line 16. Later Sanzi's testimony indicates that Defendant was handcuffed with his hands in front while in the car, see Hearing Tr. 12/12/2006 p.71 at lines 11-2 and p.72 at lines 22-24. Defendant's testimony confirms that his hands were originally handcuffed behind his back until some time after he was placed in the back seat of the car, see Hearing Tr. 12/13/2006 p.124 at line 1-3; p.120 at line 18-20 and lines 24-25; and p.164 at line 16.

It is also "well settled that a search conducted pursuant to a valid consent is constitutionally permissible," see *United States v. Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). The Fourth Circuit similarly holds "Consent to search is valid only if it was **knowing and voluntary** and courts assess validity based on the 'totality of the circumstances.' *Mendenhall*, 446 U.S. at 557." *Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001). The Supreme Court observed that acquiescence to an assertion of lawful authority does not constitute an understanding, intentional and voluntary waiver of rights under the Fourth Amendment. *Id.* citing *Bumper v. North Carolina*, 391 U.S. 543, 549-50 (1968). But, because the favored practice is a search pursuant to a warrant, and waivers are disfavored, the government has the burden of proving a valid, voluntary consent by a preponderance of the evidence. *United States v. Griffin*, 431 F.Supp. 2d 164,170 (D.Mass 2006), citing, *United States v. Winston*, 444 F.3d 115, 121 (1st Cit. 2006). Thus, the question in the instant case is whether the alleged consent given by Defendant Neil Stierhoff was voluntary.

"Whether consent to search was voluntarily given is to be determined from the totality of all the circumstances. It is the government's burden to prove that the consent was freely and voluntarily given," *Soriano* supra. The Ninth Circuit has given a list of factors which can be used to determine if a given consent was voluntary. The five factors listed were:

(1) whether defendant was in custody;
(2) whether the arresting officers had their guns drawn;
(3) whether Miranda warnings were given;
(4) whether the defendant was notified that she had a right not to consent; and
(5) whether the defendant had been told a search warrant could be obtained.

These factors are not conclusive nor is any one factor determinative. They are merely guidelines to resolve the issue of voluntariness. The First Circuit has a similar list, though it is not as well defined. In *United States v. Weidul*, 325 F3d 50 (1st Cir. 2003), the Court

acknowledged that the alleged consent must be voluntary and concluded that "Whether consent is voluntary is to be determined by examining the totality of the circumstances, including the interaction between the police and the person alleged to have given consent." Citing *United States v. Esquilin*, 208 F.3d 315, 318 (1st Cir. 2000).

Additional factors are found in the *Coraine*, supra, "voluntariness turns on a number of factors, including the person's age, education, experience, intelligence, and **knowledge of the right to withhold consent**." Citing *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir. 1993)(Emphasis added). The *Coraine* court also found that whether the alleged consenting party was advised of their constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances were also factors to be considered. The court in *United States v. Marshall*, 348 F.2d 281 (1st Cir. 2003) cited *United States v. Twomey*, 884 F.2d 46, 51 (1st Cir. 1989), to approve the factors to also include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics. Thus, the First Circuit list would include:

(1) Age;
(2) Education;
(3) Experience;
(4) Intelligence;
(5) Knowledge of the right to withhold consent;
(6) Interaction between police and consenting person;
(7) Evidence of coercive tactics; and
(8) If inherently coercive circumstances were present.

In addition, a factor which the courts apparently have not considered before is the element of the police officers actions being inconsistent with the Criminal Rules and the statutory procedures. When the above 14 factors are applied to both the disputed and undisputed facts in this case it is clear that Stierhoff's signing the two consent forms was not voluntary and therefore his consent was not voluntary.

**1. Factors Favoring a Finding of Voluntary Consent.**

There are only three factors favoring a finding of voluntary consent. At the time Defendant was arrested and signed the consent forms he was 46 years old and had a degree in engineering. The third favoring factor is that the officers did not brandish their weapons, though, according to Stierhoff, they exercised force during the arrest (see Hearing Tr. 12/13/2006 p.120 at lines 22-23 and pp.156-157 at lines 20-21) and during the search of the residence when he objected to taking the computer (Hearing Tr. 12/13/2006 p.137 at lines 5-8).

