UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

v.                                          CR No. 06-042-ML

NEIL STIERHOFF

## MEMORANDUM AND ORDER

Neil Stierhoff ("Defendant") was indicted by a federal grand jury on March 22, 2006, on

four counts of tax evasion in violation of 26 U.S.C. § 7201. Defendant now moves to suppress

statements he made to Rhode Island State Police ("RISP") following his arrest on the night of

April 12, 2002. Defendant also moves to suppress evidence seized by RISP during warrantless

searches of his vehicle, room, and self-storage units.[1] In addition, Defendant seeks to suppress

evidence taken from a computer seized from his residence. For the reasons set forth below,

Defendant's motion to suppress his statements is DENIED, and his motion to suppress evidence

is DENIED in part and GRANTED in part.

## I. Background

In March 2002, a young woman ("Complainant") contacted RISP about a man who she

claimed was harassing her. Complainant told RISP that this individual was approaching her at

work and giving her cards and poems. Complainant also informed RISP that the man in question

was leaving poems on her car while it was parked in a dormitory parking lot at Rhode Island

---

[1] Although Defendant moves to suppress evidence from the search of his vehicle, Defendant notes that nothing incriminating was seized from his vehicle and makes no specific argument as to the search of the vehicle. Consequently, the Court does not address the propriety of that search.

College.  Subsequently, RISP obtained the individual's license plate number and identified the individual as Defendant.  Between April 4-12, 2002, RISP conducted extensive surveillance of Defendant.  On several successive evenings, Defendant was observed approaching Complainant's vehicle which was parked outside of her dormitory.

Concerned with Defendant's behavior, RISP devised a "sting" operation.  On the night of April 12, 2002, RISP observed Defendant leave his home and begin driving toward Rhode Island College.  RISP instructed Complainant to sit in her car in the student parking lot and await Defendant's arrival on campus.  A RISP detective was hidden in the backseat of Complainant's car.  When RISP saw Defendant's vehicle arrive on campus, they instructed Complainant to begin driving her car on a predetermined route.  Complainant complied, and RISP observed Defendant begin to follow her.  RISP eventually instructed Complainant to pull into the parking lot of a Walgreen's Pharmacy and enter the store.  Defendant followed Complainant into the store and RISP arrested him.  Defendant was subsequently convicted in state court of misdemeanor stalking pursuant to R.I. GEN LAWS § 11-59-2.  See State v. Stierhoff, 879 A.2d 425, 436 (R.I. 2005) (affirming conviction).

## II. Findings of Fact

Defendant now moves to suppress evidence seized from his room, self-storage units, and computer.  A two-day evidentiary hearing held on December 12-13, 2006, elicited two different accounts of the events that occurred on April 12-13, 2002.  In general, the Court finds the testimony of the government's witnesses to be more credible than the testimony offered by Defendant.  Accordingly, the Court largely adopts the government's version of events.  The Court makes the following findings of fact based on the parties' papers and evidence received at

the evidentiary hearing.

On April 12, 2002, at approximately 9:30 p.m., RISP observed Defendant follow

Complainant into the Walgreen's Pharmacy at 25 Putnam Pike, Johnston. Although

approximately ten RISP officers were involved in the surveillance effort, only four officers

entered the store and approached Defendant. None of the officers who entered the store were

wearing uniforms. RISP observed Defendant standing 10-15 feet from Complainant. According

to Detective Timothy Sanzi ("Sanzi"), the officers identified themselves as members of the RISP

and asked Defendant to place his hands behind his back. Defendant was handcuffed and

searched for weapons. Sanzi and Detective David Palmer ("Palmer") then escorted Defendant

out of the store and placed him in the rear of a marked RISP cruiser in the pharmacy parking lot.

Sanzi testified that Defendant was quiet and "didn't show a great deal of emotion" during his

arrest. See Suppression Hearing Transcript vol. 1, 114:19-20, December 12, 2006 ("Hr'g Tr.").

Similarly, Detective John F. Killian ("Killian") described the Defendant as cooperative and

responsive.

After placing Defendant in the rear of the police cruiser, Sanzi proceeded to read

Defendant his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). See Gov't

Ex. A-39. Sanzi testified that he asked Defendant if he understood his rights, and Defendant

replied that he did. Defendant was then removed from the police cruiser and searched a second

time, this time for identification. RISP seized several pieces of identification from Defendant's

wallet. See Gov't Ex.'s A-16 through A-22. Two of the cards found in the wallet bore the name

"Joseph Adams." Id. at A-17, A-22. According to Sanzi, there was some concern by RISP about

Defendant's true identity and address. During their investigation between April 4-12, 2002,

-3-

RISP had uncovered multiple names and addresses associated with Defendant. See Gov't Ex.'s A-1 through A-15, A-37, and A-38.

After being searched, Defendant was again placed in the rear of the police cruiser. Sanzi and Palmer began to question Defendant about why he was following the Complainant. Sanzi sat next to Defendant and Palmer sat in the front passenger-side seat. According to Sanzi, Defendant was surprised to learn that RISP had been following him and he "spoke freely about . . . his desire to have a relationship with [Complainant]." Hr'g Tr. vol. 1, 66:15-21. Sanzi described the Defendant as articulate and coherent. Id. at 67:6. According to Sanzi, Defendant answered the detectives' questions directly and specifically – "[h]e didn't beat around the bush at all." Id. at 67:9-11. Sanzi testified further that he told Defendant that he was under arrest for stalking. Id. at 146-148. It is undisputed that Defendant never asked for an attorney nor indicated to Sanzi and Palmer that he wished to remain silent.

Upon being questioned about his address, Defendant stated that he rented a room on the second floor of a house at 25 Hollywood Road, Providence. Sanzi requested Defendant's permission to search his room. Sanzi told Defendant that the RISP were interested in recovering evidence related to the poems Defendant left on Complainant's car. Specifically, Sanzi informed Defendant that RISP wanted to retrieve the poems that he had generated on his computer. Defendant expressed some concern about awakening his roommates, but eventually agreed to the search. According to Sanzi, Defendant was removed from the police cruiser and his handcuffs were removed from behind his back and placed in front of his body. Defendant was then presented with a consent-to-search form that Sanzi testified he always carried with him. See Gov't Ex. A-23. Defendant was instructed to read the consent-to-search form. Although Sanzi

did not read the form to Defendant or ask him to read it aloud, Sanzi testified that Defendant took

his time reading the form before he signed it.  According to Sanzi, no promises or threats were

made to Defendant to induce him to sign.  At the time, both the dome light in the cruiser and the

parking lot lights were on.  Sanzi testified that the officers discussed the consent to search with

Defendant for approximately twenty minutes.

After signing the consent-to-search form, five to six RISP officers escorted Defendant in

unmarked vehicles to his residence at 25 Hollywood Road.  Sometime between 11-11:30 p.m.,

RISP entered the residence through a side door, which Defendant unlocked using his keys.

Defendant escorted the officers to his room on the second floor, and four RISP officers, including

Sanzi, Palmer, and Killian, entered Defendant's room.  Defendant, still handcuffed, was

instructed to sit on a corner of his bed while the search was being conducted.  Killian

immediately noticed and seized Defendant's computer.[2]  Sanzi testified that the officers

discovered a briefcase containing manila envelopes which, according to Defendant, held

approximately $100,000 in cash.  Defendant directed Sanzi's attention to a drawer in his desk

where another $40,000 or so in cash was found.  A search of Defendant's desk uncovered several

documents, including a Fleet Bank account statement in the name of "Joseph Adams," with a

balance of over $1 million.  See Gov't Ex.'s A-24 through A-30.  RISP seized the documents that

they found on Defendant's desk, but did not seize the cash.  According to Sanzi, the documents

were seized for identification purposes.  Because of Defendant's use of aliases, Sanzi was not

"going to be completely satisfied [as to Defendant's true identity] . . . until he was fingerprinted."

---

[2] Factual findings and the Court's analysis of the search and seizure of Defendant's
computer are discussed, infra, at Part IV, pg. 24.

Hr'g Tr. vol. 1, 77:21-23.  RISP also seized a package of Harp Workshop greeting cards that they found in Defendant's room.  Sanzi testified that the cards were similar in appearance to cards that had been left on Complainant's car.

According to both Sanzi and Killian, Defendant made several statements to RISP during the search of his room.  In response to Sanzi's questions concerning the large amount of cash that was found, Defendant stated that he did not believe in banks, and that the money was his personal savings from his business.  Sanzi and Killian both testified that Defendant also stated that he did not pay federal or state taxes.  Defendant told the officers that he operated a computer business under the name of "Joseph Adams," and used his computer to make sales on "Ebay" under the name "JA."  See Gov't Ex.'s B-6 and B-7; Hr'g Tr. vol. 1, 75-77; vol. 2, 5.  Sanzi testified that Defendant spoke about his money and his business nonchalantly, and Killian described Defendant's demeanor during the search as "cooperative" and "conversant."  Hr'g Tr. vol. 1, 76:12; vol. 2, 4:18.

Sanzi also testified that during the search of the residence one of Defendant's roommates was awakened by the police presence and yelled into the room to Defendant, "you can withdraw your consent, get them out of the house."  Id. at vol. 1, 79:16-17.  Although Defendant did not respond to his roommate, Sanzi testified that Defendant told police that he wanted to "get on with this . . . [and] get on out of here."  Id. at 80:1-2.  After the roommate left the doorway, the search resumed without objection from Defendant.  According to both Sanzi and Killian, the entire search of Defendant's room lasted approximately thirty minutes.