**2. Factors Militating Against Defendant's Voluntary Consent.**

**a. Experience of Defendant.**

An exhaustive search of Stierhoff's background by RISP prior to his arrest indicated that he had never been arrested before. Thus, he had no experience with police officers, Miranda rights, or giving or refusing consent for searches. Thus, his lack of experience with the criminal justice system does not militate in favor of voluntary consent.

**b. Defendant in Custody.**

It is undisputed that Stierhoff was in custody at the time he signed the forms. Not only was he in custody, he was handcuffed. The undisputed evidence reveals that Stierhoff was handcuffed initially with his hands behind his back, and later, presumably so he could sign the form, with his hands in front. By the time the first consent form was signed, Stierhoff had been handcuffed in the back of a police car for two hours. By the time the second form was signed he had been handcuffed for almost three hours.

**c. Giving of Miranda Warnings.**

It is undisputed Stierhoff was given a Rights form at 2:00 a.m. on April 13, 2002, and he signed it. However, the evidence does not indicate that these rights were read to him at this time

or that he read or understood them. When asked about having been given his Rights form, Defendant was confused and did not acknowledge that he was advised of or understood his rights as required under *Miranda v. Arizona*. The colloquy that transpired during police questioning some time after 2:00 a.m. on April 13, 2002, went as follows (see, Deft. Statement):

79. Q. Okay. And you also, prior to this statement, you were given your Rights form, is that correct, to which you signed?
80. A. The right to search or the right to give this statement?
81. Q. The Rights, your Miranda Rights form.
82. A. Yes.

The troubling aspect here is that Stierhoff is completely confused and does not seem to grasp the purpose of being advised of his Rights -- that he would be waiving critical constitutional protections by signing these forms which the police presented to him all evening -- and that he had the right to **refuse** his consent to the police searches, seizures and questioning, not that he had the right to agree to them. Stierhoff denies that he was read his rights. See, Hearing Tr. 12/13/2006 p.124 at lines 8-12. Detective Sanzi, on the other hand, gives inconsistent versions of how he allegedly gave Stierhoff his rights. On page 61 at line 23, Hearing Tr. 12/12/2006, Sanzi claims that he read Defendant his rights from a card in the back seat of a cruiser. Yet, in his narrative he gives a different version -- that Stierhoff was advised of his Miranda rights before he was placed under arrest, i.e. handcuffed (Exhibit "A" at p.6).

Defendant contends that Detective Sanzi has a history of violating people's constitutional rights. At the beginning of the hearing, during the Motion for Exculpatory Evidence, Defendant's counsel requested an in camera review of personnel information relating to the police officers. Hearing Tr. 12/12/2006 p.19 at lines 4-11. The authority of this request is from and consistent with the case of *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991). Defendant had strong reason to believe that Sanzi has had at least one occurrence wherein he violated another person's

constitutional rights[3] and Defendant needed the disciplinary action records for impeachment purposes. This information was never provided and yet it may seriously impeach Sanzi's credibility relating to honoring and protecting a citizen's constitutional rights. This is especially true where he gives conflicting testimony about the time and manner of his giving the Miranda rights. As a result, the question of whether Stierhoff was ever actually given his Miranda rights prior to 2:00 a.m. is not clearly established. Thus, it militates against Stierhoff's allegedly giving knowing and voluntary consent.

**d. Notification of Right to Refuse Consent.**

There is no record that any police officer informed Stierhoff that he had a right to refuse consent. The only time the issue of a right to refuse consent was raised was when a roommate allegedly yelled into the room where Stierhoff was being held by the RISP during the search of his residence. See Exhibit "A" at page 8. Stierhoff denied that he heard these comments. See, Hearing Tr. 12/13/2006 pp.173 line 23 and 174 line 1. Thus, the failure of the officers to apprise Stierhoff of his right to refuse consent is a factor which weighs against Defendant giving voluntary consent.

**e. Whether Defendant was Told a Search Warrant Could be Obtained.**

Detective Sanzi denies that he told Stierhoff he could get a warrant. Hearing Tr. 12/12/2006 p.70 at lines 17-20. Stierhoff's testimony indicates otherwise. Not only was he told that it would be pointless to resist because a warrant would be obtained, but he was also told that the door would be broken down if necessary. Hearing Tr. 12/13/2006 p.125 at lines 17-23.

---

[3] See attached and annexed hereto Exhibit B, newspaper article about Sanzi taking reporter's notebook.