After the search of Defendant's room was completed, Defendant was removed from the residence at 25 Hollywood Road and placed in an unmarked RISP vehicle parked outside.  RISP

then requested Defendant's permission to search the self-storage units that he rented from Shelby Self-Storage, located at 879 Waterman Avenue, East Providence. During the RISP investigation between April 4-12, 2002, RISP had observed Defendant using these storage units before traveling to Rhode Island College and approaching Complainant's car. Sanzi testified that RISP believed that further evidence related to Defendant's identity could be obtained from the storage units. Sanzi also testified that he told Defendant that RISP "just wanted to examine the facility . . . to make sure there wasn't anything illegal . . . going on there." Id. at 83:19-21. According to Defendant, RISP asked to search the storage units to "see if there's anything dangerous or weapons or something like that so we can satisfy ourselves that you're not a dangerous person." Id. at vol. 2, 141:1-3.

Defendant was presented with a second consent-to-search form which, according to Sanzi, Defendant read and signed. See Gov't Ex. A-32. The same five to six RISP officers then escorted Defendant to the self-storage units in East Providence. Defendant gave RISP his keys to the storage units, which they then opened. According to Sanzi, the storage units contained "a great deal of very high-end computer equipment." Hr'g Tr. vol. 1, 85:21-22. Likewise, Killian testified that the three storage units that were searched predominantly contained computer and electronic equipment. Killian further testified that Defendant reiterated his statement that he did not pay state or federal taxes in connection with his computer business. Several utility bills for 25 Hollywood Road, which were in the names of Defendant, Universal Audio, and Jos P. Mulvaney, were seized. See Gov't Ex.'s B-3, B-4, and B-5. In addition, a box containing sales records was also seized. Id. at B-2 and B-7. According to Killian, RISP seized these particular documents for a number of reasons, including concerns over Defendant's use of aliases and the

-7-

potential that these documents represented a violation of Rhode Island tax law.

After the search of the self-storage units was complete, Defendant was brought to the RISP Lincoln Woods Barracks. At approximately 2 a.m., on the morning of April 13, 2002, Defendant executed a written waiver of his Miranda rights. See Gov't Ex. A-33. Defendant then proceeded to give a formal tape-recorded statement to Sanzi. See Gov't Ex. A-34. Later that morning, Defendant was arraigned on one charge of stalking pursuant to R.I. GEN LAWS § 11-59-2.

### III. Discussion

Defendant now moves to suppress the statements he made to RISP following his arrest on April 12-13, 2002.[3] In support of this motion, Defendant argues that he did not waive his Miranda rights voluntarily, knowingly, and intelligently. Defendant also moves to suppress the evidence seized by RISP during the warrantless searches of his room and self-storage units. Defendant argues that he did not validly consent to the searches of his room and self-storage units because his consent was not given voluntarily. Alternatively, even if Defendant's consent was voluntary, he argues that RISP exceeded the scope of his consent when they seized financial documents and other evidence that Defendant asserts is unrelated to the state stalking investigation.

### 1. Motion to Suppress Statements

When an individual is taken into custody, but before interrogation, Miranda requires that the individual be advised:

---

[3] Defendant does not move to suppress the formal tape-recorded statement that he made to RISP at the Lincoln Woods Police Barracks on the morning of April 13, 2002. See Gov't Ex. A-34.

> that he has the right to remain silent, that anything he says can be
> used against him in a court of law, that he has the right to the
> presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 478-79.  "After being advised of his Miranda rights, the accused may

validly waive his right to remain silent and his right to counsel and respond to questions."

United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993) (citations omitted).  A defendant

may make a valid waiver of his rights under Miranda only if he does so voluntarily, knowingly,

and intelligently.  See United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003).  The

determination of a valid waiver usually entails two separate inquiries.  See United States v.

Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004).

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather
> than intimidation, coercion, or deception.  Second, the waiver must
> have been made with a full awareness of both the nature of the right
> being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986); see Bezanson-Perkins, 390 F.3d at 39.  Both

inquiries require the Court to look at the totality of the circumstances surrounding the

interrogation.  See Bezanson-Perkins, 390 F.3d at 39-40.  An express waiver, however, is not

required.  See Garcia, 983 F.2d at 1169 (citation omitted).  "What is required is a clear showing

of the intention, intelligently exercised, to relinquish a known and understood right."  Id.

(citations omitted).  Although courts "must presume that a defendant did not waive his rights, the

government may prove a waiver by a preponderance of the evidence."  United States v. Palmer,

203 F.3d 55, 60 (1st Cir. 2000) (citations omitted).

    First, the Court flatly rejects Defendant's testimony that RISP failed to read him his

Miranda rights. Sanzi clearly and credibly testified that Defendant was read his Miranda rights immediately upon being placed in the police cruiser in the drugstore parking lot. See Hr'g Tr. vol. 1, 61-62; see also Gov't Ex. A-39. Defendant's self-serving testimony to the contrary is simply not credible. At the evidentiary hearing on December 12-13, 2006, Defendant's testimony was interspersed with legal jargon, and many of his answers to the government's questions were evasive and obfuscatory. The Court finds that Defendant was read his Miranda rights on April 12, 2002, shortly after he was taken into custody. The next question the Court must address, therefore, is whether Defendant voluntarily, knowingly, and intelligently waived those rights.

A. Voluntary

Alternatively, Defendant argues that he was in such a state of shock and under such duress upon being arrested that the rights read to him by Sanzi were meaningless. Defendant points to several factors that he alleges support a finding of involuntariness. First, Defendant argues that the number of officers involved and the lateness of the hour during which he was arrested contributed to his feelings of coercion. Defendant claims that the undercover officers never identified themselves as members of the RISP. Furthermore, Defendant claims that he was forced to his knees during his arrest in the pharmacy. Second, Defendant asserts that during his time in the police cruiser he was never asked if he wanted to make a statement. Defendant contends that Sanzi and Palmer repeatedly switched seats in the cruiser, adding to his feelings of distress and confusion. Finally, Defendant draws the Court's attention to the fact that he had never been arrested before. Defendant claims that he felt insecure, and that his "life was in jeopardy." Hr'g Tr. vol. 2, 167:3. Defendant testified that RISP acted "jubilant," or as if they

-10-

"had captured their prey." Id. at 157:6, 10-11. In essence, Defendant argues, given the totality of the circumstances, that he was under such duress that he was incapable of making a voluntary choice to waive his rights.

The Court is not convinced. Defendant's arguments are based on a version of events that the Court summarily rejects. Sanzi testified that four officers approached Defendant in the pharmacy. Sanzi also expressly denied the assertion that he had forced Defendant to his knees before handcuffing him. Moreover, Sanzi testified that he remained seated with Defendant in the rear of the police cruiser during the entire conversation with Defendant. As for Defendant's alleged feelings of duress and insecurity, although the Court is cognizant that Defendant's mental state is pertinent to a voluntariness inquiry, First Circuit precedent "still require[s] some degree of coercion or trickery by government agents to render a statement involuntary . . . ." United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997) (citation omitted). The voluntariness of a waiver "has always depended on the absence of police overreaching, not on free choice in any broader sense of the word." United States v. Rojas-Tapia, 446 F.3d 1, 7 (1st Cir. 2006) (internal quotation marks and citation omitted). The focus in determining whether a waiver is voluntary, therefore, is on curbing abusive police practices. See generally id. In making this determination, "it is necessary to look at the totality of the circumstances, including the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne." Palmer, 203 F.3d at 60 (internal quotation marks and citations omitted).

There is simply no credible evidence that Defendant was subjected to physical or psychological coercion, intimidation, or deception by the RISP. Defendant conceded at the

evidentiary hearing that although RISP were armed at the time of his arrest, no officer ever drew

his or her weapon or threatened Defendant with physical violence. See Hr'g Tr. vol. 2, 162, 168,

182. According to Sanzi, Defendant spoke freely about his desire to have a relationship with

Complainant and answered the detectives' questions directly and specifically. During this

conversation in the police cruiser, at no time did Defendant indicate to the officers that he wished

to remain silent or speak to an attorney. See Garcia, 983 F.2d at 1169 (noting that an express

waiver is not required, only "a clear showing of the intention, intelligently exercised, to

relinquish a known and understood right").

Although, according to his testimony, Defendant had no previous experience with law

enforcement, at the time of his arrest Defendant was forty-six years of age and possessed a

Bachelor of Science Degree in Engineering from Brown University. Defendant was also

operating his own business with sales nationwide. See id. (explaining that the determination of a

valid waiver includes examining the background, experience, and conduct of the accused). The

record facts lead the Court to conclude that Defendant made a willing and reasoned choice to

speak with RISP. The government has successfully demonstrated, therefore, by a preponderance

of the evidence, that no coercive or abusive police practices were employed to extract

Defendant's waiver of his Miranda rights or his subsequent statements to RISP. Accordingly, the

government has shown that both were given voluntarily.

B. Knowing and Intelligent

The question remains whether Defendant's waiver of his Miranda rights was knowing

and intelligent, i.e. a waiver "made with a full awareness of both the nature of the right being

abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421. Like

-12-

the voluntariness inquiry, the focus of the Court in determining whether a waiver is knowing and intelligent "ultimately turns not upon any one factor, but upon all the attendant circumstances . . . ." Rojas-Tapia, 446 F.3d at 7 (citations omitted). Here, again, the government carries its burden. No evidence was adduced at the evidentiary hearing that Defendant suffered from mental problems or was otherwise incapable of understanding his rights or the consequences of a waiver. Indeed, according to Sanzi, Defendant indicated to the detective that he understood his rights as they had been read to him. Sanzi also testified that Defendant was coherent and articulate throughout his conversation with RISP. See United States v. Solis, 299 F.3d 420, 439-40 (5th Cir. 2002) (noting that observations as to a defendant's demeanor and articulateness during a confession are evidence relevant to whether a confession was knowing and voluntary).