**f. Interaction Between Police and Consenting Person.**

The factor of being told that a search warrant would be obtained is closely related to and even overlaps the more important factor of the interaction between the police officers and Stierhoff, which led to an agreement between them concerning the consent search.

It is undisputed that Stierhoff finally consented after spending almost two hours in the back seat of a police car. It is also undisputed that his alleged consent was conditioned on a promise that the people living at his address would not be involved or disturbed. Detective Sanzi acknowledge that Stierhoff had this concern in his police narrative. Exhibit "A", at page 7. According to Sanzi's narrative, Stierhoff was initially reluctant to disclose anything about his living situation, but after convincing him the RISP already knew where he lived, and that they would get a warrant if he didn't consent, the form was signed. Stierhoff's will was overborne and he finally signed the consent form when the police agreed to not disturb his roommates or identify themselves as police officers.

Sanzi's testimony indicated virtually the same except it added that Stierhoff did not want marked police cars present. Hearing Tr. 12/12/2006 pp.68-69 at lines 23-1. Stierhoff's version was somewhat similar, but he regarded the conversation as an agreement. Hearing Tr. 12/13/2006 pp.128-129 at lines 24-4. The essence of the conversation was that Stierhoff did not agree to allow the search of his room until after the police officers agreed not to disturb his roommates. It was an agreement the officers did not keep and likely only agreed to in order to overcome his reluctance.

During the interaction with Stierhoff the police officers also made some blatantly false assurances. To overcome his reluctance the police repeatedly assured Stierhoff that they were only going to search his room to obtain evidence of the poems. See, direct examination at

Hearing Tr. 12/12/2006 p 68 at lines 16-20; during cross-examinations at Hearing Tr. 12/12/2006 pp.126-127 at lines 20-14; pp 127-128 at lines 19-1; pp.128-129 at lines 17-5; p.137 at lines 18-20; pp.151-152 at lines 23-3; and pp.169-170 at lines 25-22.

The interaction between Stierhoff and the RISP officers regarding the search of the storage bins at Shelby Storage had a similar deceptive tone to them. Sanzi in his narrative merely mentioned that a second consent form was obtained, but he does not explain the circumstances. See Exhibit "A" at page 8. In his direct examination Sanzi also merely mentions the fact that the consent form was signed. Only in this case he adds a little extra fact: the consent form was signed in the car and that Stierhoff said the only thing at his storage bins was his work. Hearing Tr. 12/12/2006 p.83 at lines 8-21. Stierhoff had a more detailed understanding for what purpose the police promised they would be searching. Hearing Tr. 12/13/2006 pp.140-141 at lines 18-3; and pp.178-179 at lines 18-8. Their alleged purpose was they wanted to make sure that there were no dangerous weapons and that Stierhoff was not a dangerous person. This rationale by the RISP seems almost incredulous considering the extensive surveillance, background check, initial body search and subsequent residence search, all of which revealed no weapon or any evidence of any danger to anyone.

**g. Inherently Coercive Circumstances Present.**

When Defendant was initially handcuffed he felt threatened, primarily because the officer involved in arresting him exhibited an air of jubilance, as if they had captured their prey. Hearing Tr. 12/13/2006 p.159 at lines 5-19; and p.169 at lines 10-20. His overall feeling was that of being subjected to psychological torture. Hearing Tr. 12/13/2006 p.182 at line 8-15. By the time of the search of the storage units, Stierhoff had been in handcuffs for about four hours. He still had not been told the exact nature of the charge for which he was arrested. He testified that

he thought the police were trying to "scare" him away from the young women in question. He had all ready endured two hours of questioning from two State Police detectives in the back seat of a police car before he signed the first consent form and then only after certain assurances were made. Also, the expressed object of the consent to search was very narrowly tailored in each instance. First, the police only said they wanted to assure themselves that the poems were written by him on his computer, so the consent was limited to the "creative writing directory." Second, the search of the storage units was only to ensure that there were no weapons or anything dangerous there. In no event would a reasonable person suspect the purpose of the search was to elicit evidence beyond and completely unrelated to these stated interests. RISP used their authority and show of force to achieve their true objective which they were admittedly determined to get — a signed consent form that looks like it was signed voluntarily.[4]

### 3. Other Mitigating Factors Against a Voluntary Consent.

#### a. Time.

##### 1.) Time of Day.

There are other mitigating factors against the claimed voluntary consent of Defendant. The first is the time of day in which the two consent forms were signed. The first consent form signed for the purpose of searching the residence was signed just a few minutes before 11:30 p.m. at night. The circumstances surrounding the signature included darkness illuminated only by a car interior's dome light. The same is true for the signing of the second consent form, except that it occurred sometime after midnight.