Additionally, as the Court has already noted, Defendant is a highly educated and mature individual, readily capable of understanding the warnings given to him. Cf. Rojas-Tapia, 446 F.3d at 7-9 (collecting cases where defendants were found to have made a knowing and intelligent waiver despite relatively low I.Q.'s and other intellectual limitations). Based on the testimony elicited at the evidentiary hearing, it is clear that Defendant made a knowing and intelligent waiver. Under the totality of the circumstances, therefore, the Court finds that Defendant voluntarily, knowingly, and intelligently waived his Miranda rights following his arrest on April 12, 2002.

## 2. **Motion to Suppress Evidence**

Defendant also moves to suppress all evidence seized during the warrantless searches of his room and self-storage units by RISP. Although Defendant signed two written consent-to-search forms, see Gov't Ex.'s A-23 and A-32, Defendant now argues that his consent was not

made freely and voluntarily.  Alternatively, Defendant contends that the searches made by the
RISP exceeded the scope of his consent.  The Court will address each of Defendant's arguments
in turn.

### A. Consent to Search

"A warrantless search violates the Fourth Amendment unless it comes within one of the
'few specifically established and well-delineated exceptions' to the warrant requirement.  A
consensual search is one such exception."  United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999)
(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).  In order to be valid, a person's
consent to a search must be freely and voluntarily given.  See United States v. Coraine, 198 F.3d
306, 309 (1st Cir. 1999) (citing United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996)).  The
government has the burden of proving a valid, voluntary consent by a preponderance of the
evidence.  See United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006) (citing Forbes, 181
F.3d at 5).

Whether the government has established the voluntariness of a consent to search is a
question of fact that turns on the totality of the circumstances.  See Schneckloth, 412 U.S. at 227;
see also United States v. Genao, 281 F.3d 305, 309 (1st Cir. 2002).  This includes "both the
characteristics of the accused and the details of the interrogation."  Schneckloth, 412 U.S. at 226.
In determining whether consent to a search is voluntary, "[t]he court should take into account
factors such as the consenting party's 'age, education, experience, intelligence, and knowledge of
the right to withhold consent.'  Further considerations 'include whether the consenting party was
advised of his or her constitutional rights and whether permission to search was obtained by
coercive means or under inherently coercive circumstances.'"  Forbes, 181 F.3d at 5 (quoting

United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)).  Consent is voluntary only if it is the product of an "essentially free and unconstrained choice," and not because a defendant's "will has been overborne and his capacity for self-determination critically impaired . . . ." Schneckloth, 412 U.S. at 225 (internal quotation marks and citation omitted).  Moreover, "[s]ensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody." United States v. Trueber, 238 F.3d 79, 95 (1st Cir. 2001) (internal quotation marks and citation omitted).  Custody alone, however, "has never been enough in itself to demonstrate a coerced . . . consent to search." United States v. Watson, 423 U.S. 411, 424 (1976); see Forbes, 181 F.3d at 6.

     i. Defendant's Consent to a Search of his Room

     Defendant again argues that the circumstances surrounding his arrest and his consent to a search of his room at 25 Hollywood Road were inherently coercive.  Defendant points to, inter alia, the number of officers involved, the time of his arrest, his inexperience with law enforcement, and his feelings of confusion and fear at the "jubilant" demeanor of the RISP.  Hr'g Tr. vol. 2, 157:6.  In addition, Defendant alleges that RISP: 1) never told him he could refuse to consent, 2) promised him that they would not disturb his roommates, and 3) threatened to obtain a search warrant and "break down [Defendant's] door" if he did not consent. Id. at 163:16-17.

     First, in response to Defendant's arguments that the circumstances surrounding his consent were inherently coercive, the Court again notes that Defendant was forty-six years of age at the time and had an Engineering Degree from Brown University.  See Barnett, 989 F.2d at 555 (finding that age, education, and intelligence are relevant factors bearing on the vulnerability of a consenting party).  Furthermore, both Sanzi and Killian described Defendant at the time of his

arrest as calm, quiet, and cooperative. Hr'g Tr. vol. 1, 61, 153. Sanzi stated that Defendant "appeared to be relaxed," and was not sweating or shaking. Id. at 61:4-11. Sanzi also testified that Defendant "didn't show a great deal of emotion" during his interaction with RISP. Id. at 114:19-20. Likewise, Killian testified that Defendant was "cooperative and responsive." Id. at 153:18. See Schneckloth, 412 U.S. at 226 (noting that voluntariness of a consent to search is a question of fact that includes "the characteristics of the accused").

Additionally, although Defendant was arrested at approximately 9:30 p.m., shortly before the pharmacy closed, Sanzi testified that the parking lot where Defendant gave his consent was lit and "at the corner of a busy intersection, Route 44 and I think Woonasquatucket Road." Hr'g Tr. vol. 1, 65:21-23. Furthermore, no officer raised his or her voice to Defendant during his arrest. Id. at 61:12-14. It is also undisputed that no officer drew his or her weapon or threatened Defendant with physical violence on the night of April 12-13, 2002. See id. at vol. 2, 162, 168; see also Forbes, 181 F.3d at 5 (weighing arresting officer's decision not to show his gun to the defendant in favor of a finding of voluntariness). Accordingly, although the Court notes that an arrest is an inherently stressful situation, nothing in the record demonstrates that the circumstances surrounding Defendant's consent to a search of his room were so coercive as to dictate a finding that Defendant's will was overborne by police action.

Although Defendant claims that he was never told he could refuse to give his consent to a search, the consent-to-search form presented to Defendant clearly stated that Defendant had the right to refuse to give his consent. See Gov't Ex. A-23. Sanzi also testified that Defendant took his time reading the consent to search form before he signed it. See Hr'g Tr. vol. 1, 69:11. Finally, Defendant acknowledged that he had consented to a search of his room and self-storage

-16-

units during his formal tape-recorded statement to RISP on April 13, 2002. See Gov't Ex. A-34

at 11. There is no evidence, therefore, that Defendant did not understand what he was agreeing

to when he signed the consent-to-search form.[4] It is clear that Defendant appreciated the

significance of giving his consent and that he understood his right to withhold that consent. Cf.

Barnett, 989 F.2d at 555-56 (concluding that consent was voluntary even though the defendant

was met at the door of his home by seven or eight police officers with guns drawn, was arrested

and handcuffed, and was not informed that he could withhold consent).

Defendant also argues that the promises Sanzi and Palmer allegedly made to him about

not disturbing his roommates gradually eroded his reluctance to give permission to RISP to

search his room. There is no credible evidence, however, to support this assertion. Although

Sanzi remembered Defendant expressing his concern about not awakening his roommates, Sanzi

testified that no promises were made to Defendant in exchange for his consent. See Hr'g Tr. vol.

1, 70:15-16. Furthermore, according to Sanzi, when one of Defendant's roommates yelled into

the room to Defendant, "you can withdraw your consent, get [the police] out of the house,"

Defendant responded to Sanzi that he wanted to "get on with this and get on out." Id. at 79:16-

17, 80:22. Based on this exchange, it is clear that Defendant understood his right to refuse or

withdraw his consent. Defendant, however, made a conscious and free choice to allow the search

---

[4] Defendant argues that the consent-to-search forms that he signed on April 12-13, 2002, were defective on their faces. See Gov't Ex.'s A-23 and A-32. This argument is unpersuasive. Defendant points out that both forms omit the word "search" at one point, authorizing RISP "to conduct a complete [sic] of my premises . . . ." Id. The forms also contained a Spanish translation. Accordingly, Defendant argues that the forms were confusing and misleading. Both consent-to-search forms, however, clearly state at the top, "CONSENT TO SEARCH." Id. Additionally, although certain information is omitted, the forms plainly inform a defendant of his or her right to refuse to consent. Id. The forms also make clear that if anything incriminating is found as a result of the search, it can be used against the defendant. Id.

in the first instance, as well as to allow the search to continue.

Likewise, there is nothing, other than his self-serving testimony, to support Defendant's claim that RISP threatened to obtain a search warrant and "break down [his] door" if he did not consent. Id. at vol. 2, 163:16-17. Sanzi clearly and unequivocally denied that such a statement was made to Defendant. Id. at vol.1, 70:17-20; 121:2-11. In sum, there is simply no credible evidence that Defendant was tricked, threatened, or bullied by RISP into agreeing to give his consent. See Forbes, 181 F.3d at 5 (weighing whether permission to search was obtained by coercive means). There is no reason to believe that the circumstances surrounding Defendant's arrest were so inherently coercive that Defendant was unable to make an "essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225. Based on the testimony elicited at the suppression hearing, the Court has no reason to believe that Defendant's "capacity for self-determination [was] critically impaired." Id. Accordingly, the Court finds that Defendant freely and voluntarily consented to a search of his room at 25 Hollywood Road.

ii. Defendant's Consent to a Search of his Self-Storage Units

Again, there is no evidence, other than Defendant's self-serving and unreliable testimony, that RISP made any promises or threats to Defendant in order to obtain his permission to search the self-storage units at 879 Waterman Avenue, East Providence. Defendant points out that when he signed the second consent-to-search form, it was sometime around midnight and he had been handcuffed for several hours. Defendant also draws the Court's attention to the fact that his consent to a search his self-storage units was obtained immediately following the search of his room. Essentially, Defendant argues that he had no choice but to agree to the search; to refuse would have been futile.