---

[4] The pertinent sections of the R.I. Superior Court trial transcript (P3-2002-1892A, attached hereto) concerning this issue are excerpted here: [Sanzi] "[W]e're going to need a consent -- have his consent to look in his apartment." (R.I. Sup. Ct. Tr. 209, lns. 22-23) "I also knew we're going to introduce a consent. He was going to have to sign it. [Q.] Going to have to sign, right? That is the whole point of this. You wanted him to sign that particular evening, right? [A.] We wanted to get consent to search, yes." (R.I. Sup. Ct. Tr. 269, lns. 8-13).

**2.) Duration of Time.**

It is undisputed that Stierhoff was handcuffed for two hours prior to signing the first consent form. For two hours he was subjected to questioning by the RISP. Two hours of sitting in the back seat of a police car with your hands cuffed would seem like an eternity to most people. To add to this extended psychological torture is the fact that Defendant spent most of the time in the back seat with his hands cuffed behind his back. The evidence is clear that the only reason the cuffs were changed to the front was to allow him to sign the consent form, which presumably occurred near the end of the two hour period.

Stierhoff remained handcuffed from 9:30 p.m. until the time of his interview at 2:a.m. the next morning, nearly five hours later. He was literally led in handcuffs from the police car to his room on Hollywood Road, Providence, from his room back to a police car, from the police car to the storage units in East Providence, from the storage units back to the police car and ultimately to the police barracks in Lincoln. Stierhoff was essentially kidnapped under color of law and deprived of his constitutional right to liberty without due process.

Thus, time, both the time of day and the duration of the time in custody, militates against a free and voluntary signature on the consent form.

**b. Violations of Legal Procedures.**

Perhaps the most important aspect which clearly and strongly militates against the claim that Stierhoff voluntarily signed any consent form are the numerous violations of procedures which the police committed in their marathon arrest.

**1.) Violation of Criminal Rule 9.**

In pertinent part, Criminal Rule 9 of the Rhode Island District Court Criminal Rules states,

> "Any person making an arrest without a warrant *shall take the arrested person without unnecessary delay before a judge* of the District Court for the division in which the arrest was made or in which the crime was committed. When a person arrested without a warrant is brought before a judge, a complaint shall be filed forthwith. Whenever an arrest shall be made, the arrested person shall be afforded a prompt hearing for the purpose of admission to bail before a judge of the District Court or an officer authorized to bail persons." (Emphasis added)

When the police officers arrested Stierhoff, they had a legal duty to charge him and take him without unnecessary delay before a judge. This they did not do. Instead they subjected Stierhoff to almost five hours in handcuffs and still did not take him before the judge until the following morning. Instead of arresting him, affording him a telephone call and placing him in a holding cell until arraignment, they drove him in handcuffs from place to place compiling evidence for crimes of which he wasn't even being charged. See Exhibit "A" at page 9. Had the police officers complied with Criminal Rule 9 they would not have had time to coerce and overbear Stierhoff's will into signing a consent form.

**2.) Denial of Prompt Bail.**

Closely related and overlapping with R.I. Criminal Rule 9 is section 12-7-12 in the Chapter 12-7 of R.I.G.L. which governs the criminal procedure in arrests. Section 12-7-12 provides, in pertinent part,

> The officer in charge of any police station may release any person in his or her station who has been arrested without a warrant:
> (2) If the arrest is for a misdemeanor, upon that person signing an agreement to appear in court at a designated time.

R.I. Dist. Ct. Criminal Rule 9 also provides for a prompt bail. Through traipsing around the city for over four hours the police officers denied Stierhoff his legal right to obtain bail promptly.

**3.) Denial of Telephone Call.**

Another statute that was violated by the police officers was section 12-7-20 of R.I.G.L. Section 12-7-20 in Chapter 12-7 provides specifically, "Any person arrested under the provisions of this chapter shall be afforded, as soon after being detained as practicable, **not to exceed one hour from the time of detention**, the opportunity to make use of a telephone for the purpose of securing an attorney or arranging for bail."