-18-

The Court notes, however, that before Defendant agreed to a search of his self-storage units, he was again presented with a consent-to-search form. See Gov't Ex. A-32. The consent-to-search form clearly communicated to Defendant that he could refuse to give his consent, and that any incriminating evidence found during the search could be used against him. Id. According to Sanzi, Defendant read and signed the form. See Hr'g Tr. vol. 1, 84:7-10. Again, no officer raised his or her voice to Defendant or drew his or her weapon. Defendant also conceded at the evidentiary hearing that no officer expressly threatened him with any physical abuse. Id. at vol. 2, 182:10-19. Although it was late at night, Defendant read and signed the form under the dome light of the RISP vehicle he was placed in. Sanzi and Killian both described Defendant as being calm, coherent, and cooperative throughout the night and early morning hours of April 12-13, 2002. Moreover, at no time did Defendant indicate that he wished to withdraw his consent to a search of his room or self-storage units. In short, there is simply no credible evidence to indicate to the Court that Defendant was unable to make an "essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225. Accordingly, the Court finds that the government has demonstrated, by a preponderance of the evidence, that Defendant freely and voluntarily consented to a search of his self-storage units in East Providence.

B. Scope of Consent

"Warrantless searches may not exceed the scope of the consent given. The scope of consent is measured by a test of objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the officer and subject?'" United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). "Courts 'therefore look beyond the language of the consent itself, to the overall context,

-19-

which necessarily encompasses contemporaneous police statements and actions.'" Marshall, 348

F.3d at 286-87 (quoting United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002)). Put more

simply, "the scope of a warrantless, but consensual, search is generally defined by its expressed

object." Marshall, 348 F.3d at 287 (citing Jimeno, 500 U.S. at 251).

Defendant argues that the documents seized from the desk in his room at 25 Hollywood

Road exceeded the scope of his consent. These documents included a Fleet Bank account

statement indicating over $1 million on deposit, as well as letters, bills of sale, and checks all in

the name Joseph Adams. See Gov't Ex.'s A-24 through A-30. Defendant questions the nexus

between financial and business records and a state stalking investigation. Defendant asserts that

the documents are unrelated to his relationship with Complainant, and therefore, they should be

suppressed.

According to Sanzi's testimony, Defendant was told that RISP wanted to search his room

for evidence of the poems Defendant had left on Complainant's car. Although Sanzi specifically

indicated that RISP wanted to see the computer the poems were generated on, he also informed

Defendant that he was under investigation for stalking. See Hr'g Tr. vol. 1, 146-148. The

consent-to-search form Defendant signed gave RISP permission to "take any letters, papers, or

other property from my premises . . . ." Gov't Ex. A-23. The relevant question, therefore, is

whether a reasonable person would conclude that the financial and business documents seized

from Defendant's room were within the "expressed object" of the intended search. See Marshall,

348 F.3d at 287. The Court answers this question affirmatively.

First, although the documents seized were not themselves evidence of the poems

Defendant had written to Complainant, this is not a case where the items seized are wholly

unrelated to the expressed object of the search.  Cf. United States v. Turner, 169 F.3d 84, 88 (1st

Cir. 1999) (holding that seized computer files containing child pornography fell outside the

expressed object of the search – i.e. to gather concrete, physical evidence of an assault – because

physical evidence would not be found on a computer).  All of the documents seized were in the

name of Joseph Adams, a name Defendant admitted to RISP he used as an alias.  Sanzi testified

at great length about the difficulties RISP had in establishing Defendant's true identity.  See Hr'g

Tr. vol. 1, 42-57.  During the RISP investigation of April 4-12, 2002, officers had connected

Defendant to several names, including Joseph Adams and J.P. Mulvaney.  Id.; see Gov't Ex.'s A-

1 through A-15, A-37, and A-38.  Sanzi specifically testified that he took the documents from

Defendant's desk "to identify him further," because "I wasn't going to be completely satisfied

with his identification until he was fingerprinted."  Hr'g Tr. vol. 1, 77:19-23.  The government

argues, therefore, that RISP prudently seized the documents as part of their investigation of

Defendant, specifically to determine whether the individual RISP had arrested had a prior

criminal history of similar behavior – i.e. stalking.  It seems clear, based on Sanzi's testimony,

that Defendant's identity was a central concern of the RISP stalking investigation.  Accordingly,

the Court finds this explanation not only plausible, but reasonable.

Defendant also argues that records and sales journals seized from his self-storage units

exceeded the scope of his consent.  The phone records seized were in the names of Jos P.

Mulvaney and Universal Audio.  See Gov't Ex. B-3 and B-4.  The Narragansett Electric bill was

in the name of Defendant.  Id. at B-5.  Also seized was a box containing twenty-two sales

journals, recording, inter alia, the type, model, price, and buyer of the computer equipment

Defendant was selling.  Id. at B-2 and B-7.  According to Sanzi, Defendant was told at the time

-21-

he was presented with the second consent-to-search form that RISP "just wanted to examine the [self-storage units] . . . to make sure there wasn't anything illegal . . . going on there." Hr'g Tr. vol. 1, 83:19-21. In fact, Defendant testified that RISP asked to search the storage units "so [they could] satisfy [themselves] that [he was] not a dangerous person." Id. at vol. 2, 141:2-3; see Marshall, 348 F.3d at 286 (finding that the scope of consent is based on what the typical reasonable person would have understood by the exchange between the officer and subject). Notably, Defendant conceded that when he signed the second consent-to-search form he was no longer limiting his consent to just evidence of the poems, he acknowledged that the second consent was broader than the first. Id. at 178:19-25; 180:1-8.

Killian testified that the documents seized from the storage units had evidentiary value, i.e. the documents provided "clues" about Defendant's identity, because his identity "was not entirely clear to us, having an alias and addresses in different states, [and] renting different cars under different names." Id. at 7:16-25. Again, the Court finds this explanation reasonable and supported by the record. A reasonable person, viewing in context the exchange between Defendant and RISP, would surely have concluded that RISP were authorized to seize documents pertaining to Defendant's identity. Accordingly, the Court finds that the documents seized from Defendant's self-storage units were within the scope of his consent.[5]

_____

[5] Alternatively, the government argues that the documents seized by RISP from Defendant's room and self-storage units were seized under the plain view doctrine. See United States v. Perrotta, 289 F.3d 155, 167 (1st Cir. 2002) (explaining that officers may seize items located in plain view if (1) the seizing officer has a prior justification for being in a position to see the item in plain view and (2) the evidentiary value of the item is immediately apparent). The government argues that RISP were lawfully in Defendant's room and self-storage units pursuant to Defendant's valid consent. Given Defendant's statements about not paying taxes, his admissions about conducting a business under an alias, and the large amounts of cash found in his room, the government argues that the documents seized were "immediately apparent" as

Finally, Defendant argues that the searches of his room and self-storage units for evidence of stalking were a pretext for a federal tax investigation. In support of this argument, Defendant points out that Sanzi contacted the IRS during his preliminary investigation, which was conducted between April 4-12, 2002. In response to Sanzi's inquiry, Defendant believes that the IRS conducted a search for any income tax records or returns associated with Defendant's social security number. When the IRS was unable to locate any, Defendant contends that the IRS's interest was piqued. As further circumstantial support, Defendant again draws the Court's attention to the nature of the documents seized – i.e. financial and business records – as well as to the fact that RISP turned Defendant's computer over to the IRS on April 16, 2002. Defendant, however, is grasping at one final straw. The record simply does not support Defendant's argument. Although Sanzi contacted the IRS during his preliminary investigation, he also contacted numerous other agencies, including the Postal Inspector and INS. Sanzi testified that other than this initial contact, the IRS had no further involvement with the RISP investigation until that agency was contacted about the computer on April 16, 2002. See Hr'g Tr. vol. 1, 145:11-19. Moreover, Sanzi and Killian both consistently testified that the purpose behind the search of Defendant's room and self-storage units was to further the stalking investigation. Accordingly, the Court rejects Defendant's contention that the RISP investigation was a pretext for a federal tax investigation.

---

evidence of a state or federal tax crime. Both Sanzi and Killian testified that they recognized at the time of the seizures that the documents represented potential evidence of a violation of Rhode Island law. See e.g. Hr'g Tr. vol. 2, 7:16-25. The Court finds this rationale plausible as well.

## IV. Seizure and Search of Defendant's Computer

"Since electronic storage is likely to contain a greater quantity and variety of information than any previous storage method, computers make tempting targets in searches for incriminating information." Raphael Winick, Searches and Seizures of Computers and Computer Data, 8 HARV. J.L. & TECH. 75, 105 (1994). Defendant argues that this temptation was simply too great for the government to resist. Although Defendant consented to a search of his computer for evidence of stalking, Defendant claims that he limited that consent to the "D: Drive," "My Files" directory, "Creative Writing" folder. According to Defendant, this folder contained the poems he had written for Complainant. During the search of Defendant's computer, however, IRS Special Agent James Donahue ("Donahue") opened and viewed the contents of a folder labeled "Offshore," which he believed contained evidence of tax violations. Defendant argues that Donahue's actions exceeded the scope of his consent. Accordingly, Defendant now moves to suppress any and all tax-related evidence seized from his computer.