The evidence from the testimony and documents submitted does not indicate that Stierhoff was ever given the opportunity to make a phone call. This statutory right to be given an opportunity to make a telephone call must be given in less than one hour. It was not.

**4.) Temporary Detention.**

R.I.G.L. Section 12-7-1 provides that a suspect of a crime may be detained for a maximum of two hours.[5] At the end of the two hour time frame he must be released or arrested and charged with a crime. Stierhoff states he was never informed that he was arrested. Hearing Tr. 12/13/2006 p.131-132, lines 25-1. He also maintains that he did not know what charge he was being detained for until the next morning. R.I.G.L. Section 12-7-1 specifically provides that when the person is arrested he is to be charged with the crime. Stierhoff was arrested at 9:30 p.m. when he was handcuffed, but he was not charged at that time. He was left in the dark about the charges until the police had gathered all the information they could get, and then charged him at the Lincoln Woods Barracks early the next morning with a single misdemeanor count under R.I.G.L. § 11-59.

---

[5] R.I.G.L. § 12-7-1 Temporary detention of suspects. – A peace officer may detain any person abroad whom he or she has reason to suspect is committing, has committed, or is about to commit a crime, and may demand of the person his or her name, address, business abroad, and destination; and any person who fails to identify himself or herself and explain his or her actions to the satisfaction of the peace officer may be further detained and further questioned and investigated by any peace officer; provided, in no case shall the total period of the detention exceed two (2) hours, and the detention shall not be recorded as an arrest in any official record. At the end of the detention period the person so detained shall be released unless arrested and charged with a crime.

**5.) Violations of Procedures Concerning Identification.**

The reason claimed by the RISP that they wanted to search Stierhoff's residence was to search for identification. See Sanzi's testimony at Hearing Tr. 12/12/2006 p.63 at lines 14-15. See also, his testimony wherein he specifically stated it was the only reason. Hearing Tr. 12/12/2006 p.78 at lines 5-12. Even the government's attorney in his closing argument admits that the major reason was for the search was Stierhoff's identity. Hearing Tr. 12/13/2006 p.188 at lines 7-11.

Sanzi deceived Stierhoff by telling him several other reasons for the searches, i.e., to find the poems or to search for dangerous weapons. None of these reasons were the real reason. The fact that Sanzi wanted to conduct a search for identification is important because Detective Sanzi was violating known legal procedures.

Under Rhode Island law the Attorney General's Office is responsible for prosecuting all criminal offenses. See R.I.G.L section 42-9-4. In order to assist in the prosecution these offenses there has been established under the Attorney General a special criminal division for identification by the processing of fingerprints. See R.I.G.L. section 12-1-4. In the same chapter, at section 12-1-8 the statutes provide that the exclusive means of positive identification is fingerprints.

Sanzi knew he needed fingerprints to establish positive identification. See Hearing Tr. 12/12/2006 p.77 at lines 19-23 and also p.79 at lines 1-3. Instead of complying with the law and immediately obtain the fingerprints, he opted to illegally detain Stierhoff and badger him until he obtained the desired consent to search.

**c. Defendant's Mental State.**

One final point that needs to be made is Detective Sanzi's understanding of the Defendant's state of mind at the time he was told he had to sign the two consent forms and allegedly waive his rights. When cross examined by Defendant's attorney Sanzi admitted that he had previously testified in March of 2003 in the state trial that he felt Stierhoff was 'disturbed." [6] Beginning on page 121 and continuing through page 123 (Hearing Tr. 12/13/2006) there was a colloquy between Sanzi and Defendant's attorney addressing the previous testimony that Sanzi felt Stierhoff was 'disturbed.' When asked to explain his previous testimony he originally claimed he did not recall using that term, but did state, "I may have used that term in describing his actions involving the case as disturbing." From the context of his use of the term, that was not the meaning intended. Sanzi described Stierhoff as "disturbed" after speaking with him, not that his actions were disturbing.