## 1. Findings of Fact

Based on the parties' papers and evidence received at the suppression hearing, the Court makes the following findings of fact. On April 12, 2002, sometime between 11-11:30 p.m., RISP searched Defendant's room at 25 Hollywood Road, Providence, pursuant to Defendant's valid consent. Upon entering the room, Killian observed a computer on Defendant's desk.[6] Earlier that night, in response to questions from Sanzi, Defendant had stated that most of the poems he had written to Complainant were generated on his computer. Both Sanzi and Killian

---

[6] Defendant's computer was a Dell Precision Workstation, Model 530 MT, serial number J98DQ01, with an Intel Xeon 1.70 Gigahertz processor. See Gov't Ex. C-4.

testified at the suppression hearing that the primary purpose of the search of Defendant's room was to find evidence of the poems Defendant left on Complainant's car in the parking lot at Rhode Island College. Although RISP had no formal computer unit at the time, Killian testified that his duties included "handling computers" for the RISP. Hr'g Tr. vol. 1, 149:6-14. Killian testified that Defendant's computer appeared highly sophisticated. This description was based on his personal observations of the computer and his discussion with Defendant about the "nature of the system" and "how it was configured." Id. at 156:4-5. Because computers are also capable of containing a vast amount of information and "a computer is a huge area to search," Killian asked Defendant where on the computer the poems were located. Id. at vol. 2, 20:2. Defendant told Killian that the poems were located on the "D: Drive," in the "My Files" directory, "Creative Writing" folder. Id. at 19-20; see Gov't Ex. B-6. Defendant also stated that he used the computer for business purposes. Sanzi told Defendant that RISP would have to physically seize his computer. Both Killian and Sanzi testified that Defendant did not object to the seizure. Killian further testified that he did not attempt to examine the computer on scene, but simply unplugged it and removed it from the residence.

On April 15, 2002, Sanzi contacted IRS Special Agent Robert Ferraro ("Ferraro") for assistance in retrieving the poems from Defendant's computer. As both Ferraro and Donahue testified, at the time it was common for the IRS to lend its computer forensics capabilities to local law enforcement. Likewise, Killian testified that RISP did not have the forensic capabilities in April 2002, to properly examine Defendant's computer and that it was common practice for RISP to request assistance from federal authorities in retrieving digital evidence. In addition to his request for assistance, Sanzi also informed Ferraro about the details of the RISP

investigation. See Gov't Ex. C-12. This information included Defendant's statements to RISP

that he did not pay state or federal taxes, as well as information concerning Defendant's

computer business and the aliases that he used to conduct it. RISP subsequently provided

Ferraro with, inter alia, copies of cancelled checks and the Fleet Bank account statement, all in

the name of Joseph Adams. Soon thereafter, and based on the information from RISP, Ferraro

initiated a tax-related investigation of Defendant. Ferraro also contacted Donahue, an IRS

computer specialist, and informed him of what he had learned from the RISP.

On April 16, 2002, Ferraro and Donahue went to the RISP Barracks in Scituate, Rhode

Island to assist RISP in preserving and accessing the poems located in the "Creative Writing"

folder. Donahue, like Killian, testified that Defendant's computer was highly sophisticated.

According to Donahue, Defendant's computer contained four physical hard drives, three of

which were configured in what is known as a RAID system.[7] In order to preserve the digital

evidence, Donahue attempted to create an "image," or exact replica of Defendant's hard drive.[8]

_____

[7] RAID is an acronym for "redundant array of inexpensive disks," which allows a user to
"configure several independent physical disk[] [drives] to appear to the operating system as one
large volume or drive." Hr'g Tr. vol. 2, 87:4-11. Donahue testified that the four hard drives in
Defendant's computer had a combined total of 330 gigabytes of memory. Id. at 86:22-24. One
gigabyte is the equivalent of 500,000 typewritten pages. See MANUAL FOR COMPLEX LITIGATION
FOURTH § 11.446 at 77 (Federal Judicial Center 2004). Defendant's computer therefore could
theoretically hold 165,000,000 typewritten pages. According to Donahue, a personal computer
would normally have only one hard drive. Consequently, the number of drives and the amount of
memory in Defendant's computer contributed to Donahue's conclusion that he was dealing with
a highly sophisticated computer.

[8] Creating an image, or a copy of an entire hard drive, is different from making an
electronic copy of individual files. See SEARCHING AND SEIZING COMPUTERS AND OBTAINING
ELECTRONIC EVIDENCE IN CRIMINAL INVESTIGATIONS, United States Department of Justice at n.6
(2d ed. 2002), available at http://www.cybercrime.gov/s&smanual2002.htm ("DOJ Manual"). A
normal file-by-file copy (also known as a "logical copy") duplicates only the identified files, but
an image duplicates every bit and byte on the hard drive (allowing a computer forensics analyst

Donahue testified, however, that because of the configuration and size of Defendant's hard drive, he was unable to make an image of the computer at the RISP barracks. Donahue asked RISP if he could take the computer back to his office in Boston where he had better resources available to preserve and access the digital evidence. RISP agreed.

Over the period of April 25-29, 2002, Donahue made a "logical copy" of the hard drive on Defendant's computer, copying approximately 300,000 files. See Hr'g Tr. vol. 2, 115:18-20. In attempting to access and copy the file folder "Creative Writing," Donahue noticed another folder labeled "Offshore." Both folders were located in the "My Files" directory. See Gov't Ex. D-1. In addition to "Creative Writing" and "Offshore," the "My Files" directory listed numerous other file folders, including some labeled "Ebay," "Important Docs," "Import-Export," "Orders," and "Local Real Estate." Id.

At the time of the search, Donahue was aware of the potential tax-related information the RISP investigation had uncovered, including information that Defendant: (1) was in possession of a large amount of cash; (2) stated that he did not pay state or federal taxes; and (3) admitted to selling a large amount of computer equipment online. See e.g. Hr'g Tr. vol. 2, 95:3-19. According to Donahue, the file folder labeled "Offshore" indicated to him that Defendant "was interested in off-shore activities or the possibility of getting funds off-shore." Id. at 96:19-21. Donahue testified that he based this opinion on his years of experience as an IRS agent and on the information he had received about Defendant from Ferraro and RISP. Consequently,

---

to see an exact copy of the original, including deleted data). See Orin S. Kerr, Searches and Seizures in a Digital World, 119 HARV. L. REV. 531, 540-41 (2005); see also Hr'g Tr. vol. 2, 84:4-17.

Donahue proceeded to open and view the contents of the "Offshore" folder.[9]

According to Donahue, when he opened the "Offshore" folder he viewed numerous files relating to banking, conspiracy, and references to countries known as tax havens. See Gov't Ex. D-1 at 2. This information included, inter alia, files labeled "Banking," "Conspiracy," "Cuba," "Escape," "Grenada," "Havens," "Passports & ID's," "Panama," and "Switzerland." Id. Donahue also testified that the "Offshore" folder contained a file labeled "Money Laundering." According to Donahue, the files in the "Offshore" folder "jumped out [at him] as potential evidence of a tax case." Hr'g Tr. vol. 2, 103:6-7. After viewing the names of the files within the "Offshore" folder, Donahue terminated his search and did not open any additional folders or files. Donahue did, however, copy the contents of the "Creative Writing" folder onto a CD and sent it to the RISP.

On or about April 25, 2002, Donahue contacted Ferraro and informed him of the contents of the "Offshore" folder. According to Donahue, he told Ferraro that the IRS "may want to consider getting a search warrant." Id. at 103:2-3. Donahue testified that although he knew that Defendant had consented to a search of his computer for poems, he thought that at this point it "was more prudent to get a search warrant." Id. at 103:16-21. On April 30, 2002, Ferraro obtained a search warrant for Defendant's computer to search for all evidence of tax violations

---

[9] Donahue examined Defendant's computer in a DOS command line environment. See Gov't Ex. D-1 at 3. Donahue did not see the contents of Defendant's computer in the way a typical computer user would. In order to open and view the contents of the "Offshore" folder Donahue had to first type DIR at the "My Files" prompt. Id. This listed the contents of the "My Files" directory. Donahue then typed "CD Offshore" to change directories, and typed DIR once again to view the contents of the "Offshore" folder. Gov't Ex. D-1 at 6. Donahue testified that these actions are the functional equivalent of what a typical computer user would see if he clicked on the folder with a mouse. See Hr'g Tr. vol. 2, 99-102; Gov't Ex. D-1 at 1-2.

under 26 U.S.C. §§ 7201 and 7203.[10]  In preparing the affidavit in support of the search warrant application, Ferraro included, inter alia, the following information: (1) the approximately $147,000 in cash found in Defendant's room; (2) Defendant's statements that he never paid federal or state taxes; (3) the statement that Defendant used the name "Joseph Adams" as a business alias; (4) a bank statement indicating Defendant had over $1 million on account in the name of Joseph Adams; (5) Defendant's admission that he used his computer for business, including transactions over the internet on "Ebay;" (6) results from his investigation indicating that Defendant had failed to file a federal income tax return since at least 1996; and, finally, (7) the information discovered by Donahue, including the file folder names "Offshore," "Cuba," "Europe," "Crenada [sic]," "Belize," "Switzerland," "Citize [sic]," and "moneylaundering" [sic]. See Gov't Ex. C-3 and C-4. Although Ferraro was unable to recall exactly when he began preparing the affidavit, he testified that it was sometime between April 17-29, 2002.