The dictionary understanding of 'disturbing' is a state of mental or emotional agitation. Here Sanzi is describing the actions of Stierhoff as disturbing, rather than it was mentally or emotionally disturbing to him (Sanzi) personally. Since Sanzi saw fit to call into question the mental/emotional state of Stierhoff in a negative manner, then Sanzi had no factual foundation to claim that Stierhoff knowingly, intellectually, and voluntarily signed a consent form or gave waived any of his rights. This is true because Sanzi already believed that something was wrong with Stierhoff. By forging ahead with two hours of badgering, Sanzi knowingly took advantage of what he thought was a 'disturbed' individual. To now claim that Stierhoff voluntarily gave consent with this understanding prevents a curious paradox. How can Sanzi believe and testify

[6] The testimony that Sanzi gave is found in the transcripts for the Superior Court of the Stierhoff's trial beginning on March 24, 2003. The exact testimony is found on page 272 at line 10 and states, "I thought he was disturbed, after talking with him." See transcript page attached hereto.

that Stierhoff knowing, intellectually, and voluntarily waived any rights or voluntarily signed a consent form when Sanzi believed he was 'disturbed'?

When Sanzi's understanding of Stierhoff's mental/emotional state at the time of the arrest is coupled with overwhelming mitigating factors previously discussed, it becomes abundantly clear that the government has not and can not show with a preponderance of the evidence that Stierhoff could have voluntarily gave his consent or waived any rights.

**3. Summary of Defendant's Consent was Not Voluntary.**

Sanzi had planned to do a search of both the residence and the storage bins instead of complying with the known arrest procedures of both the criminal rules and the statutory law. The searches were illegal and unconstitutional. The searches (and the obtaining of the statements) were conducted in a highly illegal manner. In all probability the searches would not have been authorized through a warrant because there was no probable cause to believe that police could obtain a more positive identification of Stierhoff through anything other than through the stated method of fingerprinting. The searches were merely fishing expeditions and Detective Sanzi was fully aware of it.

In order for Sanzi to obtain the desired searches he had to use the outward showing of authority and police force combined with deceitfulness to coerce and trick Stierhoff into signing the consent forms. Not even taking into account the violations of criminal rules and statutory procedures there are at least eleven factors which the courts have considered in determining whether consent was freely and voluntarily given. Of these factors only two, or possible three, favor a finding of voluntary consent by Stierhoff. The remaining eight factors, coupled with the blatant violations of criminal procedures, strongly militates against Stierhoff's consent being voluntary. Accordingly, after careful review of the facts as revealed through the suppression

hearing testimony and exhibits this court should find that the government failed by a preponderance of the evidence to prove that Defendant knowingly, intelligently and voluntarily, i.e. without coercion, consented to the searches of both his residence and his storage bins. The Court must then suppress all of the evidence (both documentary and statements) obtained during the epic arrest of Stierhoff.

**C. Illegal Seizure and Viewing of Defendant's Computer.**

**1. Illegal seizure.**

While consent may be freely and voluntarily given it may also be withdrawn at any time. See, *United States v. Marshall*, supra, 348 F.2d at 287 ("a consenting party may limit the scope of his or her consent or withdraw it altogether"). Additionally, the scope of the consent is necessarily limited to the expressed intention of the parties. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991).

The written consent to search Defendant's residence was very broad and included in it the phrase "The police officer(s) named above has my permission t [sic] take any letter, papers, or other property from my premises and/or vehicle."

But the testimony of both Detective Sanzi and Stierhoff indicated that there was an agreement that the police were only going to look for poems. The expressed intent of the police officer's search was to have a look at the computer that had generated the poems in question. According to Stierhoff, when he observed Detective Killian unplugging his computer he objected to it being seized. Rather than honoring the withdrawal of consent, the officers forcibly sat Defendant back down in the chair when he attempted to stop the RISP from taking the computer. Hearing Tr. 12/13/2006 pp.136-138 starting at line 21on page 136 through line 9 on page 138.

To blindly accept the officers' statements that Stierhoff never objected to their seizing of his computer is to accept the incredulous.

When Stierhoff withdrew his consent to allow the police to take his computer, the police had no legal authority to seize it. Because the police had no warrant to seize the computer, it was illegally seized and all information gained through its seizure must be suppressed.

Significantly, even the notes of Special Agent Donahue acknowledge that he was under severe time constraints to perform the search of the computer because Stierhoff was demanding it back. The case law is clear that even an initially voluntary consent can be withdrawn at any time. When consent is withdrawn, all searches should cease unless and until a search warrant is obtained. In this case, Special Agent Donahue testified he simply worked the entire weekend attempting to copy and search Stierhoff's computer before he had to return it, a blatant disregard of a knowing withdrawal of consent and therefore illegal.