## 2. **Scope of Consent**

The government argues that Defendant's consent to the search of his computer was unlimited. According to the government, the seizure of the computer was authorized by Defendant's consent for RISP to "take any letters, papers, or other property from [his] premises." Gov't Ex. A-23. This agreement, by its own terms, however, did not permit RISP to open the files contained in the computer.  Defendant told RISP that his computer contained the poems he had written for Complainant. Defendant specifically told RISP where on his computer the poems

---

[10] Ferraro subsequently realized that he made an error in transcribing the serial number from Defendant's computer onto the search warrant application. See Gov't Ex. C-3 at 1 (serial number J89DQ01). The correct serial number was J98DQ01. Gov't Ex. C-4. After correcting the mistake, a second search warrant was issued on May 2, 2002.

were located and indicated his assent for RISP to retrieve those poems. According to both Sanzi

and Killian, Defendant did not object when Killian unplugged and removed the computer from

the residence.[11] Although the government concedes that Defendant "advised" the RISP that the

poems were located on the "D: Drive," in the "My Files" directory, "Creative Writing" folder,

the government contends that this direction from Defendant was not a limitation of Defendant's

consent to the search of his computer. Gov't Resp. to Def.'s Mot. to Suppress Evidence at 38.

Instead, the government argues that Defendant "was simply assisting the RISP as to where they

could expeditiously find the poems." Id. The Court finds the government's argument

unpersuasive.

As the Court has already noted, the scope of a defendant's consent to search is limited by

the breadth of the consent itself. See Marshall, 348 F.3d at 286-87. "The standard for measuring

the scope of a suspect's consent under the Fourth Amendment is that of 'objective'

reasonableness – what would the typical reasonable person have understood by the exchange

between the officer and the suspect?" Jimeno, 500 U.S. at 251 (citations omitted). Courts must

examine the totality of the circumstances in determining the scope of consent. See Turner, 169

F.3d at 87 (recognizing that a court must "look beyond the language of the consent itself, to the

overall context, which necessarily encompasses contemporaneous police statements and

---

[11] As Defendant points out, despite being told with great specificity where on the computer the poems were located, RISP simply seized the entire computer for future analysis. This is frequently the case with computers; the normal sequence of "search" and then selective "seizure" is turned on its head. Because of the difficulties of conducting an on-site search of computers, the government increasingly seeks (and, as here, obtains) authority to seize computers without any prior review of their contents. See United States v. Hunter, 13 F. Supp. 2d 574, 583 (D. Vt. 1998) ("Often it is simply impractical to search a computer at the search site because of the time and expertise required to unlock all sources of information."); see also Hr'g Tr. vol. 1, 157:4-7.

actions").

In the instant case, RISP made repeated reference to their interest in seeing the poems that Defendant had generated on his computer and left on Complainant's car. Sanzi testified that he told Defendant, immediately following his arrest, that RISP wanted to see "how these poems were created." Hr'g Tr. vol. 1, 68:17-18. During the search of Defendant's room, Sanzi testified that Defendant indicated that the poems were created on his computer and "that some of them were . . . in his files." Id. at 74:9-10. When Sanzi "told [Defendant] that [RISP] were going to want to look at that, to retrieve that information," Defendant stated that "he didn't have a problem with that." Id. at 74:10-14. After Killian asked Defendant where on the computer RISP could locate the poems, Defendant responded that they were on the "D: Drive," in the "My Files" directory, "Creative Writing" folder. Id. at vol. 2, 19-20. Killian then unplugged the computer and removed it from the residence.

Sanzi specifically told Defendant that RISP wanted to retrieve the poems that he had written to Complainant. See Marshall, 348 F.3d at 287 (finding that "[t]he scope of a warrantless, but consensual, search is generally defined by its expressed object") (emphasis added). Based on Sanzi's testimony, Defendant clearly gave his consent for RISP to retrieve the poems from his computer. At no time, however, did RISP express an interest in anything on Defendant's computer other than these poems. See United States v. Dichiarinte, 445 F.2d 126, 129 (7th Cir. 1971) ("Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search."). Furthermore, Killian went so far as to ask Defendant where on the computer RISP could find the incriminating poems. Cf. Turner, 169

-31-

F.3d at 87-88 (where detectives explained to the person whose consent was being sought that they just wanted to look for "any signs the suspect had been inside [the apartment]," and "any signs a suspect had left behind," the court concluded that a typical reasonable person would have construed these additional statements as expressly limiting the scope of the detectives' request); see 3 Wayne R. LaFave, Search and Seizure, § 8.1(c), at 620 (3d ed. 1996) ("When a purpose is included in the [officer's] request, then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose.").

In responding to Killian's request, Defendant expressly restricted the scope of his consent by informing RISP exactly where on his computer the poems could be located, i.e. on the "D: Drive," in the "My Files" directory, "Creative Writing" folder. See Jimeno, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); Marshall, 348 F.3d at 287 (noting that "a consenting party may limit the scope of his or her consent or withdraw it altogether"). In light of the conversations between RISP and Defendant, the Court finds that a reasonable person would conclude that the statement by Defendant that the poems were located on the "D: Drive," in the "My Files" directory, "Creative Writing" folder limited the scope of Defendant's consent to the search of his computer to that particular file folder. The question now becomes whether RISP and the IRS exceeded the scope of Defendant's consent when Donahue opened and viewed the contents of the "Offshore" folder. See Turner, 169 F.3d at 87 n.3 (noting that the burden is on the government to prove that the computer file search is within the scope of consent).

### 3. **Search of Defendant's Computer Files**

"The touchstone of the Fourth Amendment is reasonableness." Jimeno, 500 U.S. at 250

(citing Katz v. United States, 389 U.S. 347, 360 (1967)).  In order to assert a right under the

Fourth Amendment, Defendant must show that he had a legitimate expectation of privacy in the

place searched or the item seized.  See Smith v. Maryland, 442 U.S. 735, 740 (1979).  Defendant

can establish this expectation by demonstrating: (1) a subjective expectation of privacy, and (2)

an expectation that society judges as objectively reasonable.  See Id.; Rakas v. Illinois, 439 U.S.

128, 143 n.12 (1978).  Here, although Defendant consented to a search of one particular file

folder, Defendant maintains that he had a legitimate expectation of privacy in the other files on

his computer.

"Computers record and store a remarkable amount of information about what users write,

see, hear, and do." Kerr, supra, at 532.  Modern computers contain massive quantities of

information relating to all aspects of an individual's life, including business and personal

documents, financial records, address and phone lists, and email.  See Winick, supra, at 81; see

also Hunter, 13 F. Supp. 2d at 583 ("With their unparalleled ability to store and process

information, computers are increasingly relied upon by individuals in their work and personal

lives.").  "The variety of information commonly stored on a computer, and the enormous and

ever-expanding storage capacity of even simple home computers, justifies the highest expectation

of privacy." Winick, supra, at 81.

A computer can be analogized to a vast container, or warehouse, that stores thousands of

individual containers in the form of discrete files.  See Kerr, supra, at 533, 555.  Each individual

container, or discrete file, in this warehouse potentially contains personal or business information

entirely unrelated to that stored in the other containers.  This configuration raises the problem of

intermingled documents, i.e. incriminating information and non-incriminating information so

intermingled that a search for one type of information will often reveal a tremendous amount of

other unrelated information.  See United States v. Tamura, 694 F.2d 591, 595-96 (9th Cir. 1982).

Courts have acknowledged that computers often contain such "intermingled documents."  See

United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999) (citing Tamura, 694 F.2d at 595-

96).  Under the approach first articulated in Tamura, and explained in Carey:

> law enforcement must engage in the intermediate step of sorting
> various types of documents and then only search the ones specified
> in a warrant.  Where officers come across relevant documents so
> intermingled with irrelevant documents that they cannot feasibly be
> sorted at the site, the officers may seal or hold the documents pending
> approval by a magistrate of the conditions and limitations on a further
> search through the documents.  The magistrate should then require
> officers to specify in a warrant which type of files are sought.

172 F.3d at 1275 (internal citations omitted).  "[The] very quantity and variety of information [on

a computer] increases the likelihood that highly personal information, irrelevant to the subject of

the lawful investigation, will also be searched or seized."  Winick, supra, at 105.

Defendant's consent to a search of his computer was narrowly tailored; i.e. it was limited

to the "Creative Writing" file folder.  Defendant had no reason to believe, nor did RISP indicate,

that any additional file folders on Defendant's computer would be searched.  As even Killian

acknowledged, Defendant's computer contained a massive amount of information, the majority

of which was unrelated to the RISP stalking investigation.  See Hr'g Tr. vol. 2, 20:1-11.

Consequently, Defendant contends, and the Court agrees, that although he gave his consent to

RISP to search the "Creative Writing" folder, Defendant maintained a legitimate expectation of

privacy in the contents of the other file folders on his computer. See United States v. Gourde, 440 F.3d 1065, 1077 (9th Cir. 2006) (Kleinfeld, J., dissenting) (finding that "for most people, their computers are their most private spaces"); United States v. Adjani, 452 F.3d 1140, 1146 (9th Cir. 2006) (noting that "individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers"). The next question, therefore, is whether opening and viewing the "Offshore" folder by Donahue constituted a search or seizure.

As described supra, Donahue opened and viewed the contents of the folder labeled "Offshore" only after he had located the "Creative Writing" file folder on the "My Files" directory. See Hr'g Tr. vol. 2, 96:8-14. Donahue entered commands into Defendant's computer that caused the contents of the "Offshore" folder to visually appear on the screen. Id. at 99-102; see Gov't Ex. D-1 at 2. As this Court understands his testimony, Donahue's actions were the functional equivalent of a computer user viewing a picture of a file folder on the screen, clicking on the folder with a mouse, and viewing the contents. These actions undoubtedly constituted a search by a government agent. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 2.1(a) (4th ed. 2004) ("Under the traditional approach, the term 'search' is said to imply some exploratory investigation, or an invasion and quest, a looking for or seeking out."). Donahue testified that the label "Offshore" indicated to him that Defendant "was interested in off-shore activities or the possibility of getting funds off-shore." Hr'g Tr. vol. 2, 96:19-21. Donahue's suspicions were not confirmed, however, until he opened and viewed the contents of the "Offshore" folder, which contained files labeled, inter alia, "Banking," "Conspiracy," "Switzerland," and "Money Laundering." See Kerr, supra, at 551 (concluding that a search of computer files occurs "when information from or about the data is exposed to

-35-

possible human observation, such as when it appears on a screen"). It was at this point that Donahue terminated his search and concluded that the prudent course of action would be to obtain a warrant to search the rest of Defendant's computer files for evidence of tax violations.