**2. Illegal Viewing of Computer.**

The arguments provided in the Motion to Suppress are correct. Even if consent is found to be voluntary, the government must still prove that its search did not exceed the scope of consent given. The scope of consent is measured by a test of objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the subject?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Courts therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous statements and actions. *Marshall*, supra, 348 F.2d at 286-7. "We therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999).

In the instant case, even though the language of the form allowed the police officers to take property from the premises, **it did not allow the police to search the computer itself**. The First Circuit has had an occasion to rule on the illegality of a computer search, but this was after the police had secured a **valid** consent to search in *United States v. Turner*, 169 F.3d 84 (1st Cir. 1999).

In that case the First Circuit suppressed the fruits of the alleged consent search because "the consent did not authorize the search of the computer" and "an objectively reasonable person assessing in context the exchange between the defendant and these detectives would have understood that the police intended to search only in places where an intruder hastily might have disposed of any physical evidence of the … assault." *United States v. Turner*, 169 F.3d at 87. The *Turner* Court cited *Jimeno* for the proposition that "the scope of a [consensual] search is generally defined by its expressed object," citing, *Jimeno* 500 U.S. at 251. "Government agents may not obtain consent to search on the representation that they intend to look for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." Id., citing, *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971). "When a purpose is included in the [officer's] request, then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose." Id. at 88, citing 3 Wayne R.LaFave, Search and Seizure, § 8.1(c) at 620 (3d ed. 1996).

In the instant case RISP officers seized Defendant's computer under the colorable authority of a general consent form. No consent was given to search the computer itself. For that matter, if any consent was given to search the computer at all it was necessarily and specifically limited to the "My files, Creative Writing" folder. Accordingly, the RISP did not have blanket authority to search the computer. Most importantly, neither did the RISP have consent to

redelegate authority to the IRS to search the computer. Thus, **any** viewing of Defendant's computer was illegal without a search warrant, or at a minimum, any viewing of anything other than "Creative Writing folder" exceeded the scope of consent and was illegal

The conclusion is very straightforward. When Stierhoff realized the RISP were taking his computer he objected strenuously thereby effectively withdrawing his purported consent to the search and seizure of the computer. Even without his withdrawal of consent the RISP would still have no consent to search the computer. Therefore any search, either by the RISP or by the IRS was illegal in violation of the 4th Amendment to the Constitution.

**D. Evidence Obtained by IRS After Opening of Computer Folders.**

This should really be a non-issue because it was shown earlier that neither the RISP nor the IRS had any legal authority to search Stierhoff's computer. The mootness of this issue is perhaps best addressed by responding to the two issues raised by the government in its Supplemental brief.

The government claims that the evidence obtain through the computer search should not be suppressed for two primary reasons. First, they claim that Special Agent Donahue saw the "Offshore" folder in plain view which he maintains authorized him to "seize" this evidence and view its contents. Second, even if viewing the contents of the "Offshore" folder was unauthorized, the Court may judicially excise from the search warrant affidavit references to information found on defendant's computer - an affidavit nevertheless supported by probable cause. Both of these reasons are based on faulty premises and are without legal foundation.

With regard to the plain view argument, Special Agent Donahue assumes that he was in a legal position to observe the 'Offshore' folder when he was looking for the Creative Writing folder. Donahue ignores the fact that the consent that purportedly gave the RISP authority to

seize the computer had been revoked. Moreover, that purported consent did not give them or anyone else any legal authority to search it. Donahue admitted that he knew consent was revoked and that Stierhoff was demanding his computer back, but instead of abandoning his search because the consent was no longer valid, he simply worked quicker. Thus, he was not in a legal position even to be looking for the Creative Writing Folder. Regardless of Donahue's statements to the contrary, a folder labeled "Offshore" is not immediately apparent as evidence of illegal activity, nor as the government absurdly contends was "plainly incriminating on its face." Gov't Supp Memo, Doc. 62, p.2. There are dozens of innocuous explanations for a folder labeled "Offshore," most of which have nothing to do with illegal activity. For instance, there is a boating publication named "Offshore." Additionally, any Google search of the term reveals literally dozens of innocuous items, from jobs offshore, to sailboat racing offshore, to oil and gas explorations offshore, to offshore technology and outsourcing. Additionally, Special Agent Donahue admits that beyond simply noting the folder labeled "Offshore" he had to perform at least two additional functions in order to open up the folder and view its contents. Therefore, the contents of the folder cannot, by any stretch of the imagination, be said to have been in plain view. This is exactly to what the Court was referring when it was describing the action as "peeking under the tent".