The Court finds that by opening and viewing the contents of the "Offshore" folder, Donahue engaged in a search subject to the strictures of the Fourth Amendment. The remaining question, however, is whether Donahue's search of the "Offshore" folder was unreasonable within the meaning of the Fourth Amendment. See Jimeno, 500 U.S. at 250 ("The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."). The government does not deny that Donahue searched the "Offshore" folder without a warrant. The Court concludes, therefore, that given the narrow scope of Defendant's consent to search, Donahue's search of the "Offshore" folder exceeded Defendant's consent, and thus, any evidence derived from this search should be suppressed unless the government can offer some other exception to the warrant requirement. The government responds that Donahue was entitled to search the "Offshore" folder and seize its contents under the plain view exception to the warrant requirement.

**4. Plain View Doctrine**

The plain view doctrine "permits the seizure of items located in plain view if '(1) the seizing officer has a prior justification for being in a position to see the item in plain view and (2) the evidentiary value of the item is immediately apparent.'" Perrotta, 289 F.3d at 167 (quoting United States v. Owens, 167 F.3d 739, 746 (1st Cir. 1999)). "Evidentiary value is 'immediately apparent' if there are 'enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime.'" Id. (quoting United States v. Hamie, 165 F.3d 80, 83

(1st Cir. 1999).

According to the government, Donahue lawfully accessed the "My Files" directory on Defendant's computer in order to retrieve evidence of the poems related to the state stalking investigation - and, thus, he was legally in a position to see the "Offshore" folder in plain view. Up to this point in the analysis, the Court agrees with the government's position. The government next argues, however, that the file folder "Offshore" was clearly incriminating on its face and, therefore, its search and seizure was justified under the plain view doctrine. It is here that the Court parts company with the government's argument.

Applying the plain view doctrine in the context of computer files leads the Court into uncharted waters. The plain view doctrine is based on physical rules: what the officer can see, touch, and smell to determine whether an object or container is contraband or evidence of a crime. The fact that an officer can only look in places and containers large enough to contain the specific physical evidence sought necessarily limits the scope of warrantless searches. These physical rules do not easily fit the digital world; a computer forensic analyst can not rely on the physical characteristics of a computer file to determine what information the file contains. Nonetheless, analogizing a computer file to a closed container is a logical, if not entirely accurate, starting point for addressing the plain view doctrine's application to computer files.

A. Closed Containers

The basic premise of container cases is that "opening a container constitutes a search of its contents; if a person has a reasonable expectation of privacy in the contents of a container, opening the container and seeing the contents violates that reasonable expectation of privacy." Kerr, supra, at 550; see Horton v. California, 496 U.S. 128, 142 n.11 (recognizing that the seizure

-37-

of a container "does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant, or one of the well-delineated exceptions to the warrant requirement") (citations omitted).  In <u>Arkansas v. Sanders</u>, a case subsequently overruled on other grounds, <u>see</u> <u>California v. Acevedo</u>, 500 U.S. 565, 579 (1991), the Supreme Court stated in a footnote that:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.  Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant.

442 U.S. 753, 765 n.13 (1979) (citation omitted).

"Although a person generally has an expectation of privacy in items he places in a closed container, some containers so betray their contents as to abrogate any such expectation." <u>United States v. Meada</u>, 408 F.3d 14, 23 (1st Cir. 2005) (<u>citing</u> <u>United States v. Huffhines</u>, 967 F.2d 314, 319 (9th Cir. 1992)). "The contents of such containers are treated as being in plain view." <u>Id.</u> (citation omitted).  Thus, the government's argument runs, even if Defendant did not consent to a search of the "Offshore" folder, the search was reasonable under the Fourth Amendment if the "Offshore" label caused the contents of the file folder to be in "plain view" of Donahue.

In <u>Meada</u>, the First Circuit affirmed the district court's finding that the defendant did not have a reasonable expectation of privacy in the contents of a gun case because the case's "GUN GUARD" label clearly revealed its contents. 408 F.3d at 22.  After obtaining a restraining order against the defendant, the defendant's girlfriend asked police to accompany her to defendant's apartment, where she also resided, to recover her belongings. <u>Id.</u> at 17-18.  Defendant's

girlfriend told the police that the defendant kept firearms in the apartment.  Id.  Police ran a criminal history check on defendant and discovered that he had a criminal record and did not have a license to carry a firearm.  Id.  After police entered the apartment with the girlfriend, they observed in plain view a handgun and what the officer's recognized as an "ammunition can."  Id. at 18.  Inside the "ammunition can" were two grenades.  Upon entering the bedroom, police also saw a case labeled "GUN GUARD" standing upright against a wall.  Meada, 408 F.3d at 18. Officers opened the case and discovered three guns inside which they then seized.  Id.  The district court denied the defendant's motion to suppress the contents of the gun case, finding that the defendant "did not have a reasonable expectation of privacy in the contents of the gun case because the case's GUN GUARD label clearly revealed its contents.  It was specifically made to carry guns and was stamped accordingly."  Id. at 22 (internal quotation marks omitted).  On the other hand, the district court did suppress the grenades found in the ammunition can because "its outward appearance did not reveal that it contained grenades."  Id. at 19.

In concluding that the guns were seized pursuant to the plain view exception, the First Circuit found that, "the container at issue was readily identifiable as a gun case.  Particularly in light of the GUN GUARD label, the container's contents were unambiguous."  Id. at 23.  The First Circuit explained that "[w]hat justified the search of the gun case was that it reasonably appeared to contain a gun and that, as a convicted felon, [the defendant] was prohibited from possessing one."  Id. at 24.  As for the ammunition can, because the government did not appeal the suppression of the grenades, the First Circuit did not reach the issue of whether the search of the can would withstand constitutional scrutiny.

Unlike the gun case in Meada, the "Offshore" folder was not readily identifiable as

contraband or evidence of a crime. The "Offshore" folder itself was identical in size, shape, and color to literally thousands of other folders on Defendant's computer. The file folder here, therefore, is more akin to the nondescript metal can that the officers in Meada suspected of containing ammunition. The file folder has no distinctive configuration or outward appearance that immediately betrays its contents in the same way the distinctively shaped gun case did. Although the gun case was labeled GUN GUARD, it was the label and the distinctive shape of the gun case that readily identified the case as containing contraband. As the First Circuit stated, "the container's contents were unambiguous." Meada, 408 F.3d at 23. The same can not be said for the "Offshore" folder on Defendant's computer.

As Defendant points out, the word "offshore" on its face is not clearly incriminating.[12] It has many potential and innocuous meanings. In essence, Defendant contends that the "container" at issue here is really nothing more than a label and an ambiguous label at that. This argument finds some support in the case of United States v. Villarreal, 963 F.2d 770 (5th Cir. 1992). In Villarreal, two fifty-five gallon drums labeled "phosphoric acid" were searched without a warrant and were found to contain marijuana. Employees of a common carrier alerted customs agents to the drums because the employees "thought them too light to contain acid and noticed that they did not make sloshing noises when moved." Id. at 772. The government argued that the contents of the nondescript metal drums could be inferred from the label. Id. at 775-76. That is, "the defendants never had an expectation of privacy because the drums literally proclaimed their

---

[12] "Offshore" is defined as "off or away from the shore;" "at a distance from the shore, on or in a body of water;" and "in a foreign country." Webster's College Dictionary 940 (1992). Defendant also points out, for example, that there is a boating publication named "Offshore." Def.'s Supplemental Mem. at 22.

contents for all to see." Id. at 776.  The Fifth Circuit was not persuaded by this argument:

> The fact that the exterior of a container purports to reveal some
> information about its contents does not necessarily mean that its
> owner has no reasonable expectation that those contents will remain
> free from inspection by others.  Stated another way, a label on a
> container is not an invitation to search it.  If the government seeks to
> learn more than the label reveals by opening the container, it
> generally must obtain a search warrant.

Id. (citation omitted).  The Fifth Circuit did provide one caveat, however, noting that it did not

consider whether "an individual could have a reasonable expectation of privacy in a container

when he has plainly communicated its incriminating character to the public – if, for example, the

drums in this case were labeled as marijuana." Id. at n.3.  This concern is echoed by the

government in this case; the government analogizes the "Offshore" file folder to a closed, opaque

bag labeled marijuana. See Gov't Supplemental Mem. at 11.  Again, however, the Court

emphasizes the ambiguity of the word "offshore" in comparison with words like "marijuana," or

even GUN GUARD.  Donahue testified that the "Offshore" folder indicated to him that

Defendant "was interested in off-shore activities or the possibility of getting funds off-shore."

Hr'g Tr. vol. 2, 96:19-21.  Such activity in and of itself is not necessarily incriminating.  Unlike a

bag labeled "marijuana," or a gun case labeled GUN GUARD in the possession of a convicted

felon, a folder labeled "Offshore" is not immediately apparent as contraband or evidence of a

crime.