Stierhoff allegedly consented to a search for poems on his computer. Hearing Tr. 12/12/2006, p.126 lines 20-24. He fully expected the RISP to look on his computer while in place in his room. With that in mind he limited the scope of the search for the poems to the "My Files/Creative Writing Directory" in the computer. Hearing Tr. 12/13/2006, pp.19-20, lines 25-1. When Stierhoff discovered that the police had no intention of looking at the computer and began removing it from his residence he withdrew his consent and in fact attempted physically to

stop the RISP from removing it from his room. Even later, Stierhoff continued to demand the return of his computer as is evidenced in Donahue's notes.

With regard to the excising observation of the 'Offshore' folder from the affidavit requesting a search warrant, Special Agent Donahue also makes a false assumption. That assumption is that the information gathered by the RISP and subsequently made available to him was legally obtained by a voluntary search. As was discussed above, said information was not obtained through voluntary consent. In addition to the discussion above concerning both consent forms and the deception perpetrated on Stierhoff to gain entrance to search his residence, it should also be noted that deceptive tactics were also used to gain entrance to the storage bins. The RISP pressured Stierhoff into allowing them to search the storage bins on the pretext that they wanted to determine if he was a dangerous person. He was told that they were going to search for weapons. It was on this basis and because he knew there were no weapons in the storage bins that Stierhoff was deceived into letting the police search the storage bins. The search was not for weapons and was far beyond the scope of what any reasonable person would understand such a search to be.

Again the First Circuit case of *Turner* is illustrative of this principle. In *Turner*, supra, it was crucial to the Court that "the detectives never announced, before Turner gave his consent, that they were investigating a sexual assault or attempted rape. *Id*. at 88. The Court felt it was not objectively reasonable, even assuming that such computer images could be considered circumstantial evidence of a planned sexual assault, that Turner would have understood that such images were within the "expressed object" of the intended search for evidence of an aggravated assault. *Id*. Likewise in the instant case, the RISP detectives never announced that they were going to be looking for financial records. Their stated purpose of the search was to look for

dangerous weapons. Thus, the search and seizure of anything not directly concerned with dangerous weapons was an illegal search and seizure.

In conclusion, the IRS search of Defendant's computer was not authorized by the consent form. The RISP never had legal consent or authorization to search the computer and therefore could not legally transfer what they did not have to another agency. The government's claim that it would have obtained a search warrant for the computer anyway without the illegally viewed evidence, based on the remaining information provided by the RISP, is also without foundation and is merely self-serving speculation in hindsight. The factors militating **against** Defendant knowingly, voluntarily and freely giving consent to search are overwhelming. Until the government can prove with a preponderance of evidence that Stierhoff knowingly, voluntarily and freely gave consent, the evidence obtained by coercion and deception, under the color of the consent to search forms, cannot be used by the IRS to support a warrant.

WHEREFORE, Defendant moves the Court to issue an order to suppress any and all evidence, including all derivative evidence, obtained from the unconstitutional searches and seizures by the RISP and IRS of Defendant's person, papers and effects, including but not limited to, the computer and all information contained within.

Respectfully submitted,

Neil Stierhoff

By his attorney,

/s/ Scott A. Lutes

Scott A. Lutes

One Turks Head Place, Suite 1440

Providence, RI 02903

Telephone: (401) 861-1142

Facsimile: (401) 861-1141

Email: scottluteslaw@yahoo.com

**CERTIFICATION**

I hereby certify that I electronically filed with the Clerk of the Court, a copy of Defendant's Supplemental Memorandum, by means of the ECF system which will in turn send notification to Stephanie Browne, AUSA, Stephanie.browne@usdoj.gov , Thomas G. Voracek, AUSA, thomas.g.voracek@usdoj.gov , and by regular mail, postage prepaid to John N. Kane, AUSA, U.S. Department of Justice, Tax Division, 601D Street, N.W. , Washington, D.C. 20530, on this the 16th day of January, 2007.

/s/ Scott A. Lutes