The government asserts, however, that given the information Donahue had at the time of

the search concerning Defendant's possible tax violations, as well as his experience and training

as an IRS agent, Donahue was able to reasonably infer that the contents of the "Offshore" folder

contained evidence of a crime. See United States v. Johnston, 784 F.2d 416, 420 (1st Cir. 1986)

-41-

(noting that experience and knowledge of the officers at the time of the search can be

considered). A similar argument was rejected by the Tenth Circuit in United States v. Donnes,

947 F.2d 1430 (10th Cir. 1991). In Donnes, officers searched a camera lens case that was found

inside a glove with a syringe. The camera lens case contained narcotics. The Tenth Circuit

found that "the plain view container exception [had] never been extended to a container as

ambiguous as a camera lens case." Id. at 1438. The Donnes Court further recognized that:

> the officer's experience and training could have led him to infer that
> the camera lens case contained narcotics in light of the fact that it was
> found inside the glove with a syringe. However, this inference does
> not alter the cardinal principal that searches conducted outside the
> judicial process, without prior approval by judge or magistrate, are
> per se unreasonable under the Fourth Amendment . . . .

Id. (internal quotation marks and citations omitted).

Likewise, in United States v. Bonitz, the Tenth Circuit declined to apply the plain view

exception to a hard plastic case, recognizing that the "hard plastic case did not reveal its contents

to the trial court even though it could perhaps have been identified as a gun case by a firearms

expert." 826 F.2d 954, 956 (10th Cir. 1987). Here, although Donahue may have suspected that

the "Offshore" folder might contain evidence of tax violations, the incriminating nature of its

contents was not immediately apparent. According to Donahue's own testimony, it was only

after he opened the "Offshore" folder and viewed its contents, that the files "jumped out [at him]

as potential evidence of a tax case." Hr'g Tr. vol. 2, 103:6-7. Notably, after Donahue opened the

"Offshore" folder he testified that he came to the conclusion that it "was more prudent to get a

search warrant" than to continue to open computer files. Id. at 103:16-21.

As his testimony makes apparent, at the time Donahue opened the "Offshore" folder he

had no reason to believe that the folder contained evidence related to the RISP stalking investigation. To the contrary, Donahue suspected that the folder contained evidence of tax violations. See e.g. Carey, 172 F.3d at 1274 (focusing on the searching officer's subjective intent when opening computer files). In Carey, a warrant was obtained to search the defendant's computer files for "names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances." 172 F.3d at 1270. During the search of the defendant's computers, police came across numerous files with sexually suggestive titles and the label "JPG." Id. After opening one of these files and discovering child pornography, police abandoned their search for evidence of drug transactions and viewed similarly labeled files for further evidence of child pornography. Id. at 1271.

Although the government argued that the files containing child pornography were in plain view, the Tenth Circuit found that police had exceeded the scope of the warrant and did not address the question of what constitutes "plain view" in the context of computer files. Id. at 1273. The Tenth Circuit did comment, however, that "[t]he government's argument [that] the files were in plain view [was] unavailing because it is the contents of the files and not the files themselves which were seized . . . . [The contents] were in closed files and thus not in plain view." Id. As for the scope of the search, the circuit court found that after opening the first file and seeing an image of child pornography, the searching officer knew that when he opened the subsequent files "he was not going to find items related to drug activity as specified in the warrant." Carey, 172 F.3d at 1274.

Similarly here, based on his testimony, Donahue knew that when he opened the "Offshore" folder he had gone beyond the area identified by Defendant as containing the poems

-43-

which were at the center of the RISP stalking investigation. When Donahue decided to open the "Offshore" folder, he effectively abandoned his search for evidence of stalking and expanded the scope of the computer search. Given Donahue's training and experience, as well the information he had available to him through the investigations of Ferraro and RISP, Donahue likely had probable cause to believe that the "Offshore" folder contained evidence of a crime. This is not a justifiable exception, however, in the words of the Tenth Circuit, to "the cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment . . . ." Donnes, 947 F.2d at 1438. Consequently, when Donahue saw the file folder labeled "Offshore" on Defendant's computer he should have terminated his search and applied for a warrant to search Defendant's computer for evidence of potential tax violations. The mere fact that the label "Offshore" was in plain view does not justify police opening the closed file to learn more. See Walter v. United States, 447 U.S. 649, 658-59 (1980) (finding that the descriptive labels on boxes of obscene films did not eliminate the reasonable expectation of privacy in the content of the films). Consequently, the government's argument that the contents of the "Offshore" folder were in plain view is unavailing.

## 5. **Independent Source Doctrine**

The government argues that even if the contents of the "Offshore" folder were not in plain view, the evidence subsequently obtained from Defendant's computer is admissible because the search was authorized by a valid warrant. The Court, however, is not persuaded. On May 2, 2002, the government obtained a warrant to search Defendant's computer for "[a]ny and all evidence of [tax] violations [pursuant to] 26 U.S.C. §§ 7201 and 7203." Gov't Ex. C-4. In

preparing the affidavit in support of the warrant, Ferraro included the information that Donahue

had obtained from his illegal search of the "Offshore" file folder on Defendant's computer. See

Gov't Ex. C-4. When faced with a warrant affidavit containing information obtained from an

illegal search, a court must address two questions: (1) "whether the affidavit contain[s] sufficient

facts to support probable cause when the offending facts [are] excised," and (2) whether the

decision to seek the warrant was "prompted by what the police observed during the prior search."

United States v. Dessesaure, 429 F.3d 359, 367-69 (1st Cir. 2005).

This analysis ensures that the evidence obtained through the warrant was "discovered by

means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. 431, 443

(1984). The "independent source doctrine" rests "upon the policy that, while the government

should not profit from its illegal activity, neither should it be placed in a worse position than it

would otherwise have occupied." Murray v. United States, 487 U.S. 533, 542 (1988). Here,

however, the Court is not convinced that the search of Defendant's computer pursuant to a

warrant was in fact a genuinely independent source of the tax-related information at issue. It

appears more likely than not that Ferraro's decision to seek the search warrant was prompted by

what Donahue saw when he revealed the contents of the "Offshore" folder.

The Court need only briefly address the issue of probable cause. "Probable cause exists

when 'the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion

the likelihood that an offense has been committed and that there is sound reason to believe that a

particular search will turn up evidence of it.'" Schaefer, 87 F.3d at 565 (quoting United States v.

Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988)). Even if the Court excises the tainted facts from

the affidavit, i.e. the file names "Cuba," "Europe," "Grenada," "Belize," "Switzerland," and

-45-

"Money Laundering," it is likely that there are still sufficient facts to support probable cause to search Defendant's computer for evidence of tax crimes. See Gov't Ex. C-4. The more difficult determination, however, is whether Ferraro's decision to seek the search warrant was prompted by the information discovered in the "Offshore" folder.

The specific question presented is whether Ferraro would have sought the warrant if he had not known, as a result of the illegal search, that Defendant's computer contained suspiciously labeled files, including for example, "Money Laundering" and "Conspiracy." The government argues that "[t]he facts gathered by the state police on April 12, 2002, and provided to the IRS beginning on April 15th, provided compelling proof that [D]efendant committed tax crimes, and that evidence of those tax crimes would be found on his computer – thus providing more than enough incentive to seek a warrant." Gov't Supplemental Mem. at 17. In essence, the government argues that even if Donahue had never viewed the contents of the "Offshore" folder, a warrant to search Defendant's computer surely would have eventually been obtained. Despite the government's post-search assurances, the Court finds that the record does not support this contention.

In making its factual determination as to Ferraro's intent, "the [Court] is not bound by after-the-fact assurances of [his] intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear implausible." Dessesaure, 429 F.3d at 369 (internal quotation marks and citations omitted). Both Ferraro and Donahue repeatedly testified that the purpose of the computer search by Donahue was to assist the RISP in their stalking investigation by locating the poems. On or about April 25, 2002, however, Donahue contacted Ferraro and informed him about the contents of the "Offshore" folder. According to

-46-

Donahue, the files in the "Offshore" folder "jumped out [at him] as potential evidence of a tax case." Hr'g Tr. vol. 2, 103:6-7. Donahue testified that he told Ferraro that they "may want to consider getting a search warrant." Id. at 103:2-3. Five days later, on April 30, 2002, Ferraro submitted his affidavit in support of a warrant to search Defendant's computer. Accordingly, it seems abundantly clear to the Court, based on this testimony, that Ferraro's decision to seek a warrant was prompted by the call from Donahue relaying what he had already found on Defendant's computer.

Ferraro did, however, testify that he was unable to recall the precise date when he began preparing the affidavit, but stated that it was likely sometime between April 17-29, 2002. Id. at 45:5-7. The implication of this testimony is that if Ferraro began preparing his affidavit before Donahue contacted him on or about April 25, 2002, then obviously, the contents of the "Offshore" folder could not have motivated Ferraro to obtain the warrant. There is nothing in the record, however, to substantiate this inference. Furthermore, the burden is on the government to show that Ferraro was not prompted by the illegal search of the "Offshore" file folder. This the government has failed to do. Accordingly, the Court finds that all tax-related evidence obtained from Defendant's computer was not wholly independent of the constitutional violation, i.e. the illegal search of the "Offshore" file folder, and should therefore be suppressed.

## V. **Conclusion**

For the foregoing reasons, Defendant's motion to suppress statements is DENIED, and

his motion to suppress evidence is DENIED in part and GRANTED in part.


SO ORDERED.


*Mary M. Lisi*

Mary M. Lisi
Chief United States District Judge
March  *13* , 2